No. 23-4125

# In the United States Court of Appeals
## for the Tenth Circuit

ESTATE OF PATRICK HARMON SR.;
PATRICK HARMON II, as Personal Representative of the Estate of Patrick
Harmon Sr., and heir of Patrick Harmon Sr.;
TASHA SMITH, as heir of Patrick Harmon Sr.,
*PLAINTIFFS-APPELLANTS*,
v.
SALT LAKE CITY, a municipality; and
OFFICER CLINTON FOX, in his individual capacity,
*DEFENDANTS-APPELLEES.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
THE HONORABLE HOWARD C. NIELSON
CIVIL ACTION NO. 2:19-CV-00553-HCN

**JOINT APPENDIX – VOLUME I, PAGES 1 to 267**

LAURA L. ROVNER | NICHOLAS A. LUTZ | MIRIAM S. KERLER
UNIVERSITY OF DENVER STURM COLLEGE OF LAW | CIVIL RIGHTS CLINIC[1]
2255 EAST EVANS AVENUE, SUITE 335
DENVER, COLORADO 80208
(303) 871-6441

QUSAIR MOHAMEDBHAI
RATHOD MOHAMEDBHAI LLC | 2701 LAWRENCE STREET, SUITE 100
DENVER, COLORADO 80205 | (303) 578-4400

COREY D. RILEY
DEISS LAW PC | 10 WEST 100 SOUTH, SUITE 700
SALT LAKE CITY, UTAH 84101 | (801) 433-0226

*COUNSEL FOR PLAINTIFFS-APPELLANTS*

**ORAL ARGUMENT IS REQUESTED**

[1] MaKenna Zoglmann, Teagan Foti, and Casey Dinaro, Civil Rights Clinic second-year student attorneys, assisted substantially in this brief's preparation.

**1**

**TABLE OF CONTENTS**

**<u>VOLUME I</u>**

Docket Sheet …………………………………………………………………..6

Notice of Removal (Dkt. 2) …………………………………………………19

    Atch. 1 — Summonses and Complaint and Jury Demand (Dkt. 2-1) …....22

    Atch. 2 — Acceptance (Dkt. 2-2) …………………………………...67

    Atch. 3 — Civil Cover Sheet (Dkt. 2-3) ...……………………………..69

Motion to Dismiss (Dkt. 12) ...………………………………………………70

Appendix to Motion to Dismiss (Dkt. 13) ...……………………………...99

    Ex. A — Kris Smith Bodycam (Dkt. 13-1) ...……………………...101

    Ex. B — Clinton Fox Bodycam (Dkt. 13-2) ...…………………..…102

    Ex. C — Scott Robinson Bodycam (Dkt. 13-3) ...……………………103

    Ex. D — Combined Bodycam Video (Dkt. 13-4) ...……………….…104

Response to Motion to Dismiss (Dkt. 18) ...…………………………………105

Reply to Response to Motion to Dismiss (Dkt. 22) …………………………127

Order Granting Motion to Dismiss (Dkt. 29) ...………………………………144

Notice of Appeal as to Order on Motion to Dismiss (Dkt. 31) ...………………174

Order Granting Plaintiffs' Motion for Remand to State Court (Dkt. 34) ...……...176

Judgment in a Civil Case re Motion to Dismiss (Dkt. 35) ...……………….....177

Mandate Reversing Motion to Dismiss (Dkt. 40) ...…………………….…178

    Atch. 1 — Mandate Letter (Dkt. 40-1) ...………………………………194

Answer to Complaint (Dkt. 58) ...……………………………………………195

Motion for Summary Judgment (Dkt. 66) ...…………………………………219

Appendix to Motion for Summary Judgment (Dkt. 67) ...…………………………260

    Ex. 1 — Dockets (Dkt. 67-1) ...…………………………………………...…264


**VOLUME II**

    Ex. 2 — Dockets (Dkt. 67-2) ...………………………..………………........273

    Ex. 3 — Criminal Information & Docket (Dkt. 67-3) ………………........308

    Ex. 4 — Patrick Harmon Active Warrants (Dkt. 67-4) ...………………...321

    Ex. 5 — Deposition of Clinton Fox (Dkt. 67-5) ...………………………....328

    Ex. 6 — Declaration of Clinton Fox (Dkt. 67-6) ...………………………382

    Ex. 7 — Deposition of Kris Smith (Dkt. 67-7) ...………………………..…385

    Ex. 8 — Declaration of Kris Smith (Dkt. 67-8) ...………………….………415

    Ex. 9 — Kris Smith Body Camera (Dkt. 67-9) ...………………………..…417

    Ex. 10 — Scott Robinson Body Camera (Dkt. 67-10) ...…………………418

    Ex. 11 — Deposition of Scott Robinson (Dkt. 67-11) ...…………………419

    Ex. 12 — Clinton Fox Body Camera (Dkt. 67-12) ...………………………450

    Ex. 13 — Combined Body Camera (Dkt. 67-13) ...………………………451

    Ex. 14 — Clinton Fox Body Camera Still Photos (Dkt. 67-14) ...………..452

    Ex. 15 — Kris Smith Body Camera Still Photos (Dkt. 67-15) ...………...515


**VOLUME III**

    Ex. 16 — Scott Robinson Body Camera Still Photos (Dkt. 67-16) ...……571

    Ex. 17 — UPD OICI Report (Dkt. 67-17) ...………………………………..607

    Ex. 18 — Salt Lake County District Attorney Screening Letter (Dkt. 67-18) ………………. …………………………………………………............621

**3**

Ex. 19 — FBI Screening Letter (Dkt. 67-19) ...…………………………..639

Ex. 20 — Toxicology Report (Dkt. 67-20) ...…………………………….640

Response to Motion for Summary Judgment (Dkt. 79) ...……………………644

Response to Motion for Summary Judgment[1] (Dkt. 80), Part I ...……………....687

## **VOLUME IV**

Response to Motion for Summary Judgment (Dkt. 80), Part II …………….....792

## **VOLUME V**

Response to Motion for Summary Judgment (Dkt. 80), Part III ……………....872

Ex. 1 — Fox Deposition (Dkt. 80-1) ...…………………………………….1036

## **VOLUME VI**

Ex. 2 — Smith Video (Dkt. 80-2) ………………………………....…1095

Ex. 3 — Fox Video (Dkt. 80-3) ...…………………………………1096

Ex. 4 — Robinson Video (Dkt. 80-4) ...…………………………...…1097

Ex. 5 — Smith Deposition (Dkt. 80-5) ...…………………………….1098

Ex. 6 — Robinson Deposition (Dkt. 80-6) ...……………………………1142

---

[1] Plaintiffs-Appellants filed their response to the motion for summary judgment in the district court twice because of technical difficulties. *See* Dkts. 79-80. The second filed response to the motion for summary judgment, Dkt. 80, includes exhibits at the end of the motion, as well as exhibits filed separately as Dkts 80-1 to 80-12.

## **VOLUME VII**

Ex. 7 — UPD Investigation Report (Dkt. 80-7) ...………………………1178

Ex. 8 — Lab Analysis Report (Dkt. 80-8) ...……………………………1332

Ex. 9 — Castleview Knife Photo (Dkt. 80-9) ...………………………...1334

Ex. 10 — Fox Declaration (Dkt. 80-10) ...……………………………....1335

Ex. 11 — Fox Knife Photo (Dkt. 80-11) ...……………………………...1338

Ex. 12 — Sweeney Report (Dkt. 80-12) .………………………………1339

Reply in Support of Motion for Summary Judgment (Dkt. 90) ...………………1342

Appendix to Reply in Support of Motion of Summary Judgment (Dkt. 91) ......1398

Ex. 21 — Medical Examiner's Report (Dkt. 91-1) ...………………...…1401

Ex. 22 — Deposition of Patrick Harmon II (Dkt. 91-2) ...………………1406

## **VOLUME VIII**

Ex. 23 — Deposition of Tasha Smith (Dkt. 91-3) ...………………………1454

Ex. 24 — Plaintiffs' Discovery Responses (Dkt. 91-4) ...………………1490

Notice of Hearing on Motion for Summary Judgment (Dkt. 95) .....…………...1508

Minute Order for Hearing on Summary Judgment (Dkt. 100) ...…..…………1509

Order Granting Motion for Summary Judgment (Dkt. 104) ...…………….…...1511

Judgment in a Civil Case re Motion for Summary Judgment (Dkt. 105) ......…1533

Notice of Appeal on Grant of Summary Judgment (Dkt. 109) ...…….....……...1534

Transcript of Hearing on Motion for Summary Judgment (Dkt. 112) ...………1537

APPEAL,CLOSED,OPEN_MJ,REMAND

## US District Court Electronic Case Filing System
### District of Utah (Central)
### CIVIL DOCKET FOR CASE #: 2:19–cv–00553–HCN

| | |
|---|---|
| Harmon Sr, Patrick Estate of et al v. Salt Lake City et al | Date Filed: 08/02/2019 |
| Assigned to: Judge Howard C. Nielson, Jr | Date Terminated: 08/21/2023 |
| Case in other court: 3rd District, Salt Lake County, 190905238 | Jury Demand: Both |
| Tenth Circuit, 20–04085 | Nature of Suit: 440 Civil Rights: Other |
| Tenth Circuit, 23–04125 | Jurisdiction: Federal Question |
| Cause: 42:1983 Civil Rights Act | |

**Plaintiff**

| | | |
|---|---|---|
| **Harmon Sr, Patrick Estate of** | represented by | **Andrew G. Deiss** |
| | | DEISS LAW PC |
| | | 10 W 100 S STE 700 |
| | | SALT LAKE CITY, UT 84101 |
| | | 801–433–0226 |
| | | Email: deiss@deisslaw.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Qusair Mohamedbhai** |
| | | RATHOD MOHAMEDBHAI LLC |
| | | 2701 LAWRENCE ST STE 100 |
| | | DENVER, CO 80205 |
| | | (303)578–4400 |
| | | Email: qm@rmlawyers.com |
| | | *LEAD ATTORNEY* |
| | | *PRO HAC VICE* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Corey Drew Riley** |
| | | DEISS LAW PC |
| | | 10 W 100 S STE 700 |
| | | SALT LAKE CITY, UT 84101 |
| | | (801)433–0226 |
| | | Email: criley@deisslaw.com |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Nicholas A. Lutz** |
| | | UNIVERSITY OF DENVER |
| | | 2255 E EVANS AVE STE 335 |
| | | DENVER, CO 80210 |
| | | 303–871–6753 |
| | | Email: nlutz@law.du.edu |
| | | *TERMINATED: 08/07/2023* |

**Plaintiff**

| | | |
|---|---|---|
| **Patrick Harmon** | represented by | **Andrew G. Deiss** |
| *as Personal Representative of the Estate* | | (See above for address) |
| *of Patrick Harmon Sr., and heir of* | | *LEAD ATTORNEY* |
| *Patrick Harmon Sr.* | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Qusair Mohamedbhai** |
| | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *PRO HAC VICE* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Corey Drew Riley** |
| | | (See above for address) |

**6**

*ATTORNEY TO BE NOTICED*

**Nicholas A. Lutz**
(See above for address)
*TERMINATED: 08/07/2023*

**Plaintiff**

**Tasha Smith**
*as heir of Patrick Harmon Sr.*

represented by **Andrew G. Deiss**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Qusair Mohamedbhai**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Corey Drew Riley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas A. Lutz**
(See above for address)
*TERMINATED: 08/07/2023*

V.

**Defendant**

**Salt Lake City**
*a municipality*

represented by **Catherine L. Brabson**
SALT LAKE CITY ATTORNEYS
OFFICE
PO BOX 145478
451 S STATE ST STE 505
SALT LAKE CITY, UT 84114–5478
(801)535–7788
Email: Catherine.Brabson@slcgov.com
*TERMINATED: 12/17/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David F. Mull**
SALT LAKE CITY CORPORATION
PO BOX 145478
451 S STATE STE 505A
SALT LAKE CITY, UT 84114–5478
(801)535–7788
Email: david.mull@slcgov.com
*TERMINATED: 12/17/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katherine R. Nichols**
SALT LAKE CITY ATTORNEYS
OFFICE
PO BOX 145478
451 S STATE ST STE 505
SALT LAKE CITY, UT 84114–5478
801–535–7788
Fax: 801–535–7640
Email: katherine.nichols@slcgov.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark E. Kittrell**
SALT LAKE CITY ATTORNEYS
OFFICE
PO BOX 145478
SALT LAKE CITY, UT 84114–5478
(801)535–7788
Email: Mark.Kittrell@slcgov.com
*TERMINATED: 12/17/2021*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Clinton Fox**                    represented by    **Catherine L. Brabson**
*Officer, and in his individual capacity*                (See above for address)
*TERMINATED: 12/17/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David F. Mull**
(See above for address)
*TERMINATED: 12/17/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katherine R. Nichols**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark E. Kittrell**
(See above for address)
*TERMINATED: 12/17/2021*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/02/2019 | 1 | Case has been indexed and assigned to Magistrate Judge Paul M. Warner. Defendants Clinton Fox and Salt Lake City are directed to E–File the Notice of Removal  and cover sheet (found under Complaints and Other Initiating Documents) and pay the filing fee of $ 400.00 by the end of the business day. <span style="color:red">NOTE: The court will not have jurisdiction until the opening document is electronically filed and the filing fee paid in the CM/ECF system.</span> (tlh) (Entered: 08/02/2019) |
| 08/02/2019 | 2 | NOTICE OF REMOVAL from Third District Court, Salt Lake County, case number 190905238, (Filing fee $ 400, receipt number 1088–3339890) filed by Clinton Fox, Salt Lake City. (Attachments: # 1 Exhibit Summonses and Complaint and Jury Demand, # 2 Exhibit B – Acceptance, # 3 Civil Cover Sheet Civil Cover Sheet) Assigned to Magistrate Judge Paul M. Warner (Brabson, Catherine) (Entered: 08/02/2019) |
| 08/05/2019 | 3 | NOTICE OF ADR, e–mailed or mailed to Defendants Clinton Fox, Salt Lake City and Plaintiffs Patrick Harmon, Harmon Sr, Patrick Estate of, Tasha Smith. (tlh) (Entered: 08/05/2019) |
| 08/05/2019 | 4 | NOTICE – This case is assigned to a magistrate judge. To consent or request reassignment, use  the form on this link or use the included form for non–efilers and send it to consents@utd.uscourts.gov within 15 days or mail to the court with *Attention: Consent Clerk* on the envelope. Notice e–mailed or mailed to Defendants Clinton Fox, Salt Lake City, Plaintiffs Patrick Harmon, Harmon Sr, Patrick Estate of, Tasha Smith. Form due by 8/20/2019. (tlh) (Entered: 08/05/2019) |

**8**

| 08/05/2019 | 5 | ORDER TO PROPOSE SCHEDULE – Plaintiff must propose a schedule to defendant in the form of a draft Attorney Planning Meeting Report within the earlier of fourteen(14) days after any defendant has appeared or twenty−eight (28) days after any defendant has been served with the complaint. See order for additional instructions. Signed by Magistrate Judge Paul M. Warner on 8/5/2019. (nl) (Entered: 08/05/2019) |
|---|---|---|
| 08/06/2019 | 6 | File Received from 3rd District, Salt Lake County consisting of Docket and filings from state court. (Attachments: # 1 Complaint, # 2 Acceptance of Service SLC, # 3 Acceptance of Service C. Fox, # 4 State Notice of Removal) (nl) (Entered: 08/06/2019) |
| 08/19/2019 | 7 | RECEIVED Consent/Reassignment Form from Defendants Clinton Fox, Salt Lake City. (nl) (Entered: 08/19/2019) |
| 08/19/2019 | 8 | RECEIVED Consent/Reassignment Form from Plaintiffs Patrick Harmon, Harmon Sr, Patrick Estate of, Tasha Smith. (nl) (Entered: 08/19/2019) |
| 08/19/2019 | 9 | All Consent/Reassignment Forms have now been received. After review of all forms, Case Reassigned to District Judge per request of one or more party(s). Case randomly assigned to Judge Robert J. Shelby. Magistrate Judge Paul M. Warner no longer assigned to the case. (nl) (Entered: 08/19/2019) |
| 08/21/2019 | 10 | Stipulated MOTION for Extension of Time to File Answer re 6 File Received and Memorandum in Support filed by Defendants Clinton Fox, Salt Lake City. (Attachments: # 1 Text of Proposed Order Granting Extension of Time to File a Response to Plaintiffs' Complaint)(Brabson, Catherine) (Entered: 08/21/2019) |
| 08/22/2019 | 11 | ORDER granting 10 Stipulated Motion for Extension of Time to File a Response to Plaintiffs' Complaint: Defendants have up to and including **September 9, 2019** to file their responsive pleading. Signed by Judge Robert J. Shelby on 8/21/19. (dla) (Entered: 08/22/2019) |
| 09/09/2019 | 12 | MOTION to Dismiss and Memorandum in Support filed by Defendants Clinton Fox, Salt Lake City. (Brabson, Catherine) (Entered: 09/09/2019) |
| 09/09/2019 | 13 | APPENDIX to 12 MOTION to Dismiss and Memorandum in Support filed by Defendants Clinton Fox, Salt Lake City . (Attachments: # 1 Exhibit A – Kris Smith Bodycam, # 2 Exhibit B – Clinton Fox Bodycam, # 3 Exhibit C – Scott Robinson Bodycam, # 4 Exhibit D – Combined Bodycam Video, # 5 Exhibit E – Officer Smith Frame by Frame Excerpts, # 6 Exhibit F – Officer Fox Frame by Frame Excerpts, # 7 Exhibit G – Compilation Photos, # 8 Exhibit H – Officer Robinson Frame by Frame Excerpts, # 9 Exhibit I – Knife Scene Photos)(Brabson, Catherine) (Entered: 09/09/2019) |
| 09/09/2019 | 14 | NOTICE OF CONVENTIONAL FILING of Appendix of Exhibits to Defendants' Motion to Dismiss and Memorandum in Support [Dkt. 12] filed by Defendants Clinton Fox, Salt Lake City re 13 Appendix,, (Brabson, Catherine) (Entered: 09/09/2019) |
| 09/10/2019 | 15 | EXHIBITS A–I to 12 Defendants' Motion to Dismiss and Memorandum in Support and 13 Appendix of Exhibits. (Exhibits will be maintained by the records department in the Clerk's Office). (dla) (Entered: 09/10/2019) |
| 10/01/2019 | 16 | ORDER REFERRING CASE to Magistrate Judge Evelyn J. Furse under 28:636 (b)(1)(A), Magistrate to hear and determine all nondispositive pretrial matters. No attached document. Signed by Judge Robert J. Shelby on 10/1/2019. (mjm) (Entered: 10/01/2019) |
| 10/02/2019 | 17 | ORDER OF RECUSAL Magistrate Judge Evelyn J. Furse recused. Case reassigned to Magistrate Judge Cecilia M. Romero for all further proceedings. Signed by Magistrate Judge Evelyn J. Furse on 10/2/19. (dla) (Entered: 10/02/2019) |
| 10/07/2019 | 18 | Plaintiff's RESPONSE to Motion re 12 MOTION to Dismiss and Memorandum in Support filed by Plaintiffs Patrick Harmon, Harmon Sr, Patrick Estate of, Tasha Smith. (Riley, Corey) (Entered: 10/07/2019) |
| 10/11/2019 | 19 | Stipulated MOTION for Extension of Time to File Response/Reply as to 12 MOTION to Dismiss and Memorandum in Support and Memorandum in Support filed by Defendants Clinton Fox, Salt Lake City. (Attachments: # 1 Text of Proposed Order Granting Extension of Time to File Reply Memorandum in Support of Motion to |

**9**

| | | Dismiss) Motions referred to Cecilia M. Romero.(Brabson, Catherine) (Entered: 10/11/2019) |
|---|---|---|
| 10/15/2019 | 20 | ORDER granting 19 Stipulated Motion for Extension of Time to File Reply Memorandum in Support of Motion to Dismiss: Defendants shall be allowed up to and including **November 4, 2019** to file their reply memorandum in support of 12 Defendants' Motion to Dismiss. Signed by Magistrate Judge Cecilia M. Romero on 10/15/19. (dla) (Entered: 10/15/2019) |
| 10/29/2019 | 21 | **NOTICE OF HEARING ON MOTION** re: 12 MOTION to Dismiss and Memorandum in Support : (Notice generated by Mary Jane McNamee) Motion Hearing set for 2/6/2020 at 01:30 PM in Rm 3.100 before Judge Robert J. Shelby. (mjm) (Entered: 10/29/2019) |
| 11/04/2019 | 22 | REPLY to Response to Motion re 12 MOTION to Dismiss and Memorandum in Support filed by Defendants Clinton Fox, Salt Lake City. (Brabson, Catherine) (Entered: 11/04/2019) |
| 11/13/2019 | 23 | NOTICE of Appearance by David F. Mull on behalf of Clinton Fox, Salt Lake City (Mull, David) (Entered: 11/13/2019) |
| 12/23/2019 | 24 | MOTION for Admission Pro Hac Vice of Qusair Mohamedbhai , Registration fee $ 250, receipt number 1088–3447538, filed by Plaintiffs Patrick Harmon, Harmon Sr, Patrick Estate of, Tasha Smith. (Attachments: # 1 Text of Proposed Order granting Motion for Pro Hac Admission, # 2 Exhibit Pro Hac Application and ECF Form, # 3 Exhibit Certificate of Good Standing)(Deiss, Andrew) (Entered: 12/23/2019) |
| 12/23/2019 | 25 | ORDER granting 24 Motion for Admission Pro Hac Vice of Qusair Mohamedbhai for Patrick Harmon, Harmon Sr, Patrick Estate of, Tasha Smith. *Attorneys admitted Pro Hac Vice may download a copy of the District of Utahs local rules from the courts web site at http://www.utd.uscourts.gov* Signed by Judge Robert J. Shelby on 12/23/19. (dla) (Entered: 12/23/2019) |
| 01/15/2020 | 26 | MOTION for Admission Pro Hac Vice of Nicholas A. Lutz , Registration fee $ 250, receipt number 1088–3464224, filed by Plaintiffs Patrick Harmon, Harmon Sr, Patrick Estate of, Tasha Smith. (Attachments: # 1 Text of Proposed Order granting Motion for Pro Hac Admission of Nicholas A. Lutz, # 2 Exhibit 1 (Pro Hac Application, ECF Form), # 3 Exhibit 2 (Certificate of Good Standing))(Deiss, Andrew) (Entered: 01/15/2020) |
| 01/16/2020 | 27 | ORDER granting 26 Motion for Admission Pro Hac Vice of Nicholas A. Lutz for Patrick Harmon, Harmon Sr, Patrick Estate of, Tasha Smith. *Attorneys admitted Pro Hac Vice may download a copy of the District of Utahs local rules from the courts web site at http://www.utd.uscourts.gov* Signed by Judge Robert J. Shelby on 1/16/20. (dla) (Entered: 01/16/2020) |
| 02/06/2020 | 28 | Minute Entry for proceedings held before Judge Robert J. Shelby: Motion Hearing held on 2/6/2020 re : 12 MOTION to Dismiss and Memorandum in Support filed by Salt Lake City, Clinton Fox. The court hears oral argument and takes the matter under advisement. Attorney for Plaintiff: Nicholas Lutz, Corey Riley, Qusair Mohamedbhai, Andrew Deiss, Attorney for Defendant: Catherin Brabson, David Mull. Court Reporter: Ed Young.(mjm) (Entered: 02/10/2020) |
| 07/10/2020 | 29 | ORDER granting 12 Motion to Dismiss. Plaintiffs may file an amended complaint within 28 days should they wish to attempt to replead the claims dismissed without prejudice. If an amended complaint is not received within that time period, the court will close the case. Signed by Judge Robert J. Shelby on 7/10/2020.(chambers) (Entered: 07/10/2020) |
| 08/07/2020 | 30 | Plaintiff's MOTION to Remand to State Court Third District Court for Salt Lake County for the State of Utah and Memorandum in Support filed by Plaintiffs Patrick Harmon, Harmon Sr, Patrick Estate of, Tasha Smith. (Riley, Corey) (Entered: 08/07/2020) |
| 08/10/2020 | 31 | NOTICE OF APPEAL as to 29 Order on Motion to Dismiss, filed by Patrick Harmon, Harmon Sr, Patrick Estate of, Tasha Smith. Appeals to the USCA for the 10th Circuit. Filing fee $ 505, receipt number AUTDC–3678203. (Deiss, Andrew) (Entered: 08/10/2020) |

| 08/12/2020 | 32 | Transmission of Preliminary Record to USCA re 31 Notice of Appeal as to Tenth Circuit. (Attachments: # 1 Exhibit Preliminary Record) (dla) (Entered: 08/12/2020) |
|---|---|---|
| 08/12/2020 | 33 | USCA Case Number Case Appealed to Tenth Circuit Case Number 20–4085 for 31 Notice of Appeal filed by Tasha Smith, Harmon Sr, Patrick Estate of, Patrick Harmon. (jrj) (Entered: 08/12/2020) |
| 08/14/2020 | 34 | ORDER granting 30 Plaintiff's Motion to Remand to State Court: The court GRANTS the Motion and REMANDS Plaintiffs' state–law claims (Claims Four and Five) to the Utah Third District Court, Case No. 190905238. Signed by Judge Robert J. Shelby on 8/13/20. (dla) (Entered: 08/14/2020) |
| 08/14/2020 | 35 | JUDGMENT IN A CIVIL CASE: The court has granted Defendants' Motion to Dismiss. Accordingly, IT IS ORDERED AND ADJUDGED that judgment be entered in favor of Defendants Salt Lake City and Officer Clinton Fox and against Plaintiffs Estate of Patrick Harmon Sr., Patrick Harmon II, and Tasha Smith on Plaintiffs' First and Second Claims for Relief. Signed by Judge Robert J. Shelby on 8/14/20. (dla) (Entered: 08/14/2020) |
| 10/22/2020 | 36 | **RESTRICTED DOCUMENT** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion Hearing held on 2/6/20 before Judge Robert J. Shelby. Court Reporter/Transcriber Ed Young, Telephone number (801) 328–3202.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/12/2020. Redacted Transcript Deadline set for 11/23/2020. Release of Transcript Restriction set for 1/20/2021. (dla) Modified by removing restricted text on 1/20/2021 (nl). (Entered: 10/22/2020) |
| 10/23/2020 | 38 | Please be advised the Record is complete for purposes of appeal for USCA case number 20–04085 re 31 Notice of Appeal. (dla) (Entered: 10/23/2020) |
| 04/13/2021 | 39 | NOTICE OF TRANSMITTAL that case has been transferred to 3rd District Court, Salt Lake County via CM/ECF Remand letter, remand order, docket sheet sent given case number 190905238. (Attachments: # 1 Appendix) (dla) (Entered: 04/13/2021) |
| 04/13/2021 |  | Civil Case Terminated. Magistrate Judge Cecilia M. Romero no longer assigned to case per 34 Order. (dla) (Entered: 04/13/2021) |
| 11/10/2021 | 40 | MANDATE of USCA as to 31 Notice of Appeal filed by Tasha Smith, Harmon Sr, Patrick Estate of, Patrick Harmon According to the USCA the Mandate of the USDC for the Dist of UT is Reversed and Remanded. Judgment included with mandate: Yes. (Attachments: # 1 Exhibit Mandate Letter) (dla) (Entered: 12/07/2021) |
| 12/07/2021 | 41 | ORDER OF RECUSAL Judge Robert J. Shelby recused. Case reassigned to Judge Howard C. Nielson, Jr for all further proceedings. Signed by Judge Robert J. Shelby on 12/7/21. (dla) (Entered: 12/07/2021) |
| 12/14/2021 | 42 | DOCKET TEXT ORDER REFERRING CASE to Magistrate Judge Cecilia M. Romero under 28:636 (b)(1)(A), Magistrate to hear and determine all nondispositive pretrial matters. No attached document. Signed by Judge Howard C. Nielson, Jr on 12/14/2021. (kpf) (Entered: 12/14/2021) |
| 12/16/2021 | 44 | DOCKET TEXT ORDER TO COMPLY WITH 5 ORDER TO PROPOSE SCHEDULE. The parties are hereby ordered to meet and confer and submit an attorney planning meeting report and proposed scheduling order to the court within fourteen (14) days of the date of this order. No attached document. Signed by Magistrate Judge Cecilia M. Romero on 12/16/2021. (jfm) (Entered: 12/16/2021) |

| 12/17/2021 | 45 | SUBSTITUTION OF COUNSEL Katherine R. Nichols replacing David F. Mull; Catherine L. Brabson and Mark E. Kittrell as counsel on behalf of Clinton Fox, Salt Lake City. (Nichols, Katherine) (Entered: 12/17/2021) |
| --- | --- | --- |
| 12/30/2021 | 46 | Stipulated MOTION for Extension of Time Attorney Planning Meeting Report and Proposed Scheduling Order filed by Plaintiffs Patrick Harmon, Harmon Sr, Patrick Estate of, Tasha Smith. (Attachments: # 1 Text of Proposed Order) Motions referred to Cecilia M. Romero.(Riley, Corey) (Entered: 12/30/2021) |
| 01/03/2022 | 47 | ORDER granting 46 Stipulated Motion for Extension of Time to File Attorney Planning Meeting Report and Proposed Scheduling Order. Signed by Magistrate Judge Cecilia M. Romero on 1/3/22. (dla) (Entered: 01/03/2022) |
| 01/05/2022 | 48 | REPORT OF ATTORNEY PLANNING MEETING. (Riley, Corey) (Entered: 01/05/2022) |
| 01/06/2022 | 49 | DOCKET TEXT ORDER TO SUBMIT PROPOSED SCHEDULING ORDER. The court is in receipt of 48 Attorney Planning Meeting Report. As previously directed in paragraph 2(a) of the 5 Order to Propose Schedule, the parties are ordered to submit a proposed scheduling order in Microsoft Word format directly to chambers email at utdecf_romero@utd.uscourts.gov within three days from the date of this order. No attached document. Signed by Magistrate Judge Cecilia M. Romero on 1/6/2022. (jfm) (Entered: 01/06/2022) |
| 01/07/2022 | 50 | SCHEDULING ORDER: Amended Pleadings due by 3/8/2022. Joinder of Parties due by 3/8/2022. Expert Discovery due by 11/11/2022. Dispositive or Potentially Dispositive Motions due by 1/13/2023. Signed by Magistrate Judge Cecilia M. Romero on 1/6/22. (dla) (Entered: 01/07/2022) |
| 01/10/2022 | 51 | MOTION to Vacate 34 Order on Motion to Remand to State Court, and Memorandum in Support filed by Defendants Clinton Fox, Salt Lake City. (Nichols, Katherine) (Entered: 01/10/2022) |
| 01/21/2022 | 52 | Stipulated MOTION for Extension of Time to File Response/Reply as to 51 MOTION to Vacate 34 Order on Motion to Remand to State Court, and Memorandum in Support *[no Memorandum in Support included, system error]* filed by Plaintiff Patrick Harmon. (Attachments: # 1 Text of Proposed Order GRANTING STIPULATED MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO MOTION TO RECONSIDER ORDER OF REMAND) Motions referred to Cecilia M. Romero.(Deiss, Andrew) (Entered: 01/21/2022) |
| 01/24/2022 | 53 | ORDER granting 52 Stipulated Motion for Extension of Time to file response to Motion to Reconsider Order of Remand 51 . Signed by Magistrate Judge Cecilia M. Romero on 1/24/22. (dla) (Entered: 01/24/2022) |
| 02/04/2022 | 54 | Plaintiff's MEMORANDUM in Opposition re 51 MOTION to Vacate 34 Order on Motion to Remand to State Court, and Memorandum in Support filed by Plaintiffs Patrick Harmon, Harmon Sr, Patrick Estate of, Tasha Smith. (Attachments: # 1 Exhibit State Docket, # 2 Exhibit Mull Email, # 3 Exhibit First Motion to Stay, # 4 Exhibit Order Denying First Motion to Stay, # 5 Exhibit Second Motion to Dismiss, # 6 Exhibit Order Denying Second Motion to Dismiss, # 7 Exhibit Answer, # 8 Exhibit Second Motion to Stay)(Riley, Corey) (Entered: 02/04/2022) |
| 02/16/2022 | 55 | Stipulated MOTION for Extension of Time to File Response/Reply as to 51 MOTION to Vacate 34 Order on Motion to Remand to State Court, and Memorandum in Support filed by Defendants Clinton Fox, Salt Lake City. (Attachments: # 1 Text of Proposed Order) Motions referred to Cecilia M. Romero.(Nichols, Katherine) (Entered: 02/16/2022) |
| 02/16/2022 | 56 | ORDER granting 55 Stipulated Motion for Extension of Time for Defendants to file a Reply Memorandum in support of their Motion to Reconsider Order of Remand 51 . Signed by Magistrate Judge Cecilia M. Romero on 2/16/22. (dla) (Entered: 02/16/2022) |
| 03/02/2022 | 57 | REPLY to Response to Motion re 51 MOTION to Vacate 34 Order on Motion to Remand to State Court, and Memorandum in Support filed by Defendants Clinton Fox, Salt Lake City. (Attachments: # 1 Exhibit 1 – Minutes Status Conference)(Nichols, Katherine) (Entered: 03/02/2022) |

| 03/23/2022 | 58 | ANSWER to Complaint filed by Clinton Fox, Salt Lake City.(Nichols, Katherine) (Entered: 03/23/2022) |
|---|---|---|
| 04/12/2022 | 59 | **NOTICE OF HEARING ON MOTION** re: 51 MOTION to Vacate 34 Order on Motion to Remand to State Court, and Memorandum in Support : (Notice generated by HCN chambers). Motion Hearing set for 5/16/2022 at 02:00 PM in US District Court–SLCU before Judge Howard C. Nielson, Jr.<br><br>Hearing will be held via ZOOM. Link will be emailed to counsel. Members of the public or media who are interested in viewing this hearing may contact chambers at utdecf_nielson@utd.uscourts.gov (mlp) (Entered: 04/12/2022) |
| 05/16/2022 | 60 | Minute Order. Proceedings held before Judge Howard C. Nielson, Jr. Motion Hearing held on 5/16/2022 re 51 MOTION to Vacate 34 Order on Motion to Remand to State Court, and Memorandum in Support filed by Salt Lake City, Clinton Fox. All parties appearing via video conference. Court heard argument. For the reasons stated on the record, the motion is GRANTED. Docket Number 34 ORDER granting 30 Plaintiff's Motion to Remand to State Court is VACATED. The court will exercise supplemental jurisdiction over Plaintiffs' state law claims. As discussed at the hearing, counsel shall promptly submit a proposed order for the court's review. SO ORDERED.<br><br>Written Order to follow oral order: No.<br><br>Attorney for Plaintiff: Corey Riley, Attorney for Defendant: Katherine Nichols. Court Reporter: Teena Green. (Time Start: 2:00, Time End: 3:00, Room: zoom video.) (mlp) (Entered: 05/16/2022) |
| 05/20/2022 | 61 | ORDER granting 51 Motion to Reconsider Order of Remand: 1) Docket Number 51 , Motion to Vacate Remand Order is GRANTED. 2) Docket Number 34 , Order Granting Plaintiff's Motion to Remand to State Court is VACATED. 3) The Court will exercise supplemental jurisdiction over Plaintiffs state–law claims. Signed by Judge Howard C. Nielson, Jr on 5/18/22. (dla) (Entered: 05/20/2022) |
| 05/20/2022 | 62 | NOTICE OF TRANSMITTAL that Order of Remand has been **vacated**, case has been transferred **from** 3rd District Court, Salt Lake County via U.S. Mail Order Vacating Remand Letter, Order Vacating Remand, Docket sent given case number 190905238. (Attachments: # 1 Exhibit Order Vacating Remand, # 2 Exhibit Docket Sheet) (dla) (Entered: 05/20/2022) |
| 06/06/2022 | 63 | Stipulated MOTION for Amended Scheduling Order filed by Plaintiffs Patrick Harmon, Harmon Sr, Patrick Estate of, Tasha Smith. (Attachments: # 1 Text of Proposed Order) Motions referred to Cecilia M. Romero.(Deiss, Andrew) (Entered: 06/06/2022) |
| 06/08/2022 | 64 | ORDER granting 63 Stipulated Motion for Amended Scheduling Order: Expert Discovery due by 2/9/2023. Dispositive or Potentially Dispositive Motions due by 4/12/2023. Signed by Magistrate Judge Cecilia M. Romero on 6/7/22. (dla) (Entered: 06/08/2022) |
| 07/01/2022 | 65 | ACKNOWLEDGMENT OF RECEIPT of Order Vacating Order Remanding Case to State from 3rd District Court, State of Utah. (dla) (Entered: 07/20/2022) |
| 08/26/2022 | 66 | MOTION for Summary Judgment and Memorandum in Support filed by Defendants Clinton Fox, Salt Lake City. (Nichols, Katherine) (Entered: 08/26/2022) |
| 08/26/2022 | 67 | APPENDIX to 66 MOTION for Summary Judgment and Memorandum in Support filed by Defendants Clinton Fox, Salt Lake City . (Attachments: # 1 Exhibit 1 – Dockets, # 2 Exhibit 2 – Dockets, # 3 Exhibit 3 – Criminal Information & Docket, # 4 Exhibit 4 – Patrick Harmon Active Warrants, # 5 Exhibit 5 – Depo of Clinton Fox, # 6 Exhibit 6 – Declaration of Clinton Fox, # 7 Exhibit 7 – Depo of Kris Smith, # 8 Exhibit 8 – Declaration of Kris Smith, # 9 Exhibit 9 – Kris Smith Body Camera, # 10 Exhibit 10 – Scott Robinson Body Camera, # 11 Exhibit 11 – Depo of Scott Robinson, # 12 Exhibit 12 – Clinton Fox Body Camera, # 13 Exhibit 13 – Combined Body Camera, # 14 Exhibit 14 – Clinton Fox Body Camera Still Photos, # 15 Exhibit 15 – Kris Smith Body Camera Still Photos, # 16 Exhibit 16 – Scott Robinson Body Camera Still Photos, # 17 Exhibit 17 – UPD OICI Report, # 18 Exhibit 18 – Salt Lake County District Attorney Screening Letter, # 19 Exhibit 19 – FBI Screening Letter, # 20 |

| | | |
|---|---|---|
| | | Exhibit 20 – Toxicology Report)(Nichols, Katherine) (Entered: 08/26/2022) |
| 08/26/2022 | 68 | NOTICE OF CONVENTIONAL FILING of Exhibits filed by Defendants Clinton Fox, Salt Lake City re 67 Appendix,,,, (Nichols, Katherine) (Entered: 08/26/2022) |
| 08/26/2022 | 69 | NOTICE OF CONVENTIONAL FILING filed by Salt Lake City and Clinton Fox Exhibits re: 66 MOTION for Summary Judgment. Consisting of body camera footage, and audio/video files, which cannot be submitted electronically. The Disk was not entered on the docket and will retained in an envelope in the Clerk's Office while the case is active, and according to the retention schedule set forth by the Judicial Conference. (kpf) (Entered: 09/01/2022) |
| 09/07/2022 | 70 | Stipulated MOTION for Amended Scheduling Order filed by Plaintiffs Patrick Harmon, Harmon Sr, Patrick Estate of, Tasha Smith. (Attachments: # 1 Text of Proposed Order Proposed Amended Scheduling Order) Motions referred to Cecilia M. Romero.(Deiss, Andrew) (Entered: 09/07/2022) |
| 09/08/2022 | 71 | ORDER granting 70 Stipulated Motion to Amend Scheduling Order: Expert Discovery due by 3/27/2023. Dispositive or Potentially Dispositive Motions due by 5/28/2023. Signed by Magistrate Judge Cecilia M. Romero on 9/8/22. (dla) (Entered: 09/08/2022) |
| 09/09/2022 | 72 | MOTION for Short Form Discovery re: Stay Discovery Pending Resolution of Summary Judgment Motion filed by Defendants Clinton Fox, Salt Lake City. (Attachments: # 1 Text of Proposed Order) Motions referred to Cecilia M. Romero.(Nichols, Katherine) (Entered: 09/09/2022) |
| 09/16/2022 | 73 | Plaintiff's RESPONSE to Motion re 72 MOTION for Short Form Discovery re: Stay Discovery Pending Resolution of Summary Judgment Motion filed by Plaintiffs Patrick Harmon, Harmon Sr, Patrick Estate of, Tasha Smith. (Attachments: # 1 Exhibit A (Motion to Stay), # 2 Exhibit B (Motion to Dismiss), # 3 Exhibit C (Motion to Stay), # 4 Text of Proposed Order Denying Defendants Short–Form Discovery Motion to Stay Discovery Pending Resolution of Summary Judgment Motion)(Riley, Corey) (Entered: 09/16/2022) |
| 09/22/2022 | 74 | MOTION for Extension of Time to File Response/Reply *to Defendants' Motion for Summary Judgment* filed by Plaintiffs Patrick Harmon, Harmon Sr, Patrick Estate of, Tasha Smith. (Attachments: # 1 Text of Proposed Order Granting Extension of Time to Respond to Defendants' Motion for Summary Judgment) Motions referred to Cecilia M. Romero.(Riley, Corey) (Entered: 09/22/2022) |
| 09/23/2022 | 75 | ORDER granting 74 Plaintiffs' Unopposed Motion for Extension of Time 74 to respond to Defendants' Motion for Summary Judgment 66 , Response due by 10/14/2022. Signed by Magistrate Judge Cecilia M. Romero on 9/23/22. (dla) (Entered: 09/23/2022) |
| 10/13/2022 | 76 | MOTION for Extension of Time FOR PLAINTIFFS TO RESPOND TO DEFENDANTS MOTION FOR SUMMARY JUDGEMENT filed by Plaintiff Patrick Harmon. Motions referred to Cecilia M. Romero.(Deiss, Andrew) Modified by correcting event type on 10/14/2022 (dla). (Entered: 10/13/2022) |
| 10/14/2022 | 77 | ORDER granting 76 Plaintiffs' Unopposed Motion for Extension of Time to Respond to Defendants' Motion for Summary Judgment. Response due by 10/27/2022. Signed by Magistrate Judge Cecilia M. Romero on 10/14/22. (dla) (Entered: 10/14/2022) |
| 10/25/2022 | 78 | WITHDRAWAL OF MOTION by Defendants Clinton Fox, Salt Lake City re 72 MOTION for Short Form Discovery re: Stay Discovery Pending Resolution of Summary Judgment Motion filed by Salt Lake City, Clinton Fox . (Nichols, Katherine) (Entered: 10/25/2022) |
| 10/27/2022 | 79 | RESPONSE to Motion re 66 MOTION for Summary Judgment and Memorandum in Support filed by Plaintiffs Patrick Harmon, Harmon Sr, Patrick Estate of, Tasha Smith. (Lutz, Nicholas) (Entered: 10/28/2022) |
| 10/28/2022 | 80 | EXHIBITS filed by Patrick Harmon, Harmon Sr, Patrick Estate of, Tasha Smith re 79 Response to Motion. (Attachments: # 1 Exhibit Fox Deposition, # 2 Exhibit Smith Video, # 3 Exhibit Fox Video, # 4 Exhibit Robinson Video, # 5 Exhibit Smith Deposition, # 6 Exhibit Robinson Deposition, # 7 Exhibit UPD Investigation Report, # 8 Exhibit Lab Analysis Report, # 9 Exhibit Castleview Knife Photo, # 10 Exhibit Fox |

**14**

|  |  | Declaration, # <u>11</u> Exhibit Fox Knife Photo, # <u>12</u> Exhibit Sweeney Report)(Lutz, Nicholas) (Entered: 10/28/2022) |
|---|---|---|
| 10/28/2022 | <u>81</u> | NOTICE OF CONVENTIONAL FILING of Exhibits 2, 3, 4 filed by Plaintiffs Patrick Harmon, Harmon Sr, Patrick Estate of, Tasha Smith re <u>80</u> Exhibits,, <u>79</u> Response to Motion (Lutz, Nicholas) (Entered: 10/28/2022) |
| 10/31/2022 | <u>82</u> | EXHIBITS 2, 3, and 4 re <u>79</u> Response to Motion, <u>80</u> Exhibits, <u>81</u> Notice of Conventional Filing filed by Patrick Harmon, Harmon Sr, Patrick Estate of, Tasha Smith. (Note: The exhibits were filed with the clerk on a USB flash drive. Exhibits were not entered on the docket due to file type (video) and will be retained in a case folder in the Clerk's Office while case is active, and according to the retention scheduled set forth by the Judicial Conference thereafter.) (jwt) Modified on 11/1/2022 correcting filing date to 10/31/2022 (jwt). (Entered: 11/01/2022) |
| 11/03/2022 | <u>83</u> | MOTION for Extension of Time to File Response/Reply as to <u>66</u> MOTION for Summary Judgment and Memorandum in Support filed by Defendants Clinton Fox, Salt Lake City. (Attachments: # <u>1</u> Text of Proposed Order) Motions referred to Cecilia M. Romero.(Nichols, Katherine) (Entered: 11/03/2022) |
| 11/04/2022 | <u>84</u> | ORDER granting <u>83</u> Motion for Extension of Time to File Response/Reply re <u>66</u> MOTION for Summary Judgment. Replies due by 12/1/2022. Signed by Magistrate Judge Cecilia M. Romero on 11/04/2022. (jl) (Entered: 11/04/2022) |
| 11/17/2022 | 85 | **NOTICE OF HEARING ON MOTION** re: <u>66</u> MOTION for Summary Judgment and Memorandum in Support : (Notice generated by HCN chambers). Motion Hearing set for 1/26/2023 at 10:30 AM in Rm 7.300 before Judge Howard C. Nielson, Jr. (mlp) (Entered: 11/17/2022) |
| 11/23/2022 | <u>86</u> | MOTION for Extension of Time to File Response/Reply as to <u>66</u> MOTION for Summary Judgment and Memorandum in Support filed by Defendants Clinton Fox, Salt Lake City. (Attachments: # <u>1</u> Text of Proposed Order) Motions referred to Cecilia M. Romero.(Nichols, Katherine) (Entered: 11/23/2022) |
| 11/28/2022 | <u>87</u> | ORDER granting <u>86</u> Motion for Extension of Time to File Response/Reply re <u>66</u> MOTION for Summary Judgment: Reply memo due by 12/9/2022. Signed by Magistrate Judge Cecilia M. Romero on 11/28/22 (alt) (Entered: 11/28/2022) |
| 12/07/2022 | <u>88</u> | Defendant's MOTION for Leave to File Excess Pages filed by Defendants Clinton Fox, Salt Lake City. (Attachments: # <u>1</u> Text of Proposed Order) Motions referred to Cecilia M. Romero.(Nichols, Katherine) (Entered: 12/07/2022) |
| 12/08/2022 | <u>89</u> | ORDER granting <u>88</u> Defendants Motion for Excess Pages regarding Defendants' Reply in support of their Motion for Summary Judgment: Defendants may file a Reply not exceeding fifty (50) pages in length. Signed by Magistrate Judge Cecilia M. Romero on 12/8/22. (dla) (Entered: 12/08/2022) |
| 12/09/2022 | <u>90</u> | REPLY to Response to Motion re <u>66</u> MOTION for Summary Judgment filed by Defendants Clinton Fox, Salt Lake City. (Nichols, Katherine) (Entered: 12/09/2022) |
| 12/09/2022 | <u>91</u> | APPENDIX to <u>90</u> Reply Memorandum/Reply to Response to Motion filed by Defendants Clinton Fox, Salt Lake City . (Attachments: # <u>1</u> Exhibit 21 – Medical Examiner Report, # <u>2</u> Exhibit 22 – Depo of Patrick Harmon, II, # <u>3</u> Exhibit 23 – Depo of Tasha Smith, # <u>4</u> Exhibit 24 – Plaintiffs' Discovery Responses)(Nichols, Katherine) (Entered: 12/09/2022) |
| 12/23/2022 | <u>92</u> | MOTION for Extension of Time Expert Disclosure Deadlines and Memorandum in Support filed by Plaintiffs Patrick Harmon, Harmon Sr, Patrick Estate of, Tasha Smith. Motions referred to Cecilia M. Romero.(Lutz, Nicholas) (Entered: 12/23/2022) |
| 12/27/2022 | <u>93</u> | ORDER granting <u>92</u> Motion for Extension of Time for Parties to Exchange Expert Disclosures. Signed by Magistrate Judge Cecilia M. Romero on 12/27/22 (alt) (Entered: 12/27/2022) |
| 12/27/2022 |  | **Reset Deadline per <u>93</u> Order:** Expert Discovery due by 4/24/2023 (alt) (Entered: 12/27/2022) |

| 01/23/2023 | 94 | DESIGNATION OF EXPERTS Adam Bercovici, Shamus Smith filed by Plaintiffs Patrick Harmon, Harmon Sr, Patrick Estate of, Tasha Smith.(Lutz, Nicholas) (Entered: 01/23/2023) |
| 01/25/2023 | 95 | **NOTICE OF HEARING ON MOTION** re: 66 MOTION for Summary Judgment : (Notice generated by HCN) Motion Hearing RESET for 2/15/2023 at 02:00 PM in Rm 7.300 before Judge Howard C. Nielson, Jr. (mlp) (Entered: 01/25/2023) |
| 02/02/2023 | 96 | MOTION for Extension of Time to File Short Form Discovery Motion filed by Defendants Clinton Fox, Salt Lake City. (Attachments: # 1 Text of Proposed Order) Motions referred to Cecilia M. Romero.(Nichols, Katherine) (Entered: 02/02/2023) |
| 02/03/2023 | 97 | ORDER granting 96 Unopposed Motion for Extension of Time to File Short–Form Discovery Motion: Defendants' deadline to file a short–form discovery motion is extended to and including **March 6, 2023.** Signed by Magistrate Judge Cecilia M. Romero on 2/3/23. (dle) (Entered: 02/03/2023) |
| 02/06/2023 | 98 | Stipulated MOTION for Extension of Time to Complete Discovery filed by Plaintiffs Patrick Harmon, Harmon Sr, Patrick Estate of, Tasha Smith. (Attachments: # 1 Text of Proposed Order Granting Extension of Time for Parties to Exchange Expert Disclosures) Motions referred to Cecilia M. Romero.(Riley, Corey) (Entered: 02/06/2023) |
| 02/07/2023 | 99 | ORDER granting 98 Motion for Extension of Time to Complete Discovery/Exchange Expert Disclosures. Signed by Magistrate Judge Cecilia M. Romero on 2/7/23 (alt) (Entered: 02/07/2023) |
| 02/07/2023 | | **Reset Deadline per 99 Order:** Expert Discovery due by 5/8/2023 (alt) (Entered: 02/07/2023) |
| 02/15/2023 | 100 | Minute Order. Proceedings held before Judge Howard C. Nielson, Jr. Motion Hearing held on 2/15/2023 re 66 MOTION for Summary Judgment filed by Salt Lake City, Clinton Fox. Court heard argument and took under advisement 66 Motion for Summary Judgment.<br><br>Attorney for Plaintiff: Nicholas Lutz, Corey Riley, Attorney for Defendant: Katherine Nichols. Court Reporter: Teena Green. (Time Start: 2:00, Time End: 3:15, Room 7.300.) (mlp) (Entered: 02/15/2023) |
| 02/21/2023 | 101 | Stipulated MOTION for Extension of Time to Complete Discovery and Memorandum in Support filed by Defendants Clinton Fox, Salt Lake City. (Attachments: # 1 Text of Proposed Order Granting [ECF 101] Stipulated Motion to Stay Expert Discovery Pending Resolution of Summary Judgment Motion) Motions referred to Cecilia M. Romero.(Nichols, Katherine) (Entered: 02/21/2023) |
| 02/22/2023 | 102 | ORDER granting 101 Stipulated Motion to Stay Expert Discovery Pending Resolution of Summary Judgment Motion. Signed by Magistrate Judge Cecilia M. Romero on 2/22/23. (dle) (Entered: 02/22/2023) |
| 08/04/2023 | 103 | NOTICE OF WITHDRAWAL OF COUNSEL of Nicholas A. Lutz filed by Nicholas A. Lutz on behalf of Patrick Harmon, Harmon Sr, Patrick Estate of, Tasha Smith (Lutz, Nicholas) (Entered: 08/04/2023) |
| 08/18/2023 | 104 | MEMORANDUM DECISION AND ORDER granting 66 Motion for Summary Judgment. Signed by Judge Howard C. Nielson, Jr., on 8/18/2023. (jtp) (Entered: 08/18/2023) |
| 08/21/2023 | 105 | JUDGMENT IN A CIVIL CASE: 1) That summary judgment is granted in favor of Defendants on Plaintiffs' remaining federal law claims. 2) That Plaintiffs' state law claims are remanded to the Utah Third District Court, Salt Lake County. Case Closed. Magistrate Judge Cecilia M. Romero no longer assigned to case. Signed by Judge Howard C. Nielson, Jr on 8/18/23. (dle) (Entered: 08/21/2023) |
| 08/21/2023 | 106 | NOTICE OF TRANSMITTAL that case has been transferred to 3rd District, Salt Lake County via U.S. Mail Remand Letter, Judgment Remanding Case, Docket Sheet sent given case number 190905238. (Attachments: # 1 Exhibit Judgment, # 2 Exhibit Docket Sheet) (dle) (Entered: 08/21/2023) |

| 08/31/2023 | 107 | BILL OF COSTS filed by Clinton Fox, Salt Lake City. (Attachments: # 1 Exhibit A (Invoices))(Nichols, Katherine) (Entered: 08/31/2023) |
|---|---|---|
| 08/31/2023 | 108 | Defendant's MEMORANDUM re 107 Bill of Costs *(Verified)* filed by Clinton Fox, Salt Lake City. (Attachments: # 1 Exhibit 1)(Nichols, Katherine) (Entered: 08/31/2023) |
| 09/15/2023 | 109 | NOTICE OF APPEAL filed by Patrick Harmon, Harmon Sr, Patrick Estate of, Tasha Smith. Appeals to the USCA for the 10th Circuit. Filing fee $ 505, receipt number AUTDC–4811621. (Deiss, Andrew) (Entered: 09/15/2023) |
| 09/15/2023 | 110 | Transmission of Preliminary Record to USCA re 109 Notice of Appeal as to Tenth Circuit. (Attachments: # 1 Appendix Preliminary Record) (dle) (Entered: 09/15/2023) |
| 09/18/2023 | 111 | Transmission of Corrected Preliminary Record to USCA re 109 Notice of Appeal as to Tenth Circuit. (dle) (Entered: 09/18/2023) |
| 09/22/2023 | 112 | **RESTRICTED DOCUMENT** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion Hearing held on 2/15/23 before Judge Howard C. Nielson, Jr. Court Reporter/Transcriber Teena Green, RPR, CRR, CBC, Telephone number (801) 910–4092.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/13/2023. Redacted Transcript Deadline set for 11/3/2023. Release of Transcript Restriction set for 12/21/2023. (dle) (Entered: 09/22/2023) |
| 09/22/2023 | 113 | Transcript Purchased by: Atty for Plaintiff Estate of Patrick Harmon, Corey Riley @ Diess Law re 112 transcript(s) of 2/15/23. (dle) (Entered: 09/22/2023) |
| 09/26/2023 | 114 | USCA Case Number Case Appealed to Tenth Circuit Case Number 23–4125 for 109 Notice of Appeal filed by Tasha Smith, Harmon Sr, Patrick Estate of, Patrick Harmon. (Entered: 09/26/2023) |
| 10/02/2023 | 121 | ACKNOWLEDGMENT OF RECEIPT of Order Remanding Case, from 3rd District, Salt Lake County. (dle) (Entered: 10/13/2023) |
| 10/10/2023 | 115 | TAXATION OF COSTS, signed by Tiffany Brown. (dle) (Entered: 10/10/2023) |
| 10/12/2023 | 116 | **RESTRICTED DOCUMENT** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion Hearing held on 5/16/22 before Judge Howard C. Nielson, Jr. Court Reporter/Transcriber Teena Green, RPR, CRR, CBC, Telephone number (801) 910–4092.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/2/2023. Redacted Transcript Deadline set for 11/27/2023. Release of Transcript Restriction set for 1/10/2024. (dle) (Entered: 10/12/2023) |

**17**

| 10/12/2023 | 117 | Transcript Purchased by: Atty for Plaintiff Estate of Patrick Harmon, _Nicholas A. Lutz re 116 transcript(s) of 5/16/22. (dle) (Entered: 10/12/2023) |
|---|---|---|
| 10/12/2023 | 118 | The court reporter has filed the Transcript Order Form re 109 Notice of Appeal. Transcript estimated completion date is Completed. (dle) (Entered: 10/12/2023) |
| 10/12/2023 | 119 | Plaintiff's MOTION to Stay re 115 Clerks Order and Memorandum in Support *[Unopposed]* filed by Plaintiffs Patrick Harmon, Harmon Sr, Patrick Estate of, Tasha Smith. (Deiss, Andrew) (Entered: 10/12/2023) |
| 10/13/2023 | 120 | **RESTRICTED DOCUMENT** NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion Hearing held on 5/16/22 before Judge Howard C. Nielson, Jr. Court Reporter/Transcriber Teena Green, RPR, CRR, CBC, Telephone number (801) 910–4092.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact <u>personal data identifiers</u> from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/3/2023. Redacted Transcript Deadline set for 11/27/2023. Release of Transcript Restriction set for 1/11/2024. (dle) (Entered: 10/13/2023) |
| 10/13/2023 | 122 | Please be advised the Record is complete for purposes of appeal for USCA case number 23–4125 re 109 Notice of Appeal. (dle) (Entered: 10/13/2023) |
| 10/20/2023 | 123 | DOCKET TEXT ORDER. 119 Plaintiff's Unopposed Motion to Stay Enforcement of Costs Award is GRANTED. 115 Taxation of Costs is STAYED pending resolution of Plaintiff's appeal. SO ORDERED. Signed by Judge Howard C. Nielson, Jr. on 10/20/2023. No attached document.(tpk) (Entered: 10/21/2023) |

**18**

Catherine L. Brabson (#6500)
Mark E. Kittrell (#9950)
SALT LAKE CITY CORPORATION
P.O. Box 145478
451 South State Street, Suite 505A
Salt Lake City, Utah 84114-5478
Telephone:  (801) 535-7788
Facsimile:  (801) 535-7640
Catherine.Brabson@slcgov.com
Mark.Kittrell@slcgov.com

*Attorneys for Defendants Salt Lake City and Officer Clinton Fox*

## IN THE UNITED STATES DISTRICT COURT
## STATE OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ESTATE OF PATRICK HARMON SR.; PATRICK HARMON II, as Personal Representative of the Estate of Patrick Harmon Sr., and heir of Patrick Harmon Sr., TASHA SMITH, as heir of Patrick Harmons, Sr., | **NOTICE OF REMOVAL** |
| Plaintiffs, | |
| vs. | |
| SALT LAKE CITY, a municipality; and OFFICER CLINTON FOX, in his individual capacity, | Case No. 2:19-cv-00553 |
| Defendants. | Judge Paul M. Warner |

Pursuant to 28 U.S.C. §§ 1441 and 1446, Defendants Salt Lake City and Officer Clinton

Fox (collectively, "Defendants") hereby give Notice of Removal of the civil action filed by the

Estate of Patrick Harmon Sr.; Patrick Harmon II, as Personal Representative of the Estate of

Patrick Harmon Sr., and heir of Patrick Harmon Sr., Tasha Smith, as heir of Patrick Harmon, Sr.,

**19**

(collectively "Plaintiffs") in the Third Judicial District Court, Case No. 190905238, Salt Lake County, State of Utah.

The grounds for removal are as follows:

1. On July 1, 2019, Plaintiffs commenced a civil action by filing a complaint in the Third Judicial District Court, Salt Lake County, State of Utah as Case No. 190905238. On July 12, 2019, Plaintiffs' counsel transmitted a copy of the summonses and the Complaint to Defendants' counsel with a request to accept service. *See* Summonses and Complaint, attached as Exhibit A.

2. Subsequently, on July 15, 2019, Defendants (through their counsel) accepted service of the summones and complaint. *See* Acceptance, attached as Exhibit B. Defendants have neither answered the Complaint nor filed any other responsive pleading.

3. Plaintiffs' Complaint contains causes of action against the Defendants for alleged violation of civil rights under 42 U.S.C. § 1983, and specifically, use of excessive force in violation of the Fourth Amendment of the United States Constitution. *See* Exhibit A at 31-37. As such, the United States District Court for the District of Utah, Central Division, has original jurisdiction over Plaintiff's civil action pursuant to 28 U.S.C. § 1331.

4. Additionally, removal of this action is timely. Fewer than thirty (30) days have elapsed since Defendants accepted service. *See* 28 U.S.C. § 1446(b).

5. Pursuant to 28 U.S.C. § 1446(a), a copy of all process, pleadings, and orders served upon Defendants in this action are attached as Exhibit A.

DATED this 2nd day of August, 2019.

/s/  Catherine L. Brabson
CATHERINE L. BRABSON
MARK E. KITTRELL
*Attorneys for Defendants Salt Lake City and*
*Officer Clinton Fox*

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of August, 2019, a true and correct copy of the **NOTICE OF REMOVAL** was electronically filed with the Clerk of the Court, which sent notice to:

Andrew G. Deiss
Corey D. Riley
Deiss Law PC
10 West 100 South, Suite 425
Salt Lake City, UT 84101
adeiss@deisslaw.com
criley@deisslaw.com

/s/  Lindsay A. Ross

**21**

Andrew G. Deiss (7184)
Corey D. Riley (16935)
Deiss Law PC
10 West 100 South, Suite 425
Salt Lake City, Utah 84101
(801) 433-0226
adeiss@deisslaw.com
criley@deisslaw.com

*Attorneys for Plaintiffs*

Qusair Mohamedbhai*
Siddhartha H. Rathod*
Matthew J. Cron*
Nicholas A. Lutz*
2701 Lawrence Street, Suite 100
Denver, Colorado 80205
(303) 578-4400 (p)
(303) 578-4401 (f)
qm@rmlawyers.com
sr@rmlawyers.com
mc@rmlawyers.com
nl@rmlawyers.com

*denotes counsel who will seek pro hac vice admission*

## IN THE THIRD JUDICIAL DISTRICT COURT

## FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| ESTATE OF PATRICK HARMON SR.; PATRICK HARMON II, as Personal Representative of the Estate of Patrick Harmon Sr., and heir of Patrick Harmon Sr., TASHA SMITH, as heir of Patrick Harmon Sr., <br><br> Plaintiff, <br><br> vs. <br><br> SALT LAKE CITY, a municipality; and OFFICER CLINTON FOX, in his individual capacity, <br><br> Defendants. | **SUMMONS** <br><br> Case No. 190905238 <br> Judge Barry Lawrence |

THE STATE OF UTAH TO DEFENDANT SALT LAKE CITY CORPORATION:

**22**

You are summoned and required to answer to the attached Complaint within 21 days after service of this summons, you must file your written, signed answer with the Clerk of the above entitled Court at 450 South State Street, Salt Lake City, Utah 84111.

Within that 21 days you must also mail or deliver a copy of your answer to Plaintiffs' counsel: Andrew G. Deiss, Deiss Law PC, 10 West 100 South, Suite 425, Salt Lake City, Utah 84101. If you fail to do so, judgment by default may be taken against you for the relief demanded in the Complaint. The Complaint is on file with the Court.

Dated: July 15, 2019                    DEISS LAW PC


                                        s/ Corey D. Riley
                                        Corey D. Riley
                                        Counsel for Plaintiffs

Andrew G. Deiss (7184)
Corey D. Riley (16935)
Deiss Law PC
10 West 100 South, Suite 425
Salt Lake City, Utah 84101
(801) 433-0226
adeiss@deisslaw.com
criley@deisslaw.com

*Attorneys for Plaintiffs*

Qusair Mohamedbhai*
Siddhartha H. Rathod*
Matthew J. Cron*
Nicholas A. Lutz*
2701 Lawrence Street, Suite 100
Denver, Colorado 80205
(303) 578-4400 (p)
(303) 578-4401 (f)
qm@rmlawyers.com
sr@rmlawyers.com
mc@rmlawyers.com
nl@rmlawyers.com

*denotes counsel who will seek pro hac vice admission*

## IN THE THIRD JUDICIAL DISTRICT COURT

## FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| ESTATE OF PATRICK HARMON SR.; PATRICK HARMON II, as Personal Representative of the Estate of Patrick Harmon Sr., and heir of Patrick Harmon Sr., TASHA SMITH, as heir of Patrick Harmon Sr., <br><br>         Plaintiff, <br><br> vs. <br><br> SALT LAKE CITY, a municipality; and OFFICER CLINTON FOX, in his individual capacity, <br><br>         Defendants. | **SUMMONS** <br><br> Case No. 190905238 <br> Judge Barry Lawrence |

THE STATE OF UTAH TO DEFENDANT CLINTON FOX:

You are summoned and required to answer to the attached Complaint within 21 days after service of this summons, you must file your written, signed answer with the Clerk of the above entitled Court at 450 South State Street, Salt Lake City, Utah 84111.

Within that 21 days you must also mail or deliver a copy of your answer to Plaintiffs' counsel: Andrew G. Deiss, Deiss Law PC, 10 West 100 South, Suite 425, Salt Lake City, Utah 84101. If you fail to do so, judgment by default may be taken against you for the relief demanded in the Complaint. The Complaint is on file with the Court.

Dated: July 1, 2019                          DEISS LAW PC


                                             s/ Corey D. Riley
                                             Corey D. Riley
                                             Counsel for Plaintiffs

Andrew G. Deiss (7184)
Corey D. Riley (16935)
Deiss Law PC
10 West 100 South, Suite 425
Salt Lake City, Utah 84101
(801) 433-0226
adeiss@deisslaw.com
criley@deisslaw.com

*Attorneys for Plaintiffs*

Qusair Mohamedbhai*
Siddhartha H. Rathod*
Matthew J. Cron*
Nicholas A. Lutz*
2701 Lawrence Street, Suite 100
Denver, Colorado 80205
(303) 578-4400 (p)
(303) 578-4401 (f)
qm@rmlawyers.com
sr@rmlawyers.com
mc@rmlawyers.com
nl@rmlawyers.com

*denotes counsel who will seek pro hac
vice admission*

## IN THE THIRD JUDICIAL DISTRICT COURT

## FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| ESTATE OF PATRICK HARMON SR.; PATRICK HARMON II, as Personal Representative of the Estate of Patrick Harmon Sr., and heir of Patrick Harmon Sr., TASHA SMITH, as heir of Patrick Harmon Sr., <br><br>          Plaintiff, <br><br> vs. <br><br> SALT LAKE CITY, a municipality; and OFFICER CLINTON FOX, in his individual capacity, <br><br>          Defendants. | **COMPLAINT AND JURY DEMAND** <br><br><br> Case No. <br><br><br> Judge |

Plaintiffs Estate of Patrick Harmon Sr., Patrick Harmon II, as personal representative of the Estate of Patrick Harmon Sr., and heir of Patrick Harmon Sr., and Tasha Smith, as heir of Patrick Harmon Sr., by and through undersigned counsel, allege as follows:

**26**

## I.   <u>INTRODUCTION</u>

This case involves an all-too-familiar narrative: an unarmed black man shot to death by law enforcement without justification.  On August 13, 2017, Patrick Harmon Sr. ("Mr. Harmon") was fatally shot by Salt Lake City Police Department ("SLCPD") Officer Clinton Fox.  SLCPD officers had initially detained Mr. Harmon for the minor infraction of riding a bicycle without a taillight, yet Mr. Harmon's encounter with the SLCPD left him dead.  Although Mr. Harmon attempted to flee from arrest, he posed no threat to the officers that would have justified deadly force.

Fellow SLCPD Officers Kris Smith and Scott Robinson were also present during the deadly encounter with Mr. Harmon.  When Mr. Harmon attempted to flee, only Officer Fox employed deadly force.  Officer Smith fired his Taser, while Officer Robinson did not even draw a weapon.  All three officers later claimed that Mr. Harmon, while fleeing, yelled words to the effect of "I'll stab you," and then lunged at the officers, knife in his hand.  The problem with this description of events is that all three officers wore body cameras.  From three different angles, there is no knife visible in Mr. Harmon's hands.  There are no words to the effect of "I'll stab you."  And there was no lunge; rather, Mr. Harmon was shot in the back and left side of his body as he moved away from the officers.

The homicide of Mr. Harmon is reflective of a city plagued by a racial policing crisis.  In a city that is just 2.7% black, SLCPD used force against black persons in

13.1% of all incidents.[1]  As such, black Salt Lake City residents are nearly five times more likely to be subjected to force by law enforcement.

Mr. Harmon did not lead a perfect life.  But, prior to his death, he had found renewed spirituality.  He had reunited with his son and daughter, Patrick and Tasha, who looked forward to rebuilding their relationship with their father.  Despite his mistakes, Mr. Harmon deserved the opportunity to grow with grace.

## II.    JURISDICTION

1.      This Court has jurisdiction over this action pursuant to UTAH CODE § 78A-5-102(1).  This Court has personal jurisdiction over Defendants pursuant to UTAH CODE § 78B-3-205.

2.      All of the events and omissions alleged herein occurred within Salt Lake County.  At the time of the events and omissions giving rise to this litigation, all of the defendants resided in Salt Lake County. The claims for relief relate to causes of action which substantially arose in Salt Lake County.  Venue therefore lies in this Court pursuant to UTAH CODE ANN. § 78B-3-307.

## III.    PARTIES

3.      The decedent, Patrick Harmon Sr., was a citizen of the United States of America and a resident of the State of Utah.

---

[1] *See* https://dotnet.slcgov.com/police/useofforce#/chartpresentation (data from between January 2017 and December 2018), attached as **Ex. 1**; http://worldpopulationreview.com/us-cities/salt-lake-city-population/ (2.7% African American/Black figure).  Mr. Harmon was killed in Salt Lake City's Council District 5.  The zip code area in which Mr. Harmon was killed is 3.63% African American/Black.
http://www.healthysaltlake.org/?module=demographicdata&controller=index&action=index&id=40141&sectionId=940.

4.      Plaintiff Patrick Harmon II ("Mr. Harmon II") is the personal representative of the Estate of Patrick Harmon Sr.  He is the son of Patrick Harmon Sr., and is a resident of the State of Colorado.

5.      Plaintiff Tasha Smith is the daughter of Patrick Harmon Sr.  She is a resident of the State of Missouri.

6.      Defendant Salt Lake City is a municipal corporation.  The Salt Lake City Police Department (SLCPD) is responsible for the oversight, supervision, and training of the officers in the SLCPD.  Salt Lake City was the employer of Defendant Officers and is a proper entity to be sued under 42 U.S.C. § 1983.

7.      At all times relevant to the subject matter of this litigation, Defendant Officer Clinton Fox ("Officer Fox" or "Defendant Fox") was a citizen of the United States and a resident of Utah and was acting under color of state law in his capacity as a law enforcement officer employed by Salt Lake City.

## IV.     FACTUAL BACKGROUND

### MR. HARMON'S LIFE AND THE LOSS TO HIS FAMILY



*Photos of Patrick Harmon Sr.*

8.     Mr. Harmon was born on ████████████, in St. Louis, Missouri.  He was

raised by a single mother, Belulah Mae Deliah.

9.      Mr. Harmon grew up with his sisters.

10.     Mr. Harmon moved to Salt Lake City as a young man and entered the job corps.  There he fell in love with young woman whom he had met at work.

11.     The young couple became pregnant with Patrick II and moved to Denver, Colorado to be closer to family.

12.     Unfortunately, Mr. Harmon had difficulty finding consistent employment in Denver and so he moved back to St. Louis to look for work.

13.     Patrick II remained in Denver where he was surrounded by a strong family support network.

14.     Unable to earn enough to bring his family to St. Louis and depressed by a lack of economic opportunity, Mr. Harmon entered a downward spiral that oppresses many persons of color.  A lack of employment opportunities led to desperate and ill-advised decisions and a criminal record, which led to even more decreased employment opportunities.

15.     Mr. Harmon found himself in and out of prison, losing touch with his extended family in the process.  However, Mr. Harmon kept in frequent contact with his children over the phone and made sure that they were being taken care of.

16.     In 2010, Mr. Harmon reconnected with his children.  Although it had been a while since they had last spoken with each other, Patrick II and Tasha had never ceased to miss him and their reunification was one of unadulterated joy.  Mr. Harmon was extremely proud that both of his children had grown up to lead productive and law-abiding lives.

17.     Although they regretted that they had grown up largely without a father, Patrick II and Tasha badly wanted Mr. Harmon in their lives.  Patrick II and Tasha had high hopes of rebuilding their familial bond with their father at the time of his death.

18.     The immense loss that they feel is not only the pain of losing a father but of losing the hope of what may have been.

## THE SHOOTING DEATH OF PATRICK HARMON

19.     On August 13, 2017, SLCPD Officer Kris Smith was on patrol in downtown Salt Lake City.

20.     Officer Smith observed Mr. Harmon riding a bicycle without a red tail light.

21.     Based on this alleged violation of a local traffic ordinance, Officer Smith stopped Mr. Harmon.

22.     According to Officer Smith, Mr. Harmon gave varying and inconsistent names when asked to identify himself.

23.     Mr. Harmon volunteered to Officer Smith that he likely had an outstanding warrant for a years' old prior incident.  At some point during this interaction, Officer Smith radioed for backup.

24.     Officer Smith returned to his patrol car to run a warrant check.  While Officer Smith did so, Mr. Harmon stood calmly and waited for Officer Smith to return.

25.     Soon thereafter, SLCPD officers Clinton Fox and Scott Robinson arrived on scene.

26.     Officer Smith was eventually able to verify the warrant that Mr. Harmon had reported, and exclaimed to Officer Fox, "Yes! Excellent.  We're going to go 82, 99,

7

Fox 2,"[2] indicating that Mr. Harmon should be taken into custody for an outstanding felony warrant.

27.     Officer Smith exited his patrol car and he and the other two officers approached Mr. Harmon.

28.     The officers told Mr. Harmon that he was going to be arrested and asked him to remove his backpack.  Mr. Harmon complied.

29.     Officer Smith told Mr. Harmon to place his hands behind his back.  Mr. Harmon complied, while begging the officers to let him go.

30.     Officers Smith and Robinson each took one of Mr. Harmon's arms to handcuff them behind his back.

31.     Mr. Harmon allowed Officers Smith and Robinson to place his hands behind his back.

---

[2] Code 10-82 indicates "Prisoner in custody."  *Utah State Public Service 10-Codes*, RADIO REFERENCE, last accessed August 8, 2018 (available at: http://wiki.radioreference.com/index.php/Utah_State_Public_Service_10-Codes).  Code 10-99 indicates "Wanted/Stolen Indicated."  *Id.*  "Fox 2" likely indicates a level 2 felony charge.



*View of Officer Fox. Mr. Harmon is pictured with a cigarette in his mouth. Officer Smith is pictured in the left of the frame behind Mr. Harmon's right shoulder. Officer Robinson is pictured in the center of the frame behind Mr. Harmon's left shoulder.*

32. While Officers Smith and Robinson stood behind Mr. Harmon and pulled his arms behind his back, Officer Fox Stood in front of and to the left of the others.

33. As Officers Smith and Robinson began to handcuff Mr. Harmon, Mr. Harmon pulled his arms away from the officers and strained to break free.



*View of Officer Fox.  Mr. Harmon is pictured in the center of the frame, with Officer Smith pictured in the left of the frame and Officer Robinson in the center of the frame.*

34.    While continuing to move away from Officers Smith and Robinson, Mr.

Harmon also moved toward his left, away from Officer Fox.

35.    Mr. Harmon continued to run forward, with his parked bicycle to his right

side, in between himself and Officer Fox.

36.    Officer Fox followed Mr. Harmon, proceeding around the back tire of the

bicycle.

37.    Mr. Harmon then turned back to his own left side and onto the nearby

sidewalk.

38.     Officer Fox followed closely behind as Mr. Harmon began moving down the sidewalk.

39.     Mr. Harmon ran in a southward direction down the sidewalk.

40.     Officer Robinson placed himself directly in Harmon's path and attempted to grab Mr. Harmon.

41.     While attempting to grab Mr. Harmon, Officer Robinson struck Mr. Harmon near his head and neck, knocking the cigarette out of Mr. Harmon's mouth.



*View of Officer Smith. Officer Robinson pictured in left of the frame trying to grab Mr. Harmon and knocking the cigarette out of Mr. Harmon's mouth causing sparks. Officer Fox pictured in bottom right of frame running toward Mr. Harmon with his left hand extended toward Mr. Harmon.*

42.     As Mr. Harmon pushed past Officer Robinson, Officer Fox began reaching for his gun with his right hand. Meanwhile, he reached toward Mr. Harmon with his left arm.



*View of Officer Smith.  Officer Fox is pictured drawing his firearm with his right hand as Mr. Harmon runs past him.*

43.     As Mr. Harmon ran past Officers Smith and Robinson, Officer Robinson fell backward to the ground.

44.     At this point, there is clearly nothing visible in either of Mr. Harmon's hands.





*View of Officer Robinson.  Mr. Harmon's hands appear empty.*

      45.    At this juncture, there appears no reason for Officer Fox to draw and

brandish his firearm.

      46.    Mr. Harmon continued running past the officers.  There is nothing visible in

Mr. Harmon's right hand.



*View of Officer Smith.  Mr. Harmon is pictured in the left of the frame running away from the officers.  His right hand is empty.  Officer Robinson is pictured in the middle right of the frame falling toward the ground.*

47.     Officer Fox ran after Mr. Harmon with his gun drawn.



*View of Officer Fox. Officer Fox's right hand is pictured holding his firearm in the middle right of the frame. Officer Robinson is in the upper right of the frame with his hand on the ground, getting up after having fallen to the ground.*

48.     As Mr. Harmon distanced himself from all three officers and was running

away from their direction, Officer Fox took aim at Mr. Harmon.



*View of Officer Fox.  Officer Fox's forearms are pictured at bottom of frame and he is
pointing his firearm at Mr. Harmon, pictured in the center of the frame.*

49.     Mr. Harmon heard Officers Smith and Fox giving chase.

50.     Mr. Harmon turned his head to look at Officer Smith as he continued to

run.

16

**41**



*View of Officer Smith.  Mr. Harmon is pictured in the middle of the frame looking backward at Officers Smith and Fox as he continues to move away from them.*

51.    Officer Smith drew his TASER and aimed it at Mr. Harmon.





*View of Officer Smith.  Officer Smith's arm is pictured on the left of all three frames aiming his taser at Mr. Harmon.  Officer Fox's arms are pictured in the right and bottom frames aiming his firearm at Harmon.  Mr. Harmon is pictured in the middle of all three frames looking at back at the officers.*

52.     Officer Fox yelled, "I'll fucking shoot you!" and immediately fired three

shots in rapid succession.

53.     Mr. Harmon had no opportunity to surrender as Officer Fox fired shots

almost simultaneously to shouting, "I'll fucking shoot you!"



*View of Officer Fox – Gun Shot 1*          *View of Officer Smith – Gun Shot 1*



*View of Officer Fox – Gun Shot 2*          *View of Officer Smith – Gun Shot 2*

19

**44**



*View of Officer Fox – Gun Shot 3*



*View of Officer Smith – Gun Shot 3*

54.    At approximately the same time that Officer Fox shot Mr. Harmon, Officer Robinson fired his Taser, striking Mr. Harmon.

55.    Upon being shot, Mr. Harmon fell immediately to the ground.

56.    Officer Fox did not issue any commands or warnings to Mr. Harmon other than yelling, "I'll fucking shoot you!" less than a second before opening fire.

57.    Neither Officer Smith nor Officer Robinson issued any commands or warnings to Mr. Harmon before Officer Fox shot and killed him.

58.    Mr. Harmon did not audibly threaten the officers at any point during this incident.

### THE IMMEDIATE AFTERMATH OF THE SHOOTING

59.    After Officer Fox shot Mr. Harmon, all of the officers, including Officer Fox appeared to be in a state of shock.

60.    Eventually, Officer Smith stated into his radio, "Priority, shots fired.  Start medical."

61.    Officer Robinson was the first to approach Mr. Harmon.

62.    Officer Robinson did not draw a weapon as he approached Mr. Harmon, who was lying face-down on the ground.

63.    As Officer Smith next approached, Mr. Harmon began screaming out in pain but otherwise remained unmoving.



*View of Officer Fox. Mr. Harmon is pictured in the bottom left of the frame. Officer Robinson is pictured in the bottom right of the frame.*

64. Officer Fox did not warn Officer Robinson that he believed Mr. Harmon had a knife. Nor did he instruct Officer Robinson to look for a knife or to secure a knife.

65. Officer Smith did not warn Officer Robinson that he believed Mr. Harmon had a knife. Nor did he instruct Officer Robinson to look for a knife or to secure a knife.

66. Officer Robinson did not check Mr. Harmon's hands for a knife.

67. Officer Robinson did not check Mr. Harmon's hands or clothing for other weapons.

68. Officer Robinson did not search the area near Mr. Harmon's body for a knife.

69.    Officer Robinson did not report to other officers that he had found a knife.

70.    Although the Officers later claimed that knife was recovered near where Mr. Harmon's body had fallen, Officer Robinson did not secure any knife while approaching Mr. Harmon.

71.    When Officer Robinson reached Mr. Harmon, he picked up Mr. Harmon's left arm to place Mr. Harmon in handcuffs.  Mr. Harmon cried out in pain.

72.    Officer Robinson dropped Mr. Harmon's left arm apparently surprised or shocked that Mr. Harmon was hemorrhaging blood.

73.    As Mr. Harmon was bleeding to death, Officer Robinson finished handcuffing Mr. Harmon's hands behind his back.

74.    Officer Robinson then examined Mr. Harmon's body for gunshot wounds.

75.    Officer Robinson instructed Mr. Harmon, "Roll on your left side, bro.  Roll on your left side."

76.    Finding Mr. Harmon incapacitated, Officer Robinson forcefully rolled Mr. Harmon onto his side and back.

77.    After Officer Robinson rolled Mr. Harmon onto his side, Mr. Harmon stopped crying out in pain and ceased making any noise.

78.    Officer Fox ran back to his patrol car after telling the other officers that he was going to get gloves.

79.    The officers found a large blood stain on the back of Mr. Harmon's pants, above his left buttock.

80.    The officers rolled Mr. Harmon back onto his back and discovered that Mr. Harmon was hemorrhaging blood from his right thigh.

81.     Officer Smith stated, "We've got something major right here."

82.     Officer Fox returned from his patrol car and began cutting Mr. Harmon's clothing off with a knife.

83.     Officer Smith began removing Mr. Harmon's pants by pulling them down.

84.     The officers identified a gunshot wound on Mr. Harmon's left buttock.

85.     At this point, other SLCPD officers began to arrive on scene.

86.     Mr. Harmon was pronounced dead just after midnight.

87.     According to the Office of the Medical Examiner, "Patrick Harmon died as a result of gunshot wounds of the torso (2) and extremity (I) during an encounter with police. Gunshot wound #3 injured the femoral artery and vein, major blood vessels in the body, causing significant blood loss. The other two gunshot wounds injured soft tissue and contributed to death through bleeding. The manner of death is homicide."

88.     Notably, it was Officer Fox's third shot that struck Mr. Harmon's femoral artery and vein causing the injury that most seriously to his death by blood loss.

89.     As captured on the video, Mr. Harmon suffered excruciating pain and suffering before passing.

**OFFICER FOX'S STATEMENTS**

90.     Following the incident, Officer Fox participated in an internal investigation with SLCPD regarding the shooting.

91.     As part of that investigation, Officer Fox provided a recorded interview regarding the incident and his decision to shoot and kill Mr. Harmon.

92.     Officer Fox repeatedly states that he shot and killed Mr. Harmon because Mr. Harmon reached for and produced a knife.

93.     Officer Fox stated, "As soon as he started running, both of his hands went to his right pocket.  The moment he started going for the pocket, and I don't remember exactly what he said but I remember it was to the effect of, 'You'll get cut,' 'I'm gonna cut you' or something.  I know that I heard it.  I know that I processed it."

94.     Mr. Harmon cannot be seen on any of the three bodycam angles reaching for his right pocket.

95.     Mr. Harmon cannot be heard saying "You'll get cut" or "I'm gonna cut you," in the audio of any of the three bodycam recordings.

96.     Officer Fox claimed in the interview, "And I can't remember but I think, I think Kris [Smith] was telling him to stop."

97.     Officer Smith cannot be heard telling Mr. Harmon to stop in the audio of any of the three bodycam recordings.

98.     Officer Fox stated that once Mr. Harmon pushed past Officer Robinson, "I see what he's doing, I see his hands are going for his right pocket still."

99.     Officer Fox stated, "the entire time the guy is running, I can see him going for that right pocket."

100.    Officer Fox stated, "When he broke direction and he started going North on the sidewalk again, he was still going for that pocket."

101.    Officer Fox repeated similar statements about Mr. Harmon reaching for his pocket throughout the interview.

102.    Officer Fox claimed that prior to shooting Mr. Harmon, Mr. Harmon, "stop[ped], turn[ed] around, and [came] back at [them]."

103.    At no point in their interaction did Mr. Harmon come back at the officers.

104.    Officer Fox claims repeatedly to have seen a knife in Mr. Harmon's hand.

105.    Officer Fox claims that Mr. Harmon said, "I'll fucking stab you."

106.    None of Officer Fox's justifications for shooting Mr. Harmon are supported by the video and audio recordings of the incident.

107.    When asked why he had chosen the force option that he did, Officer Fox replied,

> When he first started going in his pocket, and again, I don't remember exactly what he said but I know it was to the effect of 'I'll cut you' or 'You're going to get cut,' he said something to that effect, I immediately believed that he was going for a weapon and it was most likely going to come out as a knife. At that point I knew that was a lethal weapon, and every bit of my training from post to until – we actually had a lineup training that day and the sergeant had watched – had us watch a video and it was the video of the officer in South Carolina where he was confronting the guy and he drew a TASER, the guy ended up having a gun and we had talked about never leading into a situation where if there could be a potential for lethal force that we use a less lethal weapon.

108.    Officer Fox stated, "[t]hrough every bit of training you don't respond to a knife or a lethal weapon with a less lethal option. So, that's why I drew my gun."

**THE KNIFE**

109.    As pled above, Officer Fox relied extensively during the SLCPD internal investigation on his alleged belief that Mr. Harmon drew a knife.

110.    SLCPD Officers claim to have recovered the knife that Mr. Harmon was allegedly carrying:



*Photo of the knife recovered from the scene*

111.    The knife allegedly carried by Mr. Harmon appears to be a "rescue knife," a style of folding knife with additional tactical features that can be used in emergency situations.  For example, this particular knife features a glass breaker and seatbelt or strap cutter to assist in vehicle rescues.

112.    The knife is also branded "Castleview Hospital."

113.    Castleview Hospital is a rural community hospital located in Price, Utah, about 120 miles from Salt Lake City.

114.    As such, it is very likely that the knife allegedly recovered at the scene was originally the property of a Castleview Hospital employee.

115.    Mr. Harmon was never an employee of Castleview Hospital.

116.    The knife appears to be in pristine condition, lacking any noticeable fingerprints, smudges, or other indications that it was being held in a bare hand just prior to being dropped on the ground.

117.    The SLCPD quickly disposed of this knife before conducting any testing to determine the presence of fingerprints or other evidence that could help establish possession of the knife.

118.    Officers who responded to the scene and discovered the knife near where Mr. Harmon's body had fallen believed the knife belonged to Officer Fox.

119.    Sergeant Alma Sweeney wrote in his police report, "After moving the subject I observed a folding style knife lying in the grass.  At first it was believed this was Officer Fox's knife, . . .").

120.    Officer Fox used a very similar type of knife to cut off Mr. Harmon's clothing.



*Photo of knife found near Mr. Harmon's body*

28



*Photo of Officer Fox's knife*

121.   The knife allegedly found near Mr. Harmon is a manually opening, folding-style knife.

122.   Folding style knives generally require two hands to open.[3]

123.   The knife near Mr. Harmon's body was found in the unfolded, or open, position.

124.   At no point in the bodycam footage can Mr. Harmon be seen to using both hands to open a folding knife.

**SALT LAKE CITY'S PATTERN OF RACIALLY BIASED POLICING**

125.   Salt Lake City has an unfortunate history of racially biased policing and use of force.

---

[3] *See, e.g.*, Anthony Awaken, Four Options for Deploying Your Knife, November 11, 2016, Recycled Firefighter (available at https://recycledfirefighter.com/blogs/news/knife-opening-types) ("These type of manual openers will also require 2 hands to open.").

**54**

126.    In 2018 alone, there were seven police shootings in Salt Lake County.  Of those seven shootings, four of the victims were people of color.

127.    In 2018, all three fatal shootings in Salt Lake County involved people of color.

128.    Salt Lake's excessive force and racial-policing problem has a deeply-rooted and well-established history.

129.    In August 2014, a SLCPD Officer shot and killed Dillon Taylor, an unarmed 20-year old man.

130.    In January 2015, a SLCPD officer shot and killed James Barker, in part because he was armed with a snow shovel.

131.    In January 2016, the SLCPD settled a lawsuit which alleged that it had engaged in a racially motivated gang sweep of a local high school, exclusively targeting and arresting Latino, African American, and Pacific Islander students.  *See* Complaint, *Winston v. Salt Lake City, et al.*, 12-cv-01134-PMW, WL 6216571 (D. UT 2012).  The settlement included a term that "SLCPD officers shall not use race, color, ethnicity, or national origin in exercising discretion to conduct a warrantless stop or search, or to seek a warrant."

132.    In February 2016, a SLCPD officer shot and paralyzed 17-year-old ████ ████████, who had been carrying a mop handle.

133.    These high-profile examples are indicative of the culture of excessive force and racially charged police tactics that pervade the SLCPD.

## V. STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. 193 – Fourth Amendment Through Fourteenth Amendment
### Excessive Force
### (Against Officer Fox)

134.   Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

135.   Defendant Fox is a person for purposes of 42 U.S.C. § 1983.

136.   At all times relevant to this claim, Defendant Fox was acting under the color of state law in his capacity as a Salt Lake City Police Department law enforcement officer.

137.   Mr. Harmon had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure in his person against unreasonable seizure through excessive force, including excessive deadly force.

138.   At all times relevant to this claim, it was clearly established that law enforcement cannot use deadly force against a suspect where a reasonable officer on the scene would have not found probable cause to believe there was a threat of serious physical harm to him or herself or others.

139.   Defendant Fox engaged in deadly force that was objectively unreasonable in light of the facts and circumstances confronting him, violating Mr. Harmon's right to be free from excessive force.

140.   Mr. Harmon did not pose an actual and imminent threat of serious bodily injury or death to any persons when Defendant Fox shot and killed him.

141.   It was not objectively reasonable to shoot Mr. Harmon, who was unarmed and fleeing from the officers.  Defendant Fox had no objectively reasonable belief that

Mr. Harmon posed an actual and imminent threat of serious bodily injury or death to any persons when Defendant Fox employed deadly force.

142.    Defendant Fox's claim that Mr. Harmon had drawn a knife was objectively unreasonable.  Evidence that his belief was unreasonable is that no knife is visible on the body camera footage, the officers never identified Mr. Harmon as holding a knife on the video, no other officer shot Mr. Harmon (or even drew their firearms), and none of them moved to secure a knife after he was shot.

143.    Additional evidence that Defendant Fox's use of deadly force was objectively unreasonable is the video evidence showing Mr. Harmon being shot while fleeing from the officers.  This is especially true in light of the fact that Defendant Fox did not order Mr. Harmon to drop a weapon or give him any chance to surrender. Instead, Defendant Fox shot Mr. Harmon dead just seconds after yelling "I'll fucking shoot you."

144.    To the extent that Defendant Fox reasonably felt in danger of serious bodily injury or death, he created the need for deadly force in this incident through his own reckless, deliberate conduct that was immediately connected to his use of excessive deadly force.

145.    By approaching Mr. Harmon with his gun drawn at a close distance, failing to issue a single warning, and limiting the distance between himself and Mr. Harmon, Defendant Fox created an unnecessarily dangerous situation.  However, Mr. Harmon posed no danger as he was unarmed and fleeing when he was shot.

146.    Defendant Fox's actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Mr. Harmon's federally protected rights.

147.    Defendant Fox's actions were the legal and proximate cause of Mr. Harmon's death.

148.    Defendant Fox's actions caused Mr. Harmon damages in that he suffered extreme physical and mental pain as a result of being shot in the thigh, arm, and buttock.

149.    Defendant Fox's actions as described herein deprived Mr. Harmon of his constitutional rights and caused him other damages.

150.    As a proximate result of Defendants' unlawful conduct, Mr. Harmon's Estate and heirs have suffered actual physical and emotional injuries in amounts to be determined at trial.  These injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, extraordinary pain and suffering at the time of death, emotional distress and hedonic damages to which his Estate is entitled to claim on his behalf, and for his loss of enjoyment of life and the value of his life and continuing familial relationships.

## SECOND CLAIM FOR RELIEF
**42 U.S.C. § 1983 – Fourth Amendment Through Fourteenth Amendment
Deliberately Indifferent Policies, Practices, Customs, Training, Supervision, and Ratification
Fourteenth Amendment
(Defendant City of Salt Lake)**

151.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

58

152.   At all times relevant to this claim, Defendant Salt Lake City failed to properly train, supervise, and discipline its officers in a manner amounting to deliberate indifference with respect to excessive force by police officers generally, and including obviously recurring situations faced by police such as suspects fleeing from arrest.

153.   Defendant Salt Lake City's policies, customs, and practices, and failure to properly train, supervise and/or discipline its officers included the failure to train officers on avoiding the reckless and deliberate creation of the need to use force.

154.   Defendant Fox's use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal, particularly suspects fleeing from arrest.

155.   Defendant Salt Lake City failed to discipline, train, and supervise Defendant Fox concerning the Fourth Amendment and the use of excessive force, including deadly force, pedestrian stop and arrests, and the avoidance of the reckless and deliberate creation of the need to use force.

156.   In light of the duties and responsibilities of those police officers that participate in arrests and covert operations, the need for specialized training is obvious, and the inadequacy of training and/or supervision is so likely to result in the violation of constitutional and federal rights, that not providing such training and supervision was deliberately indifferent.

157.   Defendant Salt Lake City has trained its officers that they should always respond with lethal force if there is even the potential that a suspect has weapon. Essentially, Defendant Salt Lake City trains its officers to shoot first and ask questions later.

158.    Defendant Fox fatally shot Mr. Harmon based on an objectively unreasonable threat perception without even waiting for other officers to employ available less lethal options.

159.    Defendant Fox has stated that he acted pursuant to his training when he shot Mr. Harmon to death without justification.

160.    Confirming that Defendant Fox acted in accordance with his training, Defendant Salt Lake City has not disciplined Defendant Fox for shooting Mr. Harmon.

161.    Defendant Salt Lake City has failed to train and supervise its officers on the use of deadly force, and what a reasonable officer would perceive to pose an imminent threat to life of self or others.

162.    Defendant Salt Lake City's conduct with respect to its failure to train and supervise its officers on the use of deadly force was a driving force behind the constitutional violations described herein.

163.    The constitutional violations against and harming of decedent Mr. Harmon was a foreseeable consequence of Defendant Salt Lake City's actions and omissions.

164.    Defendant Salt City was deliberately indifferent to the constitutional rights of members of the public, knowing that its officers presented a danger to them, by failing to properly train, monitor, supervise, and discipline its employees with respect to the use of excessive force, including in the specific principles described above.  Defendant Salt Lake City could have and should have pursued reasonable methods of training, monitoring, supervising, and disciplining its employees.

165.    Defendant Salt Lake City's policies, customs, and/or practices and failure to properly train and supervise its employees, including Defendant Fox, were the

moving force and proximate cause of the violation of decedent Mr. Harmon's constitutional rights.

166.    Defendant Salt Lake City's actions and omissions caused Plaintiffs damages.

167.    Defendant Salt Lake City's actions and omissions as described herein deprived Plaintiffs of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused them other damages.

168.    As a proximate result of Defendants' unlawful conduct, Mr. Harmon's Estate and heirs have suffered actual physical and emotional injuries in amounts to be determined at trial.  These injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, extraordinary pain and suffering at the time of death, emotional distress and hedonic damages to which his Estate is entitled to claim on his behalf, and for his loss of enjoyment of life and the value of his life and continuing familial relationships.

<u>**THIRD CLAIM FOR RELIEF**</u>
**42 U.S.C. § 1983 – Fourteenth Amendment**
**Equal Protection Clause**
**(All Defendants)**

169.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

170.    At the time of the events described herein, Mr. Harmon had the clearly established constitutional right to be free from racial discrimination in law enforcement by police officers and to enjoy the equal protection of the law.

171.    Mr. Harmon, as a black man, was a member of protected class, and thus also had the clearly established right to be free from racially motivated use of force.

172.    Any reasonable police officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established.

173.    The SLCPD exercises force against racial minorities at a disproportionately high rate.

174.    The SCLPD exercises force against black persons at a disproportionately high rate.

175.    In a city that is just 2.7% Black, SLCPD used force against black persons in 13.1% of all use of force incidents between January 2017 and December 2018.

176.    Mr. Harmon's race was a substantial motivating factor in Defendant Fox's decision to use excessive force against him.

177.    The acts or omissions of Defendant Salt Lake City as described herein deprived Plaintiffs of Mr. Harmon's constitutional right to be free from excessive force due to his race.

178.    At all times relevant to this claim, Defendant Salt Lake City maintained longstanding policies, customs, and practices concerning unlawful race discrimination perpetrated by its police department, and failed to properly train, supervise, and discipline its officers in a manner amounting to deliberate indifference with respect to excessive force by police officers generally, and failure to train its officers on the use of deadly force.

179.    Defendant Salt Lake City's policies, customs, and/or practices and failure to properly monitor, train, supervise and discipline its employees were the moving force and proximate cause of the violation of decedent Patrick Harmon Sr.'s constitutional rights.

180.    Defendant Salt Lake City's acts or omissions are the proximate cause of Plaintiffs' damages.

### FOURTH CLAIM FOR RELIEF
**U.C.A. § 78B-3-106 – Death of a Person Caused by Wrongful Act
Utah State Law
(Defendant Fox)**

181.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

182.    Patrick Harmon II and Tasha Smith, as Mr. Harmon's natural children and heirs, are entitled to maintain a cause of action against Defendants for damages sustained based on Defendants' wrongful acts.

183.    Officer Fox's shooting of Mr. Harmon was wrongful, willful, and unreasonable given the facts and circumstances at the time of the shooting and resulted in Mr. Harmon's death.

184.    As alleged above, Officer Fox utilized excessive force by shooting Mr. Harmon, who was unarmed and did not reasonably present a danger to Officer Fox or the other officers.

185.    Officer Fox acted with willfully and maliciously in by shooting Mr. Harmon, who was unarmed and fleeing.

186.    Plaintiffs Harmon II and Smith have suffered damage as a result of Mr. Harmon's wrongful death.

187.    Defendant Fox's acts and omissions caused Plaintiffs Harmon II and Smith's damages.

188.     Plaintiffs Mr. Harmon II and Ms. Smith's damages include costs associated with his death and the value of services he would have provided, and the

loss of his society, comfort, association, love, counsel, care, consortium, protection, and the reasonable expectations of association with Mr. Harmon for the rest of his natural life.

## FIFTH CLAIM FOR RELIEF
### Article I, Section IX of the Utah State Constitution
### Excessive Rigor
### (All Defendants)

189.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

190.    As alleged above, Officer Fox utilized unnecessary rigor to effect Mr. Harmon's arrest.

191.    By shooting Mr. Harmon, who was unarmed and did not reasonably present a danger to Officer Fox or the other officers, Officer Fox's actions flagrantly violated Mr. Harmon's rights under the Utah state constitution.

192.    Defendant Fox's actions were the legal and proximate cause of Mr. Harmon's death.

193.    Defendant Fox's actions caused Mr. Harmon damages in that he suffered extreme physical and mental pain as a result of being shot in the thigh, arm, and buttock.

194.    Defendant Fox's actions as described herein deprived Mr. Harmon of his rights under the constitution of the state of Utah and caused him other damages

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against each of the Defendants, and award them all relief allowed by law, including but not limited to the following:

(a)     All appropriate relief at law and equity;

(b)     Declaratory relief and other appropriate equitable relief;

(c)     Economic losses on all claims as allowed by law;

(d)     Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(e)     Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(f)     Attorneys' fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

(g)     Pre- and post-judgment interest at the appropriate lawful rate; and

(h)     Any further relief that this court deems just and proper, and any other relief as allowed by law.

**PLAINTIFFS HEREBY DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated: July 1, 2019          Respectfully submitted,

s/ *Andrew G. Deiss*
Andrew G. Deiss (7184)
Corey D. Riley (16935)
**DEISS LAW PC**
10 West 100 South, Suite 425
Salt Lake City, Utah 84101
Telephone: (801) 433-0226
adeiss@deisslaw.com
criley@deisslaw.com

RATHOD | MOHAMEDBHAI LLC

*S/ Qusair Mohamedbhai*

_____
Qusair Mohamedbhai*
Siddhartha H. Rathod*
Matthew J. Cron*
Nicholas A. Lutz*
2701 Lawrence Street, Suite 100
Denver, Colorado 80205
(303) 578-4400 (p)
(303) 578-4401 (f)
qm@rmlawyers.com
sr@rmlawyers.com
mc@rmlawyers.com
nl@rmlawyers.com

*denotes counsel who will seek pro hac vice admission*

Andrew G. Deiss (7184)
Corey D. Riley (16935)
Deiss Law PC
10 West 100 South, Suite 425
Salt Lake City, Utah 84101
(801) 433-0226
adeiss@deisslaw.com
criley@deisslaw.com

*Attorneys for Plaintiffs*

Qusair Mohamedbhai*
Siddhartha H. Rathod*
Matthew J. Cron*
Nicholas A. Lutz*
2701 Lawrence Street, Suite 100
Denver, Colorado 80205
(303) 578-4400 (p)
(303) 578-4401 (f)
qm@rmlawyers.com
sr@rmlawyers.com
mc@rmlawyers.com
nl@rmlawyers.com

*denotes counsel who will seek pro hac vice
admission*

## IN THE THIRD JUDICIAL DISTRICT COURT

## FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| ESTATE OF PATRICK HARMON SR.; PATRICK HARMON II, as Personal Representative of the Estate of Patrick Harmon Sr., and heir of Patrick Harmon Sr., TASHA SMITH, as heir of Patrick Harmon Sr., <br><br> Plaintiff, <br><br> vs. <br><br> SALT LAKE CITY, a municipality; and OFFICER CLINTON FOX, in his individual capacity, <br><br> Defendants. | **ACCEPTANCE OF SERVICE** <br><br> Case No. 190905238 <br> Judge Barry Lawrence |

The undersigned, Catherine Brabson, Senior City Attorneys for Salt Lake City,

represent that she is authorized and does accept service on behalf of defendants Salt Lake

City Corporation and Clinton Fox of the Summons and Complaint in this action and waives

service by any other method.

**67**

Dated: July 15, 2019                    SALT LAKE CITY ATTORNEY'S OFFICE


                                        _____
                                        Catherine Brabson, Senior City Attorney

JS 44 (Rev. 09/18)

**CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Estate of Patrick Harmon Sr., Patrick Harmon, II, as Personal Representative of the Estate and heir of Patrick Harmon, Sr., and Tasha Smith, as heir of Patrick Harmon, Sr. | Salt Lake City, a municipality; and Officer Clinton Fox, in his individual capacity |

**(b)** County of Residence of First Listed Plaintiff    Salt Lake
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Salt Lake
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Andrew G. Deiss and Corey D. Riley, Deiss Law, PC., 10 West 100 South, Suite 425, Salt Lake City, UT 84101, (801) 433-0226

Attorneys *(If Known)*
Catherine L. Brabson and Mark E. Kittrell, Salt Lake City Attorney's Office, P.O. Box 145478, Salt Lake City, UT 84114-5478, (801) 535-7788

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*    Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 485 Telephone Consumer Protection Act<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☒ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br><br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | |
| | | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. 1983
Brief description of cause:
alleged excessive force in violation of the Fourth Amendment

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions):*
JUDGE     DOCKET NUMBER

DATE    08/02/2019
SIGNATURE OF ATTORNEY OF RECORD    /s/ Catherine L. Brabson

**FOR OFFICE USE ONLY**

RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE

Catherine L. Brabson (#6500)
Mark E. Kittrell (#9500)
SALT LAKE CITY CORPORATION
P.O. Box 145478
451 South State Street, Suite 505A
Salt Lake City, Utah 84114-5478
Telephone:  (801) 535-7788
Facsimile:  (801) 535-7640
Catherine.Brabson@slcgov.com
Mark.Kittrell@slcgov.com

*Attorneys for Defendants Salt Lake City and Officer Clinton Fox*

---

## IN THE UNITED STATES DISTRICT COURT
## STATE OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| ESTATE OF PATRICK HARMON SR.; PATRICK HARMON II, as Personal Representative of the Estate of Patrick Harmon Sr., and heir of Patrick Harmon Sr., TASHA SMITH, as heir of Patrick Harmons, Sr., | **MOTION TO DISMISS AND MEMORANDUM IN SUPPORT** |
| Plaintiffs, | |
| vs. | |
| SALT LAKE CITY, a municipality; and OFFICER CLINTON FOX, in his individual capacity, | Case No. 2:19-cv-00553 |
| Defendants. | Judge Robert J. Shelby |

**70**

## TABLE OF CONTENTS

INTRODUCTION AND STATEMENT OF RELIEF SOUGHT .................................................. 1

STATEMENT OF FACTS ........................................................................ 3

ARGUMENT .................................................................................... 9

    I.      RULE 12(B)(6) STANDARD OF REVIEW .................................................. 9

    II.    BECAUSE THE USE OF DEADLY FORCE WAS OBJECTIVELY
           REASONABLE, OFFICER FOX IS ENTITLED TO QUALIFIED
           IMMUNITY ON PLAINTIFFS' FOURTH AMENDMENT CLAIM
           AS A MATTER OF LAW ............................................................... 10

           A.      The Standard for Qualified Immunity on a Rule 12(b)(6) Motion
                  to Dismiss ................................................................... 10

           B.      Based on the Indisputable Bodycam Video Evidence, Plaintiffs'
                  Allegations are Not Plausible .............................................. 11

           C.      The Use of Deadly Force by Officer Fox was Objectively
                  Reasonable ................................................................... 14

                i.      The Fourth Amendment reasonableness standard ...................... 14

                ii.     Under the totality of the circumstances, the use of deadly
                     force by Officer Fox was objectively reasonable ...................... 15

            D.      No Clearly Established Law Shows the Use of Deadly Force in
                  these Circumstances Violated Harmon's Fourth Amendment
                 Rights ......................................................................... 18

    III.   PLAINTIFFS FAIL TO STATE AN EQUAL PROTECTION
           VIOLATION ............................................................................ 20

    IV.   PLAINTIFFS CANNOT STATE A MUNICIPAL LIABILITY CLAIM ........... 20

    V.    PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED
           WITHOUT PREJUDICE ............................................................... 21

    VI.   ALTERNATIVELY, PLAINTIFFS FAIL TO STATE A CLAIM FOR
           RELIEF UNDER STATE LAW ....................................................... 21

A.      Plaintiffs' Wrongful Death Claim is Barred by the GIAU ...................... 21

B.      Plaintiffs Cannot State A Claim for Violation of the Unnecessary
        Rigor Clause of the Utah Constitution....................................................... 23

CONCLUSION.................................................................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*Albers v. Bd. of Cty. Comm'rs.*, 771 F.3d 697, 700 (10th Cir. 2014) ............................................ 9

*Ashcroft v. al-Kidd*, 563 U.S. at 741 ............................................................................................. 19

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) .................................................................... 9, 10, 20, 22

*Barneck v. Utah Dep't of Transp.*, 2015 UT 50 ............................................................................ 22

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................................... 9

*Borneman v. Rozier*, 398 F. App'x 415 (10th Cir. 2010) .............................................................. 12

*Bryner v. Utah*, 429 F. App'x 739 (10th Cir. 2011) ...................................................................... 12

*Chief v. West Valley City*, No. 2:11-CV-643 TS, 2013 WL 6146061, at *12
  (D. Utah Nov. 21, 2013) ............................................................................................................ 22

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ..................................................... 20

*City & Cnty. of San Francisco v. Sheehan*, ___U.S. ___, 135 S. Ct. 1765 (2015) ........................ 10

*Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d
  1194 (10th Cir. 2011) ............................................................................................................. 3, 12

*Dexter v. Bosko*, 2008 UT 29 ......................................................................................................... 23

*Estate of Larsen v. Murr*, 511 F.3d 1255 (10th Cir. 2009) ................................... 15, 16, 17, 18, 19

*Farrell-Cooper Min. Co. v. United States DOI*, 728 F.3d 1229 (10th Cir. 2013) ......................... 12

*Gallagher v. Shelton*, 587 F.3d 1063 (10th Cir. 2009) .................................................................... 9

*Garcia-Rodriguez v. Gomm*, 169 F. Supp. 3d 1221 (D. Utah 2016) ............................................ 12

*Graham v. Connor*, 490 U.S. 386 (1989) .......................................................................... 14, 15, 17

*Hinton v. City of Elwood*, 997 F.2d 774 (10th Cir. 1993) ............................................................. 20

*Kisela v. Hughes*, 138 S. Ct. 1148 (2018) ..................................................................................... 19

*Mecham v. Frazier*, 500 F.3d 1200 (10th Cir.2007) ..................................................................... 15

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) ...................................................................... 20

*Needham v. Fannie Mae*, 854 F. Supp. 2d 1145 (D. Utah 2012) ..................................................... 3

*Pearson v. Callahan*, 555 U.S. 223 (2009) ............................................................................... 11, 18

*Phelps v. Wichita Eagle–Beacon*, 886 F.2d 1262 (10th Cir.1989) ................................................ 20

*Quinn v. Young*, 780 F.3d 998 (10th Cir. 2015) ........................................................................... 11

*Requena v. Roberts*, 893 F.3d 1195 (10th Cir. 2018) ................................................................... 20

*Roska ex rel. Roska v. Peterson*, 328 F.3d 1230 (10th Cir. 2003) ............................................... 15

*Saucier v. Katz*, 533 U.S. 194 (2001) ........................................................................................... 19

*Scott v. Harris*, 550 U.S. 372 (2007) ........................................................................................... 12

*Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151 (10th Cir. 1998) ....................... 21

*Smith v. United States*, 561 F.3d 1090 (10th Cir.2009) ................................................................ 12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. at 322 ..................................................... 12

*Tennessee v. Garner*, 471 U.S. 1 (1985) ....................................................................................... 15

*Thomas v. Kaven*, 765 F.3d 1183 (10th Cir. 2014) ...................................................................... 11

*Thomson v. Salt Lake Cty.*, 584 F.3d 1304 (10th Cir. 2009) ....................................................... 22

*Tiede v. Utah State Dep't of Corr.*, 915 P.2d 500 (Utah 1996) ................................................... 22

**Other Authorities**

42 U.S.C. § 1983 ................................................................................................. 2, 10

Federal Rules of Civil Procedure Rule 12(b)(6) ............................................. 1, 9, 20

Utah Code § 63G-7-101 .......................................................................................... 21

Utah Code § 63G-7-201 .......................................................................................... 21

Utah Code § 63G-7-202(3)(a) ................................................................................. 21

Utah Code § 63G-7-301 .......................................................................................... 22

Utah Code § 76-5-103 ............................................................................................. 15

Utah Code § 78B-3-106 ........................................................................................... 21

Utah Constitution. Article 1, Section IX of the Utah Constitution .......................... 2

Pursuant to Rule 12(b)(6), Defendants Salt Lake City Corporation (the "City") and Officer Clinton Fox ("Officer Fox") move to dismiss all of Plaintiffs' claims on the basis of qualified immunity and on the grounds Plaintiffs fail to state a claim as a matter of law.

## INTRODUCTION AND STATEMENT OF RELIEF SOUGHT

This case arises from the shooting death of Patrick Harmon ("Mr. Harmon") on August 13, 2017 in Salt Lake City. Just after 10:00 p.m., Salt Lake City police officer Chris Smith observed Mr. Harmon riding his bicycle travelling south along the east side of State Street in the vicinity of 600 South. Mr. Harmon turned and rode across State Street from east to west across all six lanes and a median with no hand signals and no red taillight on his bicycle as required by law. Officer Smith stopped Mr. Harmon to discuss bicycle safety and asked him for his name. After Mr. Harmon gave several different names, and Officer Smith could not identify him, Officer Smith called for backup. Mr. Harmon mentioned an outstanding warrant, and Officer Smith confirmed that Mr. Harmon had an outstanding felony warrant for his arrest. Officer Scott Robinson and Defendant Officer Clinton Fox responded as backup officers. Officer Smith informed Mr. Harmon about the warrant and that he was under arrest. As Officer Smith and Officer Robinson were in the process of taking Mr. Harmon into custody, Mr. Harmon initially was compliant. But then Mr. Harmon suddenly broke away from the officers and ran – first heading north along the sidewalk and then turning south to run past the officers while evading their attempts to grab him.

As Mr. Harmon ran, all three officers heard him say that he was going to "cut" or "stab" them.[1] Then, Mr. Harmon stopped running and turned to face Officer Fox with his right arm and hand raised with an open knife in his right hand. At this point, Mr. Harmon was on the sidewalk only a few feet away from Officer Fox, and his body (including his raised right arm/hand) appeared to be moving towards Officer Fox. In fear of imminent harm, Officer Fox used his firearm to shoot Mr. Harmon who fell to the ground. As Officer Fox provided cover with his firearm, Officer Robinson approached Mr. Harmon and placed him in handcuffs. Medical personnel were called to the scene. Mr. Harmon later died from the gunshot wounds.

Plaintiffs bring this action under 42 U.S.C. § 1983 alleging that Officer Fox used excessive force in violation of the Fourth Amendment when he shot Mr. Harmon. Plaintiffs also assert Officer Fox engaged in racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs allege that the City has municipal liability for these alleged constitutional violations. Finally, Plaintiffs assert claims under state law for wrongful death and violation of the unnecessary rigor clause in Article 1, Section IX of the Utah Constitution.

The bodycam videos of the three officers, when considered together, provide the indisputable facts underlying this incident. Based on these indisputable facts, Defendants move to dismiss Plaintiffs' Fourth Amendment claims against Officer Fox on the basis of qualified immunity. Defendants also move to dismiss Plaintiffs' equal protection claims for failure to plausibly state a claim as a matter of law. As Plaintiffs cannot state a constitutional violation

---

[1]      Plaintiffs' Complaint only references the report of Officer Fox regarding Mr. Harmon's statement. Pls.' Complaint, ECF No. 6-1, at §§ 93, 105.

against Officer Fox, Plaintiffs' claims against the City likewise fail. Finally, Plaintiffs' state law

claims should be dismissed without prejudice for lack of subject matter jurisdiction.

Alternatively, Plaintiffs claims for wrongful death are barred by the Governmental Immunity Act

of Utah, and Plaintiffs fail to state a claim for relief under the unnecessary rigor clause of the

Utah Constitution.

### STATEMENT OF FACTS[2]

1.      Just after 10:00 p.m., Salt Lake City police officer Chris Smith ("Officer Smith")

observed Mr. Harmon riding his bicycle travelling south along the east side of State Street in the

vicinity of 600 South. Mr. Harmon turned and rode across State Street from east to west across

all six lanes and a median with no hand signals and no red taillight on his bicycle as required by

law. Officer Smith stopped Mr. Harmon to discuss bicycle safety and asked him for his name.

Pls.' Compl., ECF No. 6-1, at ¶¶ 19-21.

2.      After Mr. Harmon gave several different names, with Officer Smith returning

twice to his patrol car to run a warrant check, Officer Smith was unable to make a positive ID.

Pls.' Compl., ECF No. 6-1, at ¶¶ 22-24; Officer Smith bodycam video, filed conventionally as

Exhibit A, at 0:00 to 4:40.[3]

---

[2]      The facts are taken from Plaintiffs' Complaint and the indisputable bodycam video
evidence submitted herewith. Defendants accept the facts contained in this section as true solely
for the purpose of this motion.

[3]      Plaintiffs reference and include excerpts from the bodycam videos of Officer Smith,
Officer Fox and Officer Robinson throughout their Complaint but did not include copies of the
videos as exhibits. But in considering a motion to dismiss, the court should consider not only the
complaint but the attached exhibits or material referenced in the complaint. *Commonwealth
Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1201 (10th Cir.
2011); *Tellabs, Inc. v. Makkor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Needham v.
Fannie Mae*, 854 F. Supp. 2d 1145, 1148 (D. Utah 2012) ("If the rule were otherwise, a plaintiff
with a deficient claim could survive a motion to dismiss simply by not attaching a dispositive

3.      Unable to identify Mr. Harmon based on the names he had given for identification, Officer Smith again asked Mr. Harmon for his correct name, at which point Mr. Harmon gave his correct name of "Patrick Harmon." Officer Smith bodycam video, at 4:40 – 4:55.

4.      After Mr. Harmon provided his correct name, Mr. Harmon volunteered to Officer Smith that he likely had an outstanding felony warrant. Pls.' Compl., ECF No. 6-1, at ¶ 23; Officer Smith bodycam video, at 4:50 – 6:08.

5.      While Officer Smith returned to his patrol car again to run another warrant check, Mr. Harmon stood calmly next to his bicycle and waited for Officer Smith to return. Pls.' Compl., ECF No. 6-1, at ¶ 24; Officer Smith bodycam video, at 6:08 – 6:50.

6.      As Officer Smith ran the warrant check for "Patrick Harmon," Officer Scott Robinson ("Officer Robinson") and Defendant Officer Clinton Fox ("Officer Fox") responded to the scene as backup officers, with Officer Fox making contact with Mr. Harmon. Pls.' Compl., ECF No. 6-1, at ¶ 25; Officer Smith bodycam video, at 6:50 to 7:15; Officer Fox bodycam video, filed conventionally as Exhibit B, at 0:00 to 0:35; Officer Robinson bodycam video, filed conventionally as Exhibit C, at 0:00 to 0:55.

7.      Officer Smith located an outstanding felony warrant for Mr. Harmon. Pls.' Compl., ECF No. 6-1, at ¶ 26; Officer Smith bodycam video, at 6:50 to 7:15.

document upon which the plaintiff relied"). For this reason, Defendants have submitted a *complete* copy of all of the bodycam videos, as well as relevant still frame images and a compiled version of the three bodycam videos synchronized by time for the Court's review as part of this motion. For each of the bodycam videos, there is no accompanying audio recording during the first 30 seconds of a bodycam video because at the time the equipment is activated, the audio begins recording but the video records (without audio) for 30 seconds prior to the officer's activation, and is stored once the camera is activated.

**78**

8.      Officer Smith informed Mr. Harmon about the warrant and that he was under arrest. Pls.' Compl., ECF No. 6-1, at ¶ 28; Officer Smith bodycam video, at 7:40 to 7:55.

9.      Officer Smith asked Mr. Harmon to take off his backpack, and Mr. Harmon complied. Pls.' Compl., ECF No. 6-1, at ¶ 28; Officer Smith bodycam video, at 7:55 to 8:10; Combined bodycam video, filed conventionally as Exhibit D, at 00:00 to 00:12.

10.      Officer Smith and Officer Robinson moved into position behind Mr. Harmon to place him in handcuffs and Officer Fox stood in front of Mr. Harmon. Pls.' Compl., ECF No. 6-1, at ¶ 25; Officer Smith bodycam video, at 7:55 to 8:15; Officer Fox bodycam video at 0:40 to 1:01; Officer Robinson bodycam video at 0:55 to 1:10; Combined bodycam video, at 00:00 to 00:15.

11.      Officer Smith asked Mr. Harmon to place his hands behind his back, and Mr. Harmon complied. Pls.' Compl., ECF No. 6-1, at ¶ 29; Officer Smith bodycam video, at 8:10 to 8:13; Officer Fox bodycam video at 0:55 to 1:01; Officer Robinson bodycam video at 1:10 to 1:15; Combined bodycam video at 00:12 to 00:15.

12.      As Officers Smith and Robinson were starting the process of placing Mr. Harmon's hands into handcuffs, Mr. Harmon suddenly broke away from the officers and ran – first heading north along the sidewalk and then turning south to run past the officers while evading their attempts to grab him. Officer Smith bodycam video, at 8:13 to 8:20; Officer Fox bodycam video at 1:01 to 1:07; Officer Robinson bodycam video at 1:15 to 1:22; Combined bodycam video at 00:15 to 00:22.

13.     Officer Fox pursued Mr. Harmon as he ran south along the sidewalk. Officer Smith bodycam video, at 8:13 to 8:20; Officer Fox bodycam video at to 1:01 to 1:07; Officer Robinson bodycam video at 1:19 to 1:22; Combined bodycam video at 00:15 to 00:22.

14.     As shown in frame by frame images from the bodycam video, as Mr. Harmon was moving south on the sidewalk, Mr. Harmon's hands appear to meet together directly in front of his body at just above his waist level. Officer Smith Frame by Frame Excerpts, filed conventionally as Exhibit E, at 08_18_03 to 08_18_07; Officer Fox Frame by Frame Excerpts, filed conventionally as Exhibit F, at 01_05_15 to 01_07_17, and 01_06_00.

15.     After running only a few feet, Mr. Harmon stopped running and turned to face the officers. Officer Smith bodycam video, at 8:18 to 8:20; Officer Fox bodycam video at 1:05 to 1:07; Officer Robinson bodycam video at 1:19 to 1:21; Combined bodycam video at 00:20-00:22; Officer Smith Frame by Frame Excerpts at 08_18_28 to 08_19_05; Officer Fox Frame by Frame Excerpts at 01_05_15 to 01_06_29.

16.     As shown in frame by frame images, at this moment in the encounter both of Mr. Harmon's feet were turned in the direction of Officer Fox. Officer Smith Frame by Frame Excerpts at 08_18_28 to 08_19_05.

17.     As shown in frame by frame images, Mr. Harmon's head and face were turned towards Officer Fox and his right arm and hand were raised above his shoulder and bent at the elbow, in what is consistent with a threatening or stabbing stance towards Officer Fox. Officer Smith Frame by Frame Excerpts at 08_18_28 to 08_19_05; Officer Fox Frame by Frame Excerpts at 01_05_11 to 01_06_20.

18.     Officer Fox saw a knife in Mr. Harmon's raised right hand. Pls.' Compl., ECF No. 6-1, at ¶¶ 92-93, 104.

19.     Mr. Harmon was a few feet away from Officer Fox on the sidewalk, approximately 5 and no more than 10 feet separated them. Still Frames (3) from Combined bodycam video, attached as Exhibit G; Combined bodycam video at 00:20 – 00:23; Officer Smith Frame by Frame Excerpts at 08_18_28 to 08_19_10; Officer Fox Frame by Frame Excerpts at 01_05_11 to 01_06_20.

20.     Fearing for his safety and the safety of Officers Smith and Robinson, Officer Fox used his firearm to shoot Mr. Harmon. Pls.' Compl., ECF No. 6-1 at ¶ 52; Officer Smith bodycam video, at 8:17 to 8:19; Officer Fox bodycam video at 1:05 to 1:07; Combined bodycam video at 00:21 – 00:23; Officer Smith Frame by Frame Excerpts at 08_19_04 to 08_19_11; Officer Fox Frame by Frame Excerpts at 01_06_20 to 01_07_05.

21.     When Mr. Harmon was shot, his body spun around to the right and he fell to the ground with his right arm still outstretched, such that his right hand landed in the grass to the west of the sidewalk. Officer Fox bodycam video at 1:07 to 1:10; Officer Robinson bodycam video at 1:22 to 1:37; Combined bodycam video at 00:22 – 00:25; Officer Fox Frame by Frame Excerpts at 01_06_20 to 01_07_16.

22.     As Officer Fox remained in position with his weapon trained on Mr. Harmon, Officer Robinson approached Mr. Harmon, and Officer Fox indicated to Officer Robinson "I got him" to let him know he was covered. Officer Smith bodycam video, at 8:20 to 8:30; Officer Fox bodycam video at 1:09 to 1:16; Officer Robinson bodycam video at 1:22 to 1:32; Combined bodycam video at 00:24 – 00:31.

23.     As he approached Mr. Harmon, Officer Robinson moved Mr. Harmon's right arm from its outstretched position to a position alongside his body in order to secure Mr. Harmon's wrists in handcuffs per policy. Officer Smith bodycam video, at 8:20 to 8:34; Officer Fox bodycam video at 1:09 to 1:22; Officer Robinson bodycam video at 1:22 to 1:37; Combined bodycam video at 00:24 – 00:37.

24.     Still photos from Officer Robinson's bodycam video as he approached Mr. Harmon clearly show an open knife, approximately 8 inches long, laying in the grass at most a few inches from where Mr. Harmon's right hand landed as he fell. Officer Robinson Frame by Frame Excerpts, filed conventionally as Exhibit H; see also, Combined bodycam video at 00:35 – 00:36.

25.     Photos of the scene taken thereafter include an open knife in the location shown in Officer Robinson's bodycam video. Pls.' Compl., ECF No. 6-1 at ¶¶ 110 – 112;[4] Scene photos, attached as Exhibit I.

26.     Medical personnel were called to the scene. Mr. Harmon later died from the gunshot wounds. Pls.' Compl., ECF No. 6-1 at ¶86.

---

[4]     Plaintiffs allege that SLCPD "quickly disposed" of this knife before conducting any testing. Pls.' Compl. ECF No. 6-1 at ¶ 117. However, this allegation is false. SLCPD maintains current possession of the knife following completion of the independent investigation conducted by Unified Police Department. Obviously, Defendants would willingly present the knife to Plaintiffs and the Court for inspection at any time. Nevertheless, this allegation does not material alter the analysis of objective reasonableness for purposes of this motion.

## ARGUMENT

**I.**   **RULE 12(B)(6)** STANDARD OF REVIEW.

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that a complaint may be dismissed for "failure to state a claim upon which relief can be granted."[5] When considering a motion to dismiss, the Court must "accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff.[6] Nevertheless, a claim must be dismissed if the complaint does not contain enough facts to make the claim "plausible on its face."[7] "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"[8] Further, a complaint must allege "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action," and it must "raise a right to relief above the speculative level."[9]

In determining the adequacy of a complaint in the context of a motion under Rule 12(b)(6), the court should engage in a two-part process. First, the court should begin by identifying allegations that, because they "are no more than conclusions, are not entitled to the assumption of truth."[10] "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."[11] Thus, "[t]hreadbare recitals of the elements of a

---

[5]   FED. R. CIV. P. 12(b)(6).

[6]   *See Albers v. Bd. of Cty. Comm'rs.*, 771 F.3d 697, 700 (10th Cir. 2014).

[7]   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[8]   *Gallagher v. Shelton*, 587 F.3d 1063, 1068 (10th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).

[9]   *Twombly*, 550 U.S. at 555.

[10]   *Iqbal*, 556 U.S. at 679.

[11]   *Id.*

cause of action, supported by mere conclusory statements, do not suffice."[12] Next, after

excluding conclusory assertions, the court assumes the veracity of well-pleaded allegations and

determines whether they plausibly give rise to an entitlement to relief.[13] Under this standard,

Plaintiffs fail to state plausible claims against the City or Officer Fox for violation of the Equal

Protection Clause of the Fourteenth Amendment. In addition, Plaintiffs' claims for wrongful

death are barred by the Governmental Immunity Act of Utah. These claims should be dismissed

with prejudice.

## II.    BECAUSE THE USE OF DEADLY FORCE WAS OBJECTIVELY REASONABLE, OFFICER FOX IS ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFFS' FOURTH AMENDMENT CLAIM AS A MATTER OF LAW.

Plaintiffs assert that Officer Fox violated Mr. Harmon's Fourth Amendment right to be

free from excessive force. Officer Fox asserts the defense of qualified immunity. Because the

indisputable video evidence demonstrates that Mr. Harmon charged at Officer Fox in close

proximity with a raised knife, the use of deadly force was objectively reasonable under the

circumstances and Plaintiffs cannot establish a Fourth Amendment violation. For that reason,

Officer Fox is entitled to qualified immunity as a matter of law.

### A.    The Standard for Qualified Immunity on a Rule 12(b)(6) Motion to Dismiss.

"Public officials are immune from suit under 42 U.S.C. § 1983 unless they have violated

a statutory or constitutional right that was clearly established at the time of the challenged

conduct."[14] To overcome a qualified immunity defense, Plaintiffs bear the burden to demonstrate

---

[12]   *Id.* at 678.
[13]   *Id.*
[14]   *City & Cnty. of San Francisco v. Sheehan*, ___ U.S. ___, 135 S. Ct. 1765, 1774 (2015)
(internal quotation marks omitted).

on the facts alleged: "(1) that the official violated a statutory or constitutional right; and (2) that the right was 'clearly established' at the time of the challenged conduct."[15] Because qualified immunity is immunity from suit rather than a mere defense to liability, the Supreme Court has repeatedly stressed the importance of resolving immunity questions "at the earliest possible stage in litigation."[16] "[T]he driving force behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials will be resolved prior to discovery."[17] "Although qualified immunity defenses are typically resolved at the summary judgment stage, district courts may grant motions to dismiss on the basis of qualified immunity."[18] On a motion to dismiss, however, a defendant is subject "to a more challenging standard of review than would apply on summary judgment."[19] It is the defendant's conduct as alleged in the complaint that is scrutinized for objective legal reasonableness.[20] Here, the allegations must be considered in light of the referenced bodycam videos, which are indisputable evidence of the events that occurred.

**B.   Based on the Indisputable Bodycam Video Evidence, Plaintiffs' Allegations are Not Plausible.**

Plaintiffs' allegations that Mr. Harmon was unarmed and merely fleeing arrest, and that Mr. Harmon posed no threat when he was shot by Officer Fox are contradicted by the officers' bodycam videos referenced at length in Plaintiffs' Complaint. In considering a motion to

---

[15]   *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (recognizing the court may decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case").
[16]   *See, e.g., Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009).
[17]   *Id.* at 231 (citation simplified).
[18]   *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014).
[19]   *Id.*
[20]   *Id.* (citation simplified).

dismiss, the court should consider not only the complaint, but the attached exhibits,[21] documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.[22] "[F]actual allegations that contradict a properly considered document are not well-pleaded facts that the court must accept as true."[23] With the evolution of body camera footage in police encounters, a court cannot assume the truth concerning the facts alleged by plaintiffs but rather must view the facts in light of the indisputable video evidence.[24] If the record contains "videotape capturing the events in question" that blatantly contradict plaintiff's version of events, a court cannot adopt such "visible fiction" and must "view[] the facts in the light depicted by the videotape."[25]

Here, Plaintiffs' allegations are blatantly contradicted by the evidence from the officers' bodycam videos. First and foremost, frame by frame images from Officer Robinson's bodycam video show an open knife, approximately 8 inches long, laying in the grass at most a few inches from where Mr. Harmon's right hand landed as he fell.[26] This same knife is also shown in photos taken later of the scene.[27] In addition, the video evidence indisputably shows that Mr. Harmon's

---

[21]     *Commonwealth,* 680 F.3d at 1201; *Smith v. United States,* 561 F.3d 1090, 1098 (10th Cir.2009).
[22]     *Tellabs,* 551 U.S. at 322.
[23]     *Farrell-Cooper Min. Co. v. United States DOI,* 728 F.3d 1229, 1237, n. 6 (10th Cir. 2013) (citation simplified); *see also Garcia-Rodriguez v. Gomm,* 169 F. Supp. 3d 1221, 1230 (D. Utah 2016) (finding plaintiffs' allegations that were contradicted by warrant documents were not entitled to the assumption of truth).
[24]     *Scott v. Harris,* 550 U.S. 372, 378-81 (2007).
[25]     *Id.* at 381; *see also Borneman v. Rozier,* 398 F. App'x 415, 418 (10th Cir. 2010) ("But where, as here, the record contains videotapes capturing the events in question, the court 'view[s] the facts in the light depicted by the videotape.'"); *Bryner v. Utah,* 429 F. App'x 739, 746 (10th Cir. 2011) (same).
[26]     Officer Robinson Frame by Frame Excerpts; Combined bodycam video, at 00:35 – 00:36.
[27]     Scene photos, Ex. I.

hands appeared to meet together in front of his body just above waist level,[28] Mr. Harmon's feet were pointing in the direction of Officer Fox,[29] and his head and fact were turned towards Officer Fox.[30] Multiple bodycam images confirm that Mr. Harmon's right arm and hand were raised above his shoulder and bent at the elbow, and moving in a way that is consistent with holding a knife in a threatening or "charging" manner.[31] Because the clear video evidence shows the knife laying just inches from where Mr. Harmon's right hand landed as he fell, no reasonable jury could find that Mr. Harmon did not have a knife and was not charging at Officer Fox with the knife in his raised right hand. Thus, Plaintiffs' version of events, in which they attempt to create the impression that Mr. Harmon "was unarmed and fleeing," is utterly discredited.

Moreover, it is hardly remarkable that the bodycam videos failed to capture the audio of Mr. Harmon making the threatening "cut or stab" statements reported by all three responding officers. Even when the officers' cameras were in very close proximity to Mr. Harmon, Mr. Harmon's voice is barely audible. And as Harmon ran and the officers scrambled to grab him, the audio background noise is so pervasive that it effectively drowns out the capture of human speech for those 6 or 7 seconds. It cannot legitimately be contended that the recording captured all of the audio of the encounter.

---

[28]     Officer Smith Frame by Frame Excerpts, at 08_18_03 to 08_18_07; Officer Fox Frame by Frame Excerpts, at 01_05_15 to 01_07_17, and 01_06_00; Combined bodycam video, at 0:20 to 0:22.

[29]     Officer Smith Frame by Frame Excerpts at 08_18_28 to 08_19_05; Combined bodycam video, at 0:20 to 0:22.

[30]     Officer Smith Frame by Frame Excerpts at 08_18_28 to 08_19_05; Officer Fox Frame by Frame Excerpts at 01_05_11 to 01_06_20; Combined bodycam video, at 0:20 to 0:23.

[31]     Officer Smith Frame by Frame Excerpts at 08_18_28 to 08_19_05; Officer Fox Frame by Frame Excerpts at 01_05_11 to 01_06_20; Combined bodycam video, at 0:20 to 0:23.

### C.    The Use of Deadly Force by Officer Fox was Objectively Reasonable.

Given the indisputable video evidence, Plaintiffs cannot meet their burden to establish the first prong of qualified immunity – a violation of a constitutional or statutory right.

### i.    The Fourth Amendment reasonableness standard.

Claims of excessive force are analyzed under the Fourth Amendment's objective reasonableness standard, judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[32] The objective reasonableness standard applies to any use of force by a law enforcement officer, whether during an arrest, investigatory stop, or other seizure.[33] There is no precise formula to apply in making this fact-specific assessment, but factors to consider, as articulated by the Supreme Court in *Graham v. Connor*, include:  the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight.[34] Ultimately, however, "the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force."[35] Moreover,"[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[36]

---

[32]    *Graham v. Connor*, 490 U.S. 386, 396 (1989).
[33]    *Id*. at 395.
[34]    *Id*. at 396.
[35]    *Id*.
[36]    *Id*. at 396–97.

The use of deadly force is only reasonable where the officer has probable cause to believe the suspect poses a threat of death or serious physical harm to the officer or to others.[37] In assessing the degree of threat facing an officer in deadly force cases, the Tenth Circuit, in *Estate of Larsen v. Murr,* set forth the following non-exclusive factors to be considered:  "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect."[38]

Where, as here, the material facts are not in dispute, the objective legal reasonableness of the officer's use of force is a question of law.[39]

      ii.    <u>Under the totality of the circumstances, the use of deadly force by Officer Fox was objectively reasonable.</u>

The first *Graham* factor to consider is the severity of the crime. In this instance, Mr. Harmon had an outstanding felony warrant arising from an aggravated assault. Moreover, Mr. Harmon then engaged in an attempted aggravated assault on a police officer when he charged Officer Fox with a dangerous weapon, which is also a felony.[40] This factor weights in favor of a finding of objective reasonableness.

The second *Graham* factor to consider is whether the suspect poses an immediate threat to the safety of the officers or others. Specifically, in cases where deadly force is used, the degree

---

[37]   *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).
[38]   *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2009).
[39]   *Mecham v. Frazier*, 500 F.3d 1200, 1203 (10th Cir.2007) (stating "the question of objective reasonableness is not for the jury to decide where the facts are uncontroverted."); *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1251 (10th Cir. 2003).
[40]   UTAH CODE § 76-5-103.

of the threat may be assessed utilizing the non-exclusive factors in *Estate of Larsen*. Here,

viewing the events as depicted by the bodycam videos, a reasonable officer on the scene would

have probable cause to believe that Mr. Harmon posed an immediate threat of serious physical

harm to the officers. First, Mr. Harmon did not comply with police commands, despite being

well aware that he was under arrest for his felony warrant. Instead, as the officers gave

commands for him to place his hands behind his back, Mr. Harmon initially appeared to comply,

when suddenly and without warning, he broke free and began to run. Second and more

importantly, Mr. Harmon produced a dangerous weapon, an open knife, and charged towards the

officers, making hostile motions with his right arm and hand raised, while holding the knife in a

stabbing position. Mr. Harmon charged at Officer Fox just seconds after fleeing and before he or

any of the officers could order Mr. Harmon to drop the knife. As shown in the video, Mr.

Harmon's feet and body were facing Officer Fox and Mr. Harmon appeared fixated on Officer

Fox more so than the other officers. Third, the undisputed video evidence shows the close

proximity of Mr. Harmon to Officer Fox on the sidewalk, approximately 5-10 feet away at

most,[41] with Mr. Harmon moving in the direction of Officer Fox with his right arm and hand

raised and holding an open knife. Fourth, the undisputed video evidence indicates that Mr.

Harmon's facial expression appeared hostile and threatening. Faced with these circumstances, a

reasonable officer could conclude that Mr. Harmon intended to cause serious bodily harm to the

officers.[42] In sum, consideration of each of the *Estate of Larsen* factors weigh in favor of a

finding of objective reasonableness.

---

[41]     Still frames from Combined bodycam video.

[42]     In addition, Plaintiffs allege that Officer Fox reported hearing Harmon threaten to "cut"
or "stab" him as Harmon attempted to flee (Pls.' Compl., ECF No. 6-1, at ¶¶ 93, 105) which

The third _Graham_ factor to consider is the suspect's attempts to resist or evade arrest. Again, the undisputed video evidence shows that Mr. Harmon knew he was under arrest, initially appeared willing to cooperate, and then deliberately attempted to flee and evade the officers. A reasonable officer would believe that Mr. Harmon was attempting to resist or evade arrest. Therefore, this factor also weighs in favor of a finding of objective reasonableness.

The Tenth Circuit concluded the use of deadly force was objectively reasonable in similar circumstances to those faced by Officer Fox. For example, in _Estate of Larsen_, officers responded to an emergency call that a suspect had threatened to kill someone or himself.[43] As officers approached the suspect's home, the suspect stood alone on the front porch with a large knife.[44] Officers gave repeated commands to drop the knife.[45] Appearing agitated, the suspect raised the knife above his shoulder with the blade pointed outward.[46] The suspect took a step towards an officer who was somewhere between 7 and 20 feet away, and the officer fired his

further indicates to a reasonable officer that Mr. Harmon sought to do harm.  Although not alleged, both Officer Smith and Officer Robinson heard Harmon make similar threats about cutting or stabbing or words to that effect. Plaintiffs assert that the reports of the officers are contradicted by the audio/video recordings of the incident because the audio did not capture such statements. However, this absence in the audio recording is hardly remarkable as the recording is largely inaudible due to the movement and scuffling of the officers and Mr. Harmon, and other background noise such as radio traffic. Notably, Mr. Harmon's voice is barely audible during the initial portion of the incident where the officers are conversing with him in close proximity to the body-worn recording devices. Thus, Plaintiffs cannot legitimately contend the audio recording captured the entirety of the incident. Regardless, Mr. Harmon's threatening statements are not material for purposes of this motion because there is ample indisputable evidence to support the conclusion that a reasonable officer could believe that Mr. Harmon's manifest intentions were hostile, threatening and defiant in relation to the officers.

43  _Estate of Larsen_, 511 F.3d at 1260.
44  _Id_.
45  _Id_.
46  _Id_.

weapon.[47]. In affirming the district court, the Tenth Circuit found that the officer was faced with an armed suspect who appeared willing and able to attack with a knife, and reasonably concluded the suspect posed an immediate threat to his safety. [48]

Here, Officer Fox was arguably faced with an even greater threat given the circumstances. Mr. Harmon went from appearing cooperative as the officers were peacefully in the process of placing him into handcuffs to instantly appearing combative and unpredictable. Mr. Harmon attempted to evade arrest on a felony warrant and charged at officers in close proximity with a raised knife in his hand. The entire sequence of events occurred in approximately seven seconds, in circumstances that were tense, uncertain and rapidly evolving. Officer Fox was forced to make a split-second decision in ascertaining the threat posed by Mr. Harmon. Considering the totality of the circumstances, the use of deadly force by Officer Fox was objectively reasonable.

**D.      No Clearly Established Law Shows the Use of Deadly Force in these Circumstances Violated Harmon's Fourth Amendment Rights.**

Plaintiffs likewise cannot meet the second prong of the qualified immunity analysis – that the constitutional right was clearly established at the time of the challenged conduct. "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."[49] For a right to be "clearly established," the contours of the right must be sufficiently clear so as to give officials fair warning that their

---

[47]      *Id.* at 1260-61.
[48]      *Id.* at 1263.
[49]      *Pearson*, 555 U.S. at 233.

**92**

conduct is unconstitutional.[50] This means that "every reasonable official would have understood that what he is doing violates that right."[51] Qualified immunity gives governmental officials "breathing room to make reasonable but mistaken judgments," and "protects all but the plainly incompetent or those who knowingly violate the law."[52] Thus, qualified immunity operates "to protect officers from the sometimes 'hazy border between excessive and acceptable force.'"[53]

Although the law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question "beyond debate."[54] The Supreme Court has instructed that clearly established law should not be defined at a high level of generality.[55]

As set forth in Section C above, the Tenth Circuit has concluded the use of deadly force was objectively reasonable in circumstances similar to those faced by Officer Fox.[56] Thus, Officer Fox was presented with circumstances for which there is no factually similar caselaw that would alert him that his conduct could be unconstitutional. Accordingly, Plaintiffs cannot meet their burden under the second prong of the qualified immunity analysis to show that *every* reasonable officer would have known that the use of deadly force in circumstances faced by Officer Fox was a violation of the Fourth Amendment.

Because Plaintiffs cannot satisfy either prong of the test, Officer Fox is entitled to qualified immunity as a matter of law.

---

[50] *Saucier v. Katz*, 533 U.S. 194, 202 (2001).
[51] *Ashcroft v. al-Kidd*, 563 U.S. at 741 (citation and internal quotation omitted).
[52] *Ashcroft*, 563 U.S. at 743 (citation omitted).
[53] *Saucier*, 533 U.S. at 202.
[54] *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (citation simplified).
[55] *Id*.
[56] *Estate of Larsen*, 511 F.3d at 1263.

## III.   PLAINTIFFS FAIL TO STATE AN EQUAL PROTECTION VIOLATION.

Plaintiffs' equal protection claim fails because Plaintiffs allege no facts that plausibly show that Officer Fox's use of deadly force was motivated by racial animus. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."[57] In order to state a race-based equal protection claim, a plaintiff must sufficiently allege that the defendant was "motivated by racial animus."[58] Here, Plaintiffs allege only the conclusory assertion that "Mr. Harmon's [black] race was a substantially motivating factor in Defendant Fox's decision to use excessive force against him."[59] Under the Rule 12(b)(6) standard, this single conclusory claim is not sufficient, and Plaintiffs' equal protection claim should be dismissed.[60]

## IV.   PLAINTIFFS CANNOT STATE A MUNICIPAL LIABILITY CLAIM.

Because Officer Fox's conduct did not violate a constitutional right, the City cannot, as a matter of law, be held liable for Officer Fox's conduct. A municipality can only be liable under § 1983 if it took "action pursuant to official municipal policy of some nature [that] caused a constitutional tort."[61] A municipality cannot be held liable where there was no underlying constitutional violation by any of its officers.[62] Because Plaintiffs cannot state a constitutional violation against Officer Fox, Plaintiffs' claims similarly fail against defendant Salt Lake City.

---

[57]   *Requena v. Roberts*, 893 F.3d 1195, 1210 (10th Cir. 2018) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).
[58]   *Id.* (quoting *Phelps v. Wichita Eagle–Beacon*, 886 F.2d 1262, 1269 (10th Cir.1989)).
[59]   Pls.' Compl., ECF No. 6-1, at ¶ 176.
[60]   *Iqbal*, 556 U.S. at 678.
[61]   *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).
[62]   *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) (citations omitted).

V.      PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED WITHOUT
        PREJUDICE.

The court need not reach the merits of Plaintiffs' state law claims if it finds the federal

claims should be dismissed. "When all federal claims have been dismissed, the court may, and

usually should, decline to exercise jurisdiction over any remaining state claims."[63] In that event,

the Court may dismiss the state law claims without prejudice. Alternatively, as set forth in

Section VI., these claims should be dismissed for failure to state a claim for relief.

VI.     ALTERNATIVELY, PLAINTIFFS FAIL TO STATE A CLAIM FOR RELIEF
        UNDER STATE LAW.

        A.      Plaintiffs' Wrongful Death Claim is Barred by the GIAU.

Because Plaintiffs' claims for wrongful death under UTAH CODE § 78B-3-106 asserts an

injury arising out of the battery that occurred when Mr. Harmon was shot, the City and Officer

Fox are immune from Plaintiffs' wrongful death claim under the Governmental Immunity Act of

Utah ("GIAU"), UTAH CODE § 63G-7-101 *et seq*.

Lawsuits brought against governmental entities and/or their employees are governed by

the GIAU. The GIAU states:  "[e]xcept as provided in Subsection (3)(c), an action under this

chapter against a governmental entity for an injury caused by an act or omission that occurs

during the performance of an employee's duties, within the scope of employment, or under color

of authority is a plaintiff's exclusive remedy."[64] Unless otherwise provided in the GIAU, "each

governmental entity and each employee of a governmental entity are immune from suit for any

injury that results from the exercise of a governmental function."[65] Governmental immunity

---

[63] *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998).
[64] UTAH CODE § 63G-7-202(3)(a) .
[65] UTAH CODE § 63G-7-201(1) (2014).

from suit is not waived where the injury alleged "arose out of, in connection with, or results from "assault, battery . . . . . . or a violation of civil rights."[66]

In determining whether a claim is precluded by the GIAU, a court must look to the conduct that was the "proximate cause of the injury" the plaintiff alleges occurred.[67] Immunity is retained for negligence and wrongful death claims where the alleged negligence results in injuries arising out of assault or battery.[68] Plaintiffs' wrongful death claim is based on the act of Officer Fox in shooting Mr. Harmon. Because the alleged injury arose from a battery, Plaintiffs' claims for wrongful death against the City and Officer Fox are barred by the GIAU.

In addition, to the extent Plaintiffs assert that it may assert a claim for wrongful death against Officer Fox because they allege his actions in shooting Mr. Harmon were "willful and malicious," such allegations are not based on underlying facts but rather are mere conclusions or "formulaic recitations" of the elements of a claim. Thus, they cannot be afforded a presumption of truth, and must be excluded from the court's analysis.[69]

---

[66]   UTAH CODE § 63G-7-301(5)(b) (2014).
[67]   *See, e.g. Barneck v. Utah Dep't of Transp.*, 2015 UT 50, ¶¶ 36-49, 353 P.3d 140, 149 (finding courts must look to the "proximate cause" of the injury alleged to determine whether an exception to the waiver of immunity applies); *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1323-24 (10th Cir. 2009) ("[T]he question of immunity under the Utah Governmental Immunity Act focuses on the conduct out of which the injury arose rather than the theory of liability argued by a plaintiff.").
[68]   *See Thomson*, 584 F.3d at 1323 (finding state law claims barred by GIAU, recognizing that injury complained of—Mr. Thomson's death—arose out of the battery that occurred when he was shot by officers); *Chief v. West Valley City*, No. 2:11-CV-643 TS, 2013 WL 6146061, at *12 (D. Utah Nov. 21, 2013) (finding GIAU barred wrongful death claim against police officers for shooting death of Brandon Chief). *Tiede v. Utah State Dep't of Corr.*, 915 P.2d 500, 503 (Utah 1996) (holding that the GIAU bars wrongful death claims that arise out of an assault or battery).
[69]   *Iqbal*, 556 U.S. at 679.

**B.      Plaintiffs Cannot State A Claim for Violation of the Unnecessary Rigor Clause of the Utah Constitution.**

Because the use of deadly force by Officer Fox was objectively reasonable and did not violate clearly established law, Plaintiffs' claim under the Utah Constitution also fails as a matter of law.

Article I, Section IX of the Utah Constitution states as follows: "Excessive bail shall not be required; excessive fines shall not be imposed; nor shall cruel and unusual punishments be inflicted. Persons arrested or imprisoned shall not be treated with unnecessary rigor." Although the first sentence closely approximates the language of the Eighth Amendment to the United States Constitution, "the unnecessary rigor provision has no federal counterpart."[70] However, the prohibition against unnecessary rigor clearly allows police to use 'reasonable and necessary force' in making an arrest.[71] In order to recover, a plaintiff must establish a "flagrant" violation of constitutional rights – which means that:

> [a] defendant must have violated clearly established constitutional rights of which a reasonable person would have known. To be considered clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that [constitutional] right. The requirement that the unconstitutional conduct be flagrant ensures that a government employee is allowed the ordinary human frailties of forgetfulness, distractibility, or misjudgment without rendering [himself] liable for a constitutional violation.[72]

As set forth in Section II above, the use of deadly force by Officer Fox was objectively reasonable. Moreover, Officer Fox's conduct did not violate a clearly established constitutional right. Therefore, Plaintiffs cannot establish a claim under the unnecessary rigor clause.

---

[70] *Dexter v. Bosko*, 2008 UT 29, ¶ 7, 184 P.3d 592, 595.
[71] *Id.* at ¶ 16 (citation simplified).
[72] *Id.* at ¶¶ 21-23 (citation simplified).

## CONCLUSION

The Court should dismiss Plaintiffs' claims against Officer Fox for violation of the Fourth Amendment based on qualified immunity. The Court should dismiss Plaintiffs' claims against Officer Fox for violation of the equal protection clause on the grounds it fails to plausibly state a claim as a matter of law. Because Plaintiffs cannot state a constitutional violation against Officer Fox, the City likewise cannot be held liable. Finally, Plaintiffs' state law claims should be dismissed without prejudice for lack of subject matter jurisdiction. Alternatively, Plaintiffs' claim for wrongful death under state law should be dismissed with prejudice because it is barred by the GIAU, and Plaintiffs cannot state a claim for violation of the unnecessary rigor clause of the Utah Constitution.

DATED this 9th day of September, 2019.

/s/ Catherine L. Brabson

CATHERINE L. BRABSON
MARK E. KITTRELL
*Attorneys for Defendants Salt Lake City and Officer Clinton Fox*

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of September, 2019, a true and correct copy of the **MOTION TO DISMISS AND MEMORANDUM IN SUPPORT** was electronically filed with the Clerk of the Court, which sent notice to:

Andrew G. Deiss
Corey D. Riley
DEISS LAW PC
10 West 100 South, Suite 425
Salt Lake City, UT 84101
adeiss@deisslaw.com
criley@deisslaw.com

/s/ Lindsay A. Ross

**98**

Catherine L. Brabson (#6500)
Mark E. Kittrell (#9500)
SALT LAKE CITY CORPORATION
P.O. Box 145478
451 South State Street, Suite 505A
Salt Lake City, Utah 84114-5478
Telephone:  (801) 535-7788
Facsimile:  (801) 535-7640
Catherine.Brabson@slcgov.com
Mark.Kittrell@slcgov.com

*Attorneys for Defendants Salt Lake City and Officer Clinton Fox*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ESTATE OF PATRICK HARMON SR.; PATRICK HARMON II, as Personal Representative of the Estate of Patrick Harmon Sr., and heir of Patrick Harmon Sr., TASHA SMITH, as heir of Patrick Harmons, Sr., | **APPENDIX OF EXHIBITS A – I TO DEFENDANTS' MOTION TO DISMISS AND MEMORANDUM IN SUPPORT [DKT. 12]** <br><br> **CONVENTIONALLY FILED** |
| Plaintiffs, | |
| vs. | |
| SALT LAKE CITY, a municipality; and OFFICER CLINTON FOX, in his individual capacity, | Case No. 2:19-cv-00553 |
| Defendants. | Judge Robert J. Shelby |

Pursuant to Rule 56-1 of the Civil Rules of Practice of the United States District Court for

the District of Utah, Defendants Salt Lake City and Officer Clinton Fox, by and through their

attorneys of record, hereby submits this Appendix of Exhibits in Support of its Motion to

Dismiss and Memorandum in Support [Dkt 12].

| Docket | Exhibit | Description | Format |
|--------|---------|-------------|--------|
| 13-1 | A | Kris Smith Bodycam | MP4 Video |
| 13-2 | B | Clinton Fox Bodycam | MP4 Video |
| 13-3 | C | Scott Robinson Bodycam | MP4 Video |
| 13-4 | D | Combined Bodycam Video | MP4 Video |
| 13-5 | E | Officer Smith Frame by Frame Excerpts | BMP Photos |
| 13-6 | F | Officer Fox Frame by Frame Excerpts | BMP Photos |
| 13-7 | G | Compilation Photos | PDF Photos |
| 13-8 | H | Officer Robinson Frame by Frame Excerpts | BMP Photos |
| 13-9 | I | Knife Scene Photos | PDF Photos |

DATED this 9th day of September, 2019.

/s/ Catherine L. Brabson
CATHERINE L. BRABSON
MARK E. KITTRELL
*Attorneys for Defendants Salt Lake City and Officer Clinton Fox*

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of September, 2019, a true and correct copy of the **APPENDIX OF EXHIBITS A – I TO DEFENDANTS' MOTION TO DISMISS AND MEMORANDUM IN SUPPORT [DKT. 12]** was electronically filed with the Clerk of the Court, which sent notice to:

Andrew G. Deiss
Corey D. Riley
DEISS LAW PC
10 West 100 South, Suite 425
Salt Lake City, UT 84101
adeiss@deisslaw.com
criley@deisslaw.com

/s/ Lindsay A. Ross

**100**

# Kris Smith Bodycam

## <u>CONVENTIONALLY FILED</u>

Exhibit A – Kris Smith Bodycam (Dkt. 13-A)

Exhibit 9 - Kris Smith Bodycam (Dkt. 67-9)

Exhibit 2 – Kris Smith Bodycam (Dkt. 80-2)

# Clinton Fox Bodycam

## <u>CONVENTIONALLY FILED</u>

Exhibit B – Clinton Fox Bodycam (Dkt. 13-B)

Exhibit 12 – Clinton Fox Bodycam (Dkt. 67-12)

Exhibit 3 – Clinton Fox Bodycam (Dkt. 80-3)

# Scott Robinson Bodycam

## <u>CONVENTIONALLY FILED</u>

Exhibit C – Scott Robinson Bodycam (Dkt. 13-C)

Exhibit 10 – Scott Robinson Bodycam (Dkt. 67-10)

Exhibit 4 – Scott Robinson Bodycam (Dkt. 80-4)

# Combined Bodycam

## <u>CONVENTIONALLY FILED</u>

Exhibit D – Combined Bodycam (Dkt. 13-D)

Exhibit 13 - Combined Bodycam (Dkt. 67-13)

Andrew G. Deiss (7184)
Corey D. Riley (16935)
Deiss Law PC
10 West 100 South, Suite 425
Salt Lake City, Utah 84101
(801) 433-0226
adeiss@deisslaw.com
criley@deisslaw.com

*Attorneys for Plaintiffs*

Qusair Mohamedbhai*
Siddhartha H. Rathod*
Matthew J. Cron*
Nicholas A. Lutz*
2701 Lawrence Street, Suite 100
Denver, Colorado 80205
(303) 578-4400 (p)
(303) 578-4401 (f)
qm@rmlawyers.com
sr@rmlawyers.com
mc@rmlawyers.com
nl@rmlawyers.com

*\*denotes counsel who will seek pro hac vice
admission*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ESTATE OF PATRICK HARMON SR.; PATRICK HARMON II, as Personal Representative of the Estate of Patrick Harmon Sr., and heir of Patrick Harmon Sr., TASHA SMITH, as heir of Patrick Harmon Sr., <br><br> Plaintiff, <br><br> vs. <br><br> SALT LAKE CITY CORPORATION, a municipality; and OFFICER CLINTON FOX, in his individual capacity, <br><br> Defendants. | **PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS** <br><br> Civil Action No. 19-cv-00553-RJS <br><br> Honorable Robert Shelby |

Plaintiffs Estate of Patrick Harmon Sr., Patrick Harmon II, as personal representative of the Estate of Patrick Harmon Sr., and heir of Patrick Harmon Sr., and Tasha Smith, as heir of Patrick Harmon Sr., by and through undersigned counsel, hereby submit this Response to Defendants' Motion to Dismiss, [ECF No. 12], and in support thereof, state as follows:

## I.  **INTRODUCTION**

It is axiomatic that the Court's review of a motion to dismiss begins with the operative Complaint.  In this case, the facts alleged in Plaintiffs' Complaint are more than sufficient to establish a constitutional violation under clearly established case law.  It is undisputed that, on August 13, 2017, Defendant Clinton Fox shot and killed Patrick Harmon Sr. ("Mr. Harmon").  Plaintiffs have alleged, *inter alia*, that Mr. Harmon was unarmed at the time he was shot, that none of the three officers involved in the shooting reasonably believed Mr. Harmon to be armed, that Mr. Harmon never verbally or physically threatened the officers, that Mr. Harmon was running away from the officers at the time he was shot, that Defendant Fox failed to warn Mr. Harmon that he intended to use deadly force, and that Defendant Fox was the only officer on the scene to employ deadly force.

Defendants do not argue that the facts alleged in the Complaint fail to establish a constitutional violation, nor could they.  Rather, Defendants seek to change the applicable legal standard and substitute their own version of facts for Plaintiffs'.  Although Defendants recite the principle that the Court must accept the allegations in the Complaint as true, Defendants brazenly fail to honor this standard.  Defendants' Motion implicitly asks the Court both to ignore certain material allegations and to resolve all factual disputes in Defendants' favor.  For example, Defendants state that "Officer Fox saw a knife in Mr. Harmon's raised right hand," and cite to Plaintiffs' Complaint to support this assertion.  [ECF No. 12 at ¶ 18].  However, Plaintiffs pled only that Officer Fox told investigators that he saw a knife in Mr. Harmon's hand, but specifically pled that Officer Fox did not actually see a knife (nor could he as Mr. Harmon was

**106**

unarmed). *See* [ECF No. 2-1 at ¶¶ 44, 46, 62, 64-70, 124, 141-42, 145]. Defendants' motion to dismiss relies extensively on similar factual omissions or distortions.

Defendants also contend that a video of the fatal encounter blatantly contradicts Plaintiffs' allegations. Although Plaintiffs agree that the Court may consider the video evidence, the video evidence does not blatantly contradict Plaintiffs' version of events.[1] To the contrary, Defendants are forced to offer explanations as to why the video does not comport with their version of events. For example, Defendants argue that still-frame body camera images show Mr. Harmon "moving in a way that is consistent with holding a knife in a threatening or 'charging' manner." [ECF No. 12 at 18]. Yet, this argument implicitly admits that the video does not show Mr. Harmon actually holding a knife.[2] Similarly, Defendants' Motion attempts to explain why the body camera video did not capture Mr. Harmon making audible threats to the officers, as the officers asserted he did in post-shooting interviews. *Id.* Defendants, of course, are entitled to present these arguments at trial, but these sorts of evidentiary arguments should not be considered on a motion to dismiss.

At this stage of the litigation and for purposes of this Motion, the Court must presume what Plaintiffs have alleged is true. Under well-settled law, police officers may not shoot an

---

[1] Although consideration of the video evidence is proper, the same is not true for the still images produced by Defendants. Such images are devoid of context and can therefore be manipulated to advance a particular version of events. However, the mere fact that Defendants must explain the video through these still images demonstrates that the video evidence does not, by itself, "blatantly contradict" Plaintiffs' allegations.

[2] Moreover, as discussed below, Plaintiffs have alleged numerous facts supporting the allegation that a knife purportedly recovered from the scene was not Mr. Harmon's. Moreover, assuming *arguendo* that the knife did belong to Mr. Harmon, there is a genuine factual dispute as to whether Defendant Fox observed the knife before he used deadly force against Mr. Harmon.

unarmed person who is merely fleeing arrest and is not posing any danger to others. Because Defendants' cannot meet their burden under Fed. R. Civ. P. 12(b)(6), Defendants' Motion to Dismiss must be denied.

## II. LEGAL FRAMEWORK

The Court must 'accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff.'" [ECF No. 12 at 14] (quoting *Albers v. Bd. of Cty. Comm'rs.*, 771 F.3d 697, 700 (10th Cir. 2014) (internal quotations omitted)). "The Court must limit its consideration to the four corners of the [] Complaint, and any documents attached thereto, and any external documents that are referenced in the [] Complaint and whose accuracy is not in dispute." *Rumbaugh v. USANA Health Scis., Inc.*, No. 2:17-CV-106, 2018 WL 5044240, at *2 (D. Utah Oct. 17, 2018) (citing *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (quotation marks omitted).

As stated above, Plaintiffs do not object to the Court's consideration of the body camera footage. However, as with any allegation in the Complaint, the Court must still view the video evidence in the light most favorable to Plaintiffs. *See Ronquillo v. City & County of Denver*, No. 16-cv-01664, [WL 10843787], (D. Colo. Nov. 17, 2016) ("the Court views the video in the light most favorable to Plaintiff, except where the video 'blatantly contradicts' Plaintiff's version of the events."). Additionally, the Court should not consider the various still frame images

provided by Defendants.  Such images can be taken out of context or selected to advance a

particular narrative.  By cherry-picking only certain still frame images, Defendants have

essentially doctored the video evidence to advance their narrative.  *See Scott v. Harris*, 550 U.S.

372, 279 (2007) (proper to rely on video where "[t]here are no allegations or indications that this

videotape was doctored or altered in any way, . . .").  As such, Defendants' still frame images

cross the line from evidence referenced in the complaint to the injection of new factual material.

### III.  <u>ARGUMENT</u>

### A.  The Court Should Reject Defendants' Improper Factual Allegations and Evidentiary Argument

Defendants' Motion to Dismiss fails to accept Plaintiffs' allegations as true.  Defendants'

assertion that their "statement of facts" is "taken from Plaintiffs' Complaint and the indisputable

bodycam video evidence submitted herewith" could hardly be less true.  *See* [ECF No. 12 at 8

n.2].  Of the Defendants' twenty-six purported "facts," only fourteen even reference the

operative pleading.  *See* [ECF No. 12 at ¶¶ 1-2, 4-11, 18, 20, 25-26].  Rather, Defendants'

"Statement of Facts" flaunts the applicable legal standard.

First, Defendants fail to recognize that the Court's review should be limited to the four

corners of the Complaint and the video evidence.  Instead, Defendants' Motion introduces

numerous facts that are outside the Complaint (and are not clearly evident from the video).  For

example, Defendants allege facts related to Defendant Fox's alleged state of mind in shooting

Mr. Harmon.  *See* [ECF No. 12 at 12 ¶ 20] ("Fearing for his safety and the safety of Officers

Smith and Robinson, Officer Fox used his firearm to shoot Mr. Harmon.").  Plaintiffs never

alleged that Defendant Fox feared for his safety or the safety of the officers at the scene; rather,

the reasonableness of Defendant Fox's alleged "fear" is a material factual issue to be determined

by jury.  Similarly, Defendants assert without citation that "Mr. Harmon appeared fixated on

Officer Fox more so than the other officers" and that his "facial expression appeared hostile and

threatening."[3]  [ECF No. 12 at 21].  As Defendants do not identify when Mr. Harmon allegedly

appeared "fixated on Officer Fox" or when his facial expression was allegedly "hostile and

threatening," it is difficult to address these unsupported assertions.  Nevertheless, Plaintiffs

submit that it is impossible to discern Mr. Harmon's facial features on the body camera footage

and that these evidentiary allegations are made out of whole cloth.

Defendants' Motion even attempts to explain aspects of the video evidence that are

inconsistent with Defendants' version of events.  For example, Plaintiffs alleged that Mr.

Harmon made no verbal threats to the officers.  Indeed, no such threats are heard on the video.

In response, Defendants assert that "it is hardly remarkable that **the bodycam videos failed to**

**capture the audio of Mr. Harmon making the threatening 'cut or stab' statements** reported

by all three responding officers."  [ECF No. 12 at 18] (emphasis added).  Similarly, Defendants

assert that Mr. Harmon "charged Officer Fox with a dangerous weapon."  *Id*. at 20.  However,

Plaintiffs' alleged that Mr. Harmon merely looked back at Officer Fox "as he continue[d] to

move away from [the officers]."  [ECF No. 2-1 at ¶¶ 50-51] (caption to still image).  Simply put,

the video does not show Mr. Harmon ever charging at the officers.  At a jury trial, Defendants

---

[3] Notably, these two alleged facts were not included in Defendants' "Statement of Facts" but appeared for
the first time in Defendants' Argument section.  Defendants' Motion includes myriad other factual
assertions that are not identified in their "Statement of Facts" but are included, without citation, as matters
of fact in their Argument.  *See, e.g.*, [ECF No. 12 at 20] ("Mr. Harmon had an outstanding felony warrant
arising from an aggravated assault.") (emphasis added); *Id.* ("Mr. Harmon then engaged in an attempted
aggravated assault on a police officer . . ."); *Id.* at 21 ("Mr. Harmon produced a dangerous weapon, an
open knife, and charged towards the officers"); *Id*. at 23 (Mr. Harmon "appear[ed] combative and
unpredictable.").  By not including these factual allegations in the "Statement of Facts," Defendants seek
to include additional factual allegations that are devoid of evidentiary support.

are entitled to explain why the video does not comport with their officers' version of events. However, on a motion to dismiss, they must accept as true the allegation that Mr. Harmon never verbally threatened the officers or charged at them.

Perhaps the most significant deviation between the Complaint and Defendants' version of events concerns the factual dispute as to whether Mr. Harmon possessed a knife and, if so, whether Mr. Harmon threatened the officers with such knife. Defendants assert throughout their Motion that Mr. Harmon possessed a knife and threatened Defendant Fox with the knife. *See* [ECF No. 12 at 7, 12, 15]. However, Plaintiffs' Complaint alleges that Mr. Harmon did **not** have a knife and did not threaten the officers. *See* [ECF No. 2-1 at ¶¶ 43-47, 64-70, 111-115]. Despite Defendants' unequivocal statements, the video evidence never shows Mr. Harmon holding a knife, let alone brandishing one to threaten the officers. Unsurprisingly, no officer ever ordered Mr. Harmon to drop a knife. [ECF No. 2-1 at ¶¶ 56-57]. As such, the video evidence does not blatantly contradict Plaintiffs' allegation that Mr. Harmon never threatened the officers with a knife.[4]

At trial, Defendants are entitled to persuade a jury that Mr. Harmon threatened the officers with a knife (despite the lack of video support), just as Plaintiffs will attempt to persuade the jury that no knife is visible in Mr. Harmon's hands because he did not possess such knife. In any event, whether Mr. Harmon possessed a knife and threatened the officers with such a knife is a genuine and material factual dispute that is squarely within the province of the trier of fact.

---

[4] Although a knife was found near Mr. Harmon's body, Plaintiffs' Complaint sets forth numerous factual allegations that raise genuine doubt as to whether the knife was Mr. Harmon's or whether he threatened officers with a knife. *See* [ECF No. 2-1 at ¶¶ 64-70, 111-115].

**B.     Defendant Fox is Not Entitled to Qualified Immunity**

Accepting Plaintiffs' allegations as true, as is required at this stage of litigation,

Defendant Fox cannot establish entitlement to qualified immunity.  Qualified immunity must be

denied where, as here, Plaintiffs "can show (a) a reasonable jury could find unconstitutional the

[officer's] use of force . . . and (b) this use of force violated clearly established law."  *Estate of*

*Booker v. Gomez*, 745 F.3d 405, 423 (10th Cir. 2014).  "Claims of excessive force are analyzed

under the objective reasonableness standard of the Fourth Amendment."  *Medina v. Cram*, 252

F.3d 1124, 1131 (10th Cir. 2001).  "Because the reasonableness inquiry overlaps with the

qualified immunity analysis, a qualified immunity defense is of less value when raised in defense

of an excessive force claim."  *Maresca v. Bernalillo Cty.*, 804 F.3d 1301, 1313 (10th Cir. 2015)

(citing *Graham v. Connor,* 490 U.S. 386, 396 (1989)).

   i.     Defendant Fox's Conduct Violated Mr. Harmon's Fourth Amendment Right to be
          Free from Excessive Force

Fourth Amendment claims of excessive force are assessed from "a standard of objective

reasonableness, judged from the perspective of a reasonable officer on the scene."  *Tenorio v.*

*Pitzer*, 802 F. 3d 1160, 1162 (10th Cir. 2015) (citing *Graham v.* Conner, 490 U.S. 386, 396-97

(1989)).  In the context of assessing the reasonableness of deadly force, "an officer's use of that

force is reasonable only 'if a reasonable officer in Defendants' position would have had probable

cause to believe that there was a threat of serious physical harm to themselves or others.'"  *Pauly*

*v. White*, 814 F.3d 1060, 1070 (10th Cir. 2016), *overruled on other grounds by* 137 S. Ct. 548,

196 L. Ed. 2d 463 (2017); *see also Tennessee v. Garner*, 471 U.S. 1, 3 (1985) (holding that under

the Fourth Amendment, deadly force may not be used "to prevent the escape of an apparently

unarmed suspected felon. . . . unless it is necessary to prevent the escape and the officer has

probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officers or others.").

To guide the reasonableness inquiry in the context of deadly force, the Tenth Circuit has identified four non-exclusive factors to determine whether an officer's assessment of a threat of serious physical harm was reasonable: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1313 (10th Cir. 2009). Ultimately, however, "[t]here is no easy-to-apply legal test for whether an officer's use of deadly force is excessive" and courts "must 'slosh our way through the fact-bound morass of reasonableness.'" *Cordova v. Aragon*, 569 F.3d 1183, 1188 (10th Cir. 2009) (quoting *Scott*, 550 U.S. at 383).

Ever since *Tennessee v. Garner*, it has been well-established that law enforcement may not use deadly force to prevent the escape of an unarmed felon who does not pose a significant threat of death or serious physical injury to the officers or others. This case fits squarely within *Garner*. As pled, Mr. Harmon did not possess a weapon, the officers did not reasonably perceive a weapon, Mr. Harmon never threatened the officers, and Mr. Harmon was shot while moving away from the officers. Moreover, the officers did not issue any commands or warnings to Mr. Harmon other than yelling, "I'll fucking shoot you!" less than a second before opening fire. [ECF No. 2-1 at ¶ 56]. Defendants fail to argue that Defendant Fox is entitled to qualified immunity under the facts actually pled in the Complaint. Rather, Defendants have raised qualified immunity on a set of facts that are wildly divergent from the facts actually contained in

9

**113**

the Complaint.  As such, Defendants' invocation of qualified immunity should be rejected on the

grounds that they have not raised the defense with respect to the operative facts.

In their Motion, Defendants rely on *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th

Cir. 2009).  *See* [ECF No. 12 at 20-21].  *Larsen*, however, serves only to highlight the

importance of the factual disputes present in this case.  In *Larsen*, Denver Police Department

Officer Randy Murr and another officer responded to the home of Eugene Larsen, who had

called the police threatening to kill someone or himself.  *Larsen*, 511 F. 3d at 1258.  When the

Officers arrived, they found Larsen, armed with "a large knife with a blade over one foot long."

*Id.*  The officers announced themselves as police and ordered Larsen to drop the knife.  *Id.*  Mr.

Larsen did not comply.  *Id.*  Instead "he raised the knife above his shoulder with the blade

pointed outward and turned towards Officer Murr."  *Id.*  The officers again ordered Mr. Larsen to

drop the knife.  *Id.*  Larsen again refused to comply and began moving toward Officer Murr.  *Id.*

Officer Murr then shot and killed Mr. Larsen.  *Id.*  In contrast to Mr. Larsen, Mr. Harmon never

threatened to harm himself or others, was not armed with a knife, was never ordered to drop a

knife, and was running away from rather than moving towards the officers.

ii.     Mr. Harmon's Right to be Free from Deadly Force While Unarmed and Fleeing
        Was Well Established When He was Shot and Killed by Officer Fox

As discussed above, the facts of this case are substantially similar to the Supreme Court's

decision in *Tennessee v. Garner*, which clearly established that a police officer's use of deadly

force against an unarmed and fleeing felon violates the Fourth Amendment.  More recent Tenth

Circuit precedents put Officer Fox on further notice of Mr. Harmon's clearly established right to

free of deadly force while unarmed and fleeing.  In *Tenorio*, 802 F.3d at 1161, the Tenth Circuit

affirmed a district court's denial of qualified immunity to an officer who shot Russell Tenorio

10

**114**

after responding to an emergency call at Tenorio's home.[5]  The officers were responding to a 9-1-1 call made by one of Tenorio's relatives, disclosing that Tenorio had a knife to his own throat, that he had been violent in the past, that he was drunk, and that he was waving the knife around in close proximity to others.  *Id.* at 1162.  Officer Pitzer entered Tenorio's home and ordered the occupants to step out into the living room.  *Id.*  Tenorio's wife entered the living room, followed by Tenorio, "who had a blank stare and was carrying a santoku-style kitchen knife with a three-and-a-quarter-inch blade."  *Id.* at 1163.  As Tenorio continued to walk, "Pitzer saw the knife and yelled, 'Sir, put the knife down! Put the knife down, please! Put the knife down! Put the knife down!' When Tenorio was about two and one-half steps into the living room, Pitzer shot him, [another officer] tased him, and he fell to the floor."  *Id.*  The Tenth Circuit affirmed the district court's denial of qualified immunity, observing that:

> [T]he record supports some potential jury findings that would establish Tenorio's claim—in particular, that Tenorio did not refuse to drop the knife because he was not given sufficient time to comply with Pitzer's order; that Tenorio made no hostile motions toward the officers but was merely holding a small kitchen knife loosely by his thigh and made no threatening gestures toward anyone[]; that Tenorio was shot before he was within striking distance of [Pitzer]; and that, for all Pitzer knew, Tenorio had threatened only himself and was not acting or speaking hostilely at the time of the shooting.

---

[5] Defendants cite *Kisela v. Hughes*, 138 S. 1148, 1152 (2018), in support of their argument that Mr. Harmon has not shown that his constitutional rights were well-established.  [ECF No. 12 at 24]. However, "The Supreme Court's analysis in *Kisela* that Supreme Court and Ninth Circuit precedent was not sufficiently clear to render the officer's actions a clear violation of law does not compel the same result in this circuit, because it did not analyze the clearly established law in the Tenth Circuit."  *Tenorio v. Pitzer*, 2018 WL 4491167, at *3 (D.N.M. Sept. 19, 2018).  "*Kisela* thus did not effectively overrule *Tenorio* or amount to an intervening change in controlling law. This Court therefore continues to be bound by the Tenth Circuit decision in *Tenorio*."  *Id.* at *4.

*Id.* at 1164–65 (alterations and internal quotations omitted).  In denying qualified immunity, the

*Tenorio* court also cited to *Zuchel v. City & County of Denver*, 997 F.2d 730, 735–37 (10th

Cir.1993), to establish that the that law applied to Mr. Tenorio was clearly established.  *Id.* at

1165.  Indeed,

> *Zuchel* specifically established that where an officer had reason to believe that a
> suspect was only holding a knife, not a gun, and the suspect was not charging the
> officer and had made no slicing or stabbing motions toward him, that it was
> unreasonable for the officer to use deadly force against the suspect.

*Id.* at 1165-66 (citing *Zuchel*, 997 F.2d at 735-37).  Based on the foregoing, it was clearly

established in the Tenth Circuit that it is not reasonable for an officer to use deadly force against

a suspect who was not making aggressive actions towards the officer, even when the suspect was

holding a knife.  Likewise, Mr. Harmon did not charge or make any stabbing motions towards

Defendant Fox or the other officers.  Moreover, as Mr. Harmon was not even armed with a knife,

his deadly force claim is even stronger than the claims in *Tenerio or Zuchel*.  As such, based on

the facts alleged in the Complaint and not "blatantly contradicted" by the video, there can be no

dispute that Officer Fox violated Mr. Harmon's clearly-established right to be free from

excessive deadly force.

**C.      Plaintiffs Have Adequately Pled an Equal Protection Claim**

Defendants assert that Plaintiffs' have included only a single, conclusory allegation to

support their Equal Protection Clause claim against Defendants.  [ECF No. 12 at 25] (citing

[ECF No. 2-1 ¶ 176]).  This is a perplexing assertion given the numerous allegations in

Plaintiffs' Complaint demonstrating a record of racially biased policing, use of force, and use of

deadly force by the Salt Lake City Police Department.  *See* [ECF No. 2-1 at 6-7; ¶¶ 125-133].

As pled, Mr. Harmon's death is a predictable consequence of a police force that uses vastly

disproportionate force against the black citizens of Salt Lake City. As pled in the Complaint, "[i]n a city that is just 2.7% black, SLCPD used force against black persons in 13.1% of all incidents." *Id*. at 6-7. Additionally, Plaintiffs pled numerous allegations indicating that Salt Lake City engages in a pattern and practice of racial discrimination in use of force cases. Indeed, Salt Lake City has just recently settled a class-action suit in which it promised that "SLCPD officers shall not use race, color, ethnicity, or national origin in exercising discretion to conduct a warrantless stop or search, or to seek a warrant." *Id*. at ¶ 131;[6] *see also id.* at ¶¶ 125-133. Given these alarming statistics, the allegations in Plaintiffs' Complaint are sufficient to state an equal protection claim.

**D.    Plaintiffs Have Adequately Pled a Municipal Liability Claim**

Defendants' argument with respect to municipal liability is predicated on the contention that Plaintiffs' Complaint did not establish a constitutional claim against Defendant Fox. Defendants do not otherwise address Plaintiffs' municipal liability claim. Accordingly, Plaintiffs rely on their arguments above.

**E.    Plaintiffs' State Law Claims Should Not be Dismissed**

Defendants ask this Court to dismiss Plaintiffs' wrongful death claim on the grounds of governmental immunity. Their argument relies on two false premises: (1) that all batteries committed by a government employee fall within the immunities described in the Governmental Immunity Act of Utah ("GIA"); and (2) that battery is the only applicable tort for the wrongful

---

[6] As they are referred to and incorporated in Plaintiffs' Complaint, the Court may take judicial notice of the publicly filed documents in *Winston v. Salt Lake City, et al.*, 12-cv-01134-PMW, WL 6216571 (D. Utah 2012).

death claim.  As explained below, Defendants' arguments are mistaken for at least three reasons.

First, the GIA does not immunize willful misconduct that is outside the scope of the government

employees' duties.  Second, any immunity for Defendant Fox's conduct was waived and does

not fall within an exception.  Third, the Utah Constitution prohibits the government from

exercising immunity from liability for a wrongful death caused by the government's use of

unnecessary rigor.  For these reasons, the GIA does not apply and Defendants' motion to dismiss

Plaintiffs' wrongful death claim should be denied.

Plaintiffs' wrongful death claim is brought under Utah Code § 78B-3-106, which states:

"when the death of a person is caused by the wrongful act or neglect of another, his heirs, or his

personal representatives for the benefit of his heirs, may maintain an action for damages against

the person causing the death[.]"  The plain language of the statute provides that the wrongful

death must be the result of a "wrongful act" or "neglect" by the defendant.  Thus, the wrongful

death statute is "fault based."  *Adkins v. Uncle Bart's, Inc.*, 1 P.3d 528, 530 (Utah 2000).  "It

must be shown that a defendant negligently breached some duty owed to the [decedent] and that

the breach proximately caused the death."  *Id.*

The GIA provides the circumstances in which the government has waived immunity from

liability.  *See* Utah Code § 63G-7-101–904.  "The scope of the waivers and retentions of

immunity [under the GIA] governs all claims against governmental entities or against their

employees or agents arising out of the performance of the employee's duties, within the scope of

employment, or under color of authority."  Utah Code § 63G-7-101(2)(b).  The GIA provides

that "[a] governmental entity and an employee of a governmental entity retain immunity from

suit unless that immunity has been expressly waived . . . ."  Utah Code § 63G-7-101(3).

Defendants contend that the battery exception to the negligence waiver provides a basis

for immunity.  *See* Utah Code § 63G-7-201(4)(b) (2016) (providing that "[a] governmental

entity, its officers, and its employees are immune from suit . . . for any injury proximately caused

by a negligent act or omission of an employee committed within the scope of employment, if the

injury arises out of or in connection with, or results from . . . assault, battery, . . . or violation of

civil rights.").  However, as discussed below, the battery exception does not apply when the

government's negligence arises from the tort of unnecessary rigor, and, even if it did, the GIA

does not apply to an actor's willful misconduct or to wrongful death claims arising from

constitutional torts.

   i.   Negligence waiver

The negligence waiver applies to the wrongful death claim. The Utah Supreme Court has

held that gross negligence or "reckless indifference" is included in the negligence waiver for the

purposes of the GIA.  *Bingham v. Roosevelt City Corp.*, 235 P.3d 730, 743 (Utah 2010).  "In

Utah, gross negligence is 'the failure to observe even slight care; it is carelessness or

recklessness to a degree that shows utter indifference to the consequences that may result.'"

*Penunuri v. Sundance Partners, Ltd.*, 423 P.3d 1150, 1159 (Utah 2017).

In this case, Plaintiffs allege that "Officer Fox's shooting of Mr. Harmon was wrongful,

willful, and unreasonable given the facts and circumstances at the time of the shooting and

resulted in Mr. Harmon's death."  [ECF No. 2-1 at ¶ 183].  Moreover, the Complaint states that

"Officer Fox utilized excessive force by shooting Mr. Harmon, who was unarmed and did not

reasonably present a danger to Officer Fox or other officers."  *Id*. at ¶ 184.  Based on these

allegations, it plausible that "defendant's conduct exposed [Mr. Harmon] to a significantly

15

**119**

elevated level of risk." *See Penunuri*, 423 P.3d at 1160.  In particular, the wrongful death claim

arises from Defendant Fox's own conduct that "created the need for deadly force in this incident

through his own reckless, deliberate conduct that was immediately connected to his use of

excessive deadly force."  [ECF No. 2-1 at ¶ 144].  Accordingly, the wrongful death claim

sufficiently alleges reckless indifference or gross negligence under Utah law and, therefore, the

negligence waiver applies.

Next, the exceptions to the negligence waiver do not apply to the wrongful death claim.

Defendants argue that immunity attaches to all claims where the alleged injury "arose out of, in

connection with, or results from . . . battery[.]"  [ECF No. 12 at 27].  Under this exception,

injuries resulting from battery, violations of civil rights, and several other enumerated tort claims

are combined into one category of exceptions to the negligence waiver.  Utah Code § 63G-7-

201(4)(b) (2016).  But Plaintiffs have not alleged any of the causes of action listed in this

provision, including battery.  Instead, the wrongful death cause of action arises from the

constitutional tort of unnecessary rigor, which is not (and, as discussed below, cannot be) listed

as an exception to the waiver.  Because the unconstitutional conduct is not included in the

exceptions stated in § 201, immunity is not reinstated and the negligence waiver does not apply

to Plaintiffs' wrongful death claim.

Hoping to find an exception to the waiver, Defendants concede that Defendant Fox

committed a battery when he shot Mr. Harmon.  [ECF No. 12 at 26–27].  In doing so, they rely

on a conclusory statement in *Thomson*, 584 F.3d at 1323 ("Here, the injury complained of—Mr.

Thomson's death—arose out of the battery that occurred when he was shot.").  However,

Defendants' admission to battery does not end the analysis because the fatal shooting in this case

was more than a battery. The GIA does not reinstate immunity for conduct that violates article 1,

section 9 of the Utah Constitution. Plaintiffs' wrongful death claim is predicated on the

unnecessary rigor that Fox used when he shot Mr. Harmon, which cannot be summarily reduced

to a battery. Thus, Defendants are not immune because the conduct underlying the wrongful

death claim is a constitutional tort.

       ii.    <u>Willful misconduct</u>

      Put simply, the GIA does not immunize willful misconduct, which Plaintiffs sufficiently

allege in this case. Instead the GIA provides that when "the employee acted or failed to act

through . . . **willful misconduct**" they "may be joined or held personally liable for acts or

omissions occurring: (a) during the performance of the employee's duties; (b) within the scope of

employment; or (c) under color of authority." Utah Code § 63G-7-202(3)(c)(i), 202(4) (2014)

(emphasis added). The GIA defines "willful misconduct" as "the intentional doing of a wrongful

act, or the wrongful failure to act, without just cause or excuse, where the actor is aware that the

actor's conduct will result in injury." Utah Code § 102(11).

      In this case, the Complaint sufficiently pleads facts sufficient to show that Defendant

Fox's actions constitute willful misconduct. For instance, "Officer Fox did not issue any

commands or warnings to Mr. Harmon other than yelling, "I'll fucking shoot you!" less than a

second before opening fire." [ECF No. 2-1 at ¶ 56]. In fact, Defendants appear to concede that

Defendant Fox committed a battery. [ECF No. 12 at 26-27]. "In order for a contact to constitute

a battery at civil law, two elements must be satisfied. First, the contact must have been

deliberate. Second, the contact must have been harmful or offensive at law." *Wagner v. State*,

122 P.3d 599, 603 (Utah 2005). There can be no dispute that Defendant Fox acted intentionally.

Moreover, there is an abundance of factual allegations that Defendant Fox's use of deadly force was willful and malicious, as the Complaint alleges that Defendant Fox shot and killed a fleeing man who was unarmed and posed no threats whatsoever.  Plaintiffs' wrongful death claim is not subject to dismissal because Defendant Fox's willful misconduct is not immunized.

 iii. The Utah Constitution overrides the GIA

 Finally, the Utah Constitution bars immunity for wrongful death claims against a city employee for unconstitutional misconduct.  Under the Utah Constitution, "[t]he right of action to recover damages for injuries resulting in death, shall never be abrogated, and the amount recoverable shall not be subject to any statutory limitation, except in cases where compensation for injuries resulting in death is provided for by law."  Utah Const. art. 16, § 5.  "[T]he protection for wrongful death contained in article XVI, section 5 of the Utah Constitution places it in a 'position of privilege among torts' and entitles it to 'special protection against attempts to pare back its scope.'"  *Riggs v. Georgia-Pac. LLC*, 345 P.3d 1219, 1225 (Utah 2015) (quoting *Bybee v. Abdulla*, 189 P.3d 40, 45-46 (Utah 2008).  "The plain meaning of the constitutional provision . . . is to prevent the abolition of the right of action for a wrongful death, whether in a wholesale or piecemeal fashion."  *Beech Aircraft Corp.*, 717 P.2d at 684.

 The wrongful death claim in this case arises from a type of misconduct for which the government is never immune from liability: unconstitutional conduct.  *Cf. Colman v. Utah State Land Bd.*, 795 P.2d 622, 634–35 (Utah 1990) ("The people of Utah established the Utah Constitution as a limitation on the power of government. It can hardly be maintained that the doctrine of sovereign immunity, alone among all doctrines, is outside of the limitations the people established.").  The framers of the Utah Constitution guaranteed that "[p]ersons arrested .

. . shall not be treated with unnecessary rigor." Utah Const. Art 1, § 9. This provision provides an express and unequivocal limitation on the government's power. Only the government and its employees have the authority to make an arrest, and thus only they can be held accountable for the use of unnecessary rigor against an arrestee. Thus, the Utah Constitution overrides any invocation of immunity by the government in a wrongful death stemming from unconstitutional conduct. Accordingly, Defendants are not immune from the wrongful death claim and the motion should be denied.

**F. Plaintiffs Have Sufficiently Pled an Unnecessary Rigor Claim Under the Utah State Constitution**

Defendants ask this Court to take impermissible inferences to dismiss Plaintiffs' unnecessary rigor claim. The Court should deny the motion because the allegations in the Complaint are sufficient to prove Defendant Fox's conduct was a flagrant violation of the unnecessary rigor clause. Article 1, Section 9, of the Utah Constitution provides: "Excessive bail shall not be required; excessive fines shall not be imposed; nor shall cruel and unusual punishments be inflicted. *Persons arrested or imprisoned shall not be treated with unnecessary rigor*." (emphasis added). "Article I, section 9 is a self-executing provision. This provision does more than state general principles; it prohibits specific evils that may be defined and remedied without implementing legislation." *Bott v. DeLand*, 922 P.2d 732, 737 (Utah 1996), *abrogated on other grounds by Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder Cty. Sch. Dist.*, 16 P.3d 533 (Utah 2000).

"If an official knowingly and unjustifiably subjects an [arrestee] to circumstances previously identified as being unnecessarily rigorous, that is obviously a flagrant violation." *Dexter v. Bosko*, 184 P.3d 592, 598 (Utah 2008). Conversely, where there is no prior case law

establishing a prohibition on the conduct at issue, a plaintiff can establish "a flagrant violation of the unnecessary rigor clause . . . whenever the following two elements are established: First, the nature of the act presents an obvious and known serious risk of harm to the arrested or imprisoned person; and second, knowing of that risk, the official acts without other reasonable justification." *Id.*

Defendants assert Defendant Fox's conduct was objectively reasonable and, alternatively, that Fox did not violate a clearly established constitutional right. In review of the standard set forth in *Dexter*, Defendants' conclusory argument should be denied. First, Defendant Fox violated a clearly established constitutional right. Namely, the right to be free from excessive force, which "was well established in this circuit at the time of the events in question." *Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006). As in *Tenorio*, "the evidence in this case would support a finding that [Mr. Harmon] took no hostile or provocative action toward the officers." 802 F.3d at 1166. Plaintiffs' Complaint adequately alleges Fox's use of excessive force—and unnecessary rigor. Second, even if the Court concludes there was not a violation of a clearly established right, Defendant Fox's conduct was still a flagrant violation. It cannot be disputed that the shooting "present[ed] an obvious and known serious risk of harm to" Mr. Harmon. *See Dexter*, 184 P.3d at 598. The risk of death was clear when Defendant Fox fired his weapon. Moreover, there is no reasonable justification for shooting an unarmed arrestee, as Plaintiffs have alleged. [ECF No. 2-1 at ¶¶ 45–46]. Defendants' Motion to Dismiss Plaintiffs' Fifth Claim for Relief should be denied.

## IV.    <u>CONCLUSION</u>

In the course of this litigation, Defendants will have the opportunity to challenge Plaintiffs' factual allegations and present their version of events to a jury.  At this stage of the proceedings, however, Defendants do not have that opportunity; rather, they must accept the allegations pled in the Complaint as true.  Defendants fail to faithfully apply this well-settled legal standard, which renders the present Motion to Dismiss infirm.  Indeed, rather than identify a discrete issue of law capable of resolution at this stage, Defendants' Motion serves only to highlight the myriad factual disputes in this case.

Dated:  October 7, 2019                DEISS LAW PC


                                       s/ Andrew G. Deiss
                                       Andrew G. Deiss
                                       Corey D. Riley
                                       10 West 100 South, Suite 425
                                       Salt Lake City, Utah 84101
                                       Telephone: (801) 433-0226
                                       adeiss@deisslaw.com
                                       criley@deisslaw.com

                                       RATHOD | MOHAMEDBHAI LLC

                                       Qusair Mohamedbhai*
                                       Siddhartha H. Rathod*
                                       Matthew J. Cron*
                                       Nicholas A. Lutz*
                                       2701 Lawrence Street, Suite 100
                                       Denver, Colorado 80205
                                       (303) 578-4400 (p)
                                       (303) 578-4401 (f)

                                       *denotes counsel who will seek pro hac vice
                                       admission

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of October, 2019, I caused a true and correct copy of the foregoing **PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS** to be served upon all counsel of record via e-file notification.

s/ *Corey D. Riley*

Catherine L. Brabson (#6500)
Mark E. Kittrell (#9950)
SALT LAKE CITY CORPORATION
P.O. Box 145478
451 South State Street, Suite 505A
Salt Lake City, Utah 84114-5478
Telephone:  (801) 535-7788
Facsimile:  (801) 535-7640
Catherine.Brabson@slcgov.com
Mark.Kittrell@slcgov.com

*Attorneys for Defendants Salt Lake City and Officer Clinton Fox*

---

## IN THE UNITED STATES DISTRICT COURT
## STATE OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| ESTATE OF PATRICK HARMON SR.; PATRICK HARMON II, as Personal Representative of the Estate of Patrick Harmon Sr., and heir of Patrick Harmon Sr., TASHA SMITH, as heir of Patrick Harmon, Sr., | **REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS** |
| Plaintiffs, | |
| vs. | |
| SALT LAKE CITY, a municipality; and OFFICER CLINTON FOX, in his individual capacity, | Case No. 2:19-cv-00553 |
| Defendants. | Judge Robert J. Shelby |

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 1

    I.     Officer Fox is Entitled to Qualified Immunity on Plaintiff's Fourth
          Amendment Claim ............................................................................ 1

          A.    No reasonable jury could find that Mr. Harmon was unarmed
                and merely fleeing away from the officers, and posed no threat,
                at the moment Officer Fox fired his weapon ................................ 1

          B.    The actions of Officer Fox were objectively reasonable and
                Plaintiff cannot show a violation of clearly established law....................... 8

    II.    Plaintiffs Fail to State an Equal Protection Violation ........................................... 10

    III.   Plaintiffs' Remaining Claims Likewise Fail ........................................... 12

CONCLUSION.................................................................................................................. 12

**128**

# TABLE OF AUTHORITIES

## Cases

*Angilau v. United States*, No. 216CV00992JEDPJC, 2018 WL 1278393
(D. Utah Mar. 9, 2018) ................................................................................ 4

*Blackwell v. Strain*, 496 F. App'x 836 (10th Cir. 2012) .......................... 10, 11

*Borneman v. Rozier*, No. CIV-09-187-R, 2010 WL 455124 (W.D. Okla.
Feb. 2, 2010), *aff'd*, 398 F. App'x 415 (10th Cir. 2010) ................................ 2

*Bryner v. Utah*, 429 F. App'x 739 (10th Cir. 2011) ............................... 4, 7, 9

*Choate v. City of Gardner, Kansas*, No. 16-2118-JWL, 2016 WL 2958464,
(D. Kan. May 23, 2016) ............................................................................ 4

*Clark v. Bowcutt*, 675 F. App'x 799 (10th Cir. 2017) .................................. 4

*Estate of Larsen v. Murr*, 511 F.3d 1255 (10th Cir. 2009) .......................... 9

*Estate of Ronquillo by & through Estate of Sanchez v. City & Cty. of Denver*,
Case No. 16-CV-01664-CMA-KMT, 2016 WL 10843787 (D. Colo. Nov. 17,
2016), *aff'd*, 720 F. App'x 434 (10th Cir. 2017) ................................... 4, 6, 7

*Jackson v. Gatto*, 2014 WL 2743130 (D. Colo. June 17, 2014) .................... 4

*Johnson v. Peay*, No. 1:14-CV-147-TC, 2016 WL 4186956 (D. Utah Aug. 8,
2016), *aff'd*, 704 F. App'x 738 (10th Cir. 2017) ....................................... 2, 4

*Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157 (10th Cir. 2003) .......... 10

*Myers v. Brewer*, No. 17-2682, 2018 WL 3145401 (D. Kan. June 27, 2018) ...... 4

*Pauly v. White*, 874 F.3d 1197 (10th Cir. 2017), *cert. denied*, 138 S. Ct. 2650,
201 L. Ed. 2d 1063 (2018) ........................................................................ 8

*Roybal-Mack v. New Mexico Dep't of Pub. Safety*, 286 F. Supp. 3d 1226
(D.N.M. 2017) ....................................................................................... 2, 4

*Scott v. Harris*, 550 U.S. 372 (2007) ..................................................... 1, 8

*Tenorio v. Pitzer*, 802 F.3d 1160 (10th Cir. 2015) .......................................................... 9

*Thomas v. Durastanti*, 607 F.3d 655 (10th Cir. 2010).................................................... 1, 2, 4, 6, 7

*Zuchel v. City & Cty. of Denver*, 997 F.2d 730 (10th Cir. 1993)................................................. 10

Defendants Salt Lake City Corporation (the "City") and Officer Clinton Fox ("Officer Fox") submit the following reply memorandum in support of their motion to dismiss.

## INTRODUCTION

None of Plaintiffs' claims survive this motion. Based on the video evidence, which Plaintiffs acknowledge should properly be considered by the Court, no rational jury could conclude that Mr. Harmon was unarmed and fleeing, or was not threatening, at the moment that Officer Fox fired his weapon. For this reason, the use of deadly force by Officer Fox was objectively reasonable and Plaintiffs cannot meet their burden to show a Fourth Amendment violation. In addition, Plaintiffs fail to state a claim for violation of equal protection because they have not explained how their largely irrelevant statistical evidence satisfies the necessary elements of either discriminatory effect or discriminatory intent. Since Plaintiffs cannot show a constitutional violation, their remaining federal and state law claims likewise fail.

## ARGUMENT

**I.    Officer Fox is Entitled to Qualified Immunity on Plaintiff's Fourth Amendment Claim.**

**A.    No reasonable jury could find that Mr. Harmon was unarmed and merely fleeing away from the officers, and posed no threat, at the moment Officer Fox fired his weapon.**

The Court must view the facts "in the light depicted by the video"[1] and cannot adopt a party's version of the facts where "there is clear contrary video evidence" such that no reasonable jury could believe those facts.[2] In addition, the Court should consider statements and testimony

---

[1] *Scott v. Harris*, 550 U.S. 372, 378-80 (2007).

[2] *Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010); *Borneman v. Rozier*, No. CIV-09-187-R, 2010 WL 455124, at *6 (W.D. Okla. Feb. 2, 2010), *aff'd*, 398 F. App'x 415 (10th Cir.

of the officers recounting the incident.[3] Here, the Complaint contains the following statements of

Officer Fox: (1) Plaintiffs allege that "Officer Fox repeatedly states that he shot and killed Mr.

Harmon because Mr. Harmon reached for and produced a knife,"[4] that Officer Fox claimed that

prior to shooting Mr. Harmon, Mr. Harmon, "stop[ped], turn[ed] around, and [came] back at

[them],"[5] and that  "Officer Fox claims repeatedly to have seen a knife in Mr. Harmon's hand."[6]

The indisputable video evidence corroborates the statements of Officer Fox and blatantly

contradicts Plaintiffs' claim that Mr. Harmon was unarmed and merely fleeing arrest, and posed

no threat when Officer Fox fired his weapon.[7] Given this video evidence, no reasonable jury

could believe the facts alleged by Plaintiffs.

    As an initial matter, Plaintiffs do not object to the Court's consideration of the three

bodycam videos submitted by the Defendants, nor do they dispute that the Complaint

---

2010) (concluding that no reasonable juror could view the video evidence and believe Plaintiff's allegations).

[3] *See e.g., Thomas,* 607 F.3d at 661(considering officer's that "he was concerned that [the other agent] was in distress, that the [car] was coming directly at him and his objective was to stop the [car]"); *Johnson v. Peay*, No. 1:14-CV-147-TC, 2016 WL 4186956, at *5 (D. Utah Aug. 8, 2016), *aff'd,* 704 F. App'x 738 (10th Cir. 2017) (considering officer's statements recounting the incident); *Roybal-Mack v. New Mexico Dep't of Pub. Safety,* 286 F. Supp. 3d 1226, 1232 (D.N.M. 2017) (finding that the dash-cam videos corroborated the statements of the officers).

[4] Pls.' Compl., ECF No. 6-1, at ¶ 92.

[5] Pls.' Compl., ECF No. 6-1, at ¶ 102.

[6] Pls.' Compl., ECF No. 6-1, at ¶ 104.

[7] In addition, Plaintiffs allege that Officer Fox reported hearing Harmon verbally threaten to cut the officers or that they would "get cut" as Harmon attempted to flee (Pls.' Compl., ECF No. 6-1, at ¶¶ 93, 105) which further indicates to a reasonable officer that Mr. Harmon sought to do harm. Both Officer Smith and Officer Robinson also heard Harmon make similar threats about cutting or stabbing or words to that effect, which Plaintiffs acknowledge in their opposition. Mem. Opp. at 3. These statements are not audible on the bodycam videos. However, Mr. Harmon's threatening statements are not material for purposes of this motion because there is ample indisputable evidence to support the conclusion that a reasonable officer could believe that Mr. Harmon's manifest intentions were hostile, threatening and defiant in relation to the officers.

incorporates the bodycam videos by reference, that it includes still frame photos taken from the

bodycam videos, or that the videos are central to their claim. Although they assert the Court

should not consider the still frame photos submitted by Defendants because "such images can be

taken out of context or selected to advance a particular narrative," this argument is sheer

speculation. Plaintiffs have not provided any basis for the assertion that the incident is not

accurately depicted in the still-frame photos, or explained why they are materially different from

the videos. Of course, there is no discernable difference between hitting the "pause" button while

playing a bodycam video, reviewing a video in frame-by-frame mode,[8] or reviewing still frame

photo images excerpted from the bodycam videos. Moreover, the still frame images included in

Plaintiffs' own complaint confirm the body position of Mr. Harmon's raised right arm and hand

and the position of his feet showing he was moving towards the officers rather than fleeing

away.[9] Thus, the still-frame images submitted by Defendants, though not necessary, are

submitted for the Court's convenience and properly considered on this motion.

      The Tenth Circuit and its district courts have regularly considered bodycam videos on a

motion to dismiss, including frame-by-frame excerpts, and disregarded allegations that are

---

[8] For the Court's information, there are several programs that can be used to view the bodycam videos (and the time-synchronized compilation video) in frame-by-frame mode. For example, with Microsoft Office, simply right click on the video and select "Open with" and from the menu select "Photos." Then by selecting "Edit & Create" on the top toolbar (with or without pausing the video) and selecting "Save a photo" from the menu, the video can be viewed in frame-by-frame mode using the arrows at the bottom of the screen. The video can be fast-forwarded to the relevant event by sliding the time bar across the bottom of the frame. Similarly, a free player called "VLC media player" can be downloaded and used to view videos in frame-by-frame mode.

[9] Pls. Compl. ECF No. 6-1, at ¶¶ 50-51, 53.

**133**

"blatantly contradicted" by the video evidence.[10] Even where the video does not capture the

entire episode, in many circumstances the court can still ascertain the objective reasonableness of

the officer.[11]

For example, in *Estate of Ronquillo by & through Estate of Sanchez v. City & Cty. of*

*Denver*,[12] officers sought to arrest Mr. Ronquillo pursuant to outstanding warrants. Two officers

in unmarked vehicles followed Mr. Ronquillo into a parking lot and formed a wedge blocking

---

[10]  *See e.g., Estate of Ronquillo by & through Estate of Sanchez v. City & Cty. of Denver*, Case
No. 16-CV-01664-CMA-KMT, 2016 WL 10843787, at *3 (D. Colo. Nov. 17, 2016), *aff'd*, 720
F. App'x 434 (10th Cir. 2017) (considering surveillance video on motion to dismiss when it
captured most of the events and disregarding plaintiff's allegations when directly contracted by
the video); *Bryner v. Utah*, 429 F. App'x 739, 746 (10th Cir. 2011) (unpublished) (rejecting
plaintiff's recitation of facts on a motion to dismiss that were clearly contradicted by the security
video); *Choate v. City of Gardner, Kansas*, No. 16-2118-JWL, 2016 WL 2958464, at *3, fn. 2
(D. Kan. May 23, 2016) (considering bodycam videos "viewed frame by frame" on a motion to
dismiss over unsupported objection that the videos were edited); *Jackson v. Gatto*, 2014 WL
2743130, at *3 (D. Colo. June 17, 2014) (considering videos in ruling on a motion to dismiss);
*Myers v. Brewer*, No. 17-2682, 2018 WL 3145401, at *1–2 (D. Kan. June 27, 2018) (considering
videos where they were central to complaint and part of the record in another court case).
[11]  *See e.g., Estate of Ronquillo*, 2016 WL 10843787, at *3 (video captured most of the events and
disregarding plaintiff's allegations when directly contracted by the video); *Thomas*, 607 F.3d at
672 (videotape of police encounter sufficiently captured incident for court to conclude law
enforcement officer's use of force was objectively reasonable, even though video did not
conclusively establish the speed of the suspect's car); *Clark v. Bowcutt*, 675 F. App'x 799, 807–
08 (10th Cir. 2017) (unpublished) ("[a]cknowledging that the dashboard camera video does not
capture the entire episode in this case, it is nevertheless readily apparent to us from examining
the video that Mr. Burkinshaw posed an immediate threat to Deputy Bowcutt's safety.");
*Johnson v. Peay*, 704 F. App'x 738, 743 (10th Cir. 2017) (unpublished) (rejecting plaintiff's
argument that the district court improperly weighed the evidence and made credibility
assessments where district court determined the dashcam videos depicted a sequence of events
corroborating the undisputed testimony of the officers.); *Angilau v. United States*, No.
216CV00992JEDPJC, 2018 WL 1278393, at *5 (D. Utah Mar. 9, 2018) (finding the video and
audio "refute plaintiffs' strained construction of the facts" such that no reasonable jury could
believe plaintiff's version); *Roybal-Mack*, 286 F. Supp. 3d at 1236–37 (concluding evidence
presented by the dash-cam videos was "striking and unequivocal, and completely supportive of
Defendants' facts").
[12]

Mr. Ronquillo's car which he had backed into a parking spot. The two officers exited their vehicles, with one approaching the passenger side and one approaching the driver's side of Ronquillo's vehicle. A third officer arrived in a marked vehicle and approached the driver's side. The three officers then tried unsuccessfully to forcefully extract Ronquillo from the car. Although the plaintiff contended that Ronquillo was unaware the individuals were police officers, the district court found the video clearly demonstrated that one officer was fully uniformed and another wore a police vest, thus contradicting plaintiff's allegation. Plaintiff then contended that the force used by the officers in attempting to extract Ronquillo was such that they jostled the car forward, causing it to hit one of the officer's unmarked vehicles. However, the district court found the video "depicted movement from the officer's vehicle that is consistent with being hit by a car, not with a car being jostled into it," thus the court "can reach no other conclusion than Mr. Ronquillo intentionally accelerated forward as the officers began their efforts to extract him from the vehicle."

Plaintiff then asserted that as Mr. Ronquillo put or was putting his car in gear to move forward, the officers opened fire, killing Mr. Ronquillo instantly. But the district court declined to accept this allegation as true because the video demonstrated that even though the moment the officers fired was not captured on video, Ronquillo's car was rapidly accelerating forward, and traveled over a median, into the parking lot, and crashed into the officers' SUV after the shots were fired. As a result, the court concluded this was "a car movement that is wholly inconsistent with the notion that Mr. Ronquillo was shot before ever pressing on the gas." Finally, the district court found the video contradicted plaintiff's assertion that no officers stood in the car's forward-moving path and that all officers had taken safe positions around the perimeter of Mr.

**135**

Ronquillo's car before it began moving forward. While the court found the video did not show the locations of all officers, some could be clearly seen jumping out of the way as the vehicle accelerated toward them. Thus, the district court did not accept plaintiff's contrary allegations.[13] On appeal, the Tenth Circuit reviewed the video and affirmed the district court's findings.[14]

Similarly, in _Thomas v. Durastanti_,[15] plaintiff brought an excessive force claim against a federal agent who shot plaintiff, a passenger in a Lincoln town car, when the driver drove his car towards the federal agent in an effort to flee a traffic stop.[16] Plaintiff argued that questions of fact precluded summary judgment because the video failed to show the speed of the Lincoln, as well as other events, such as (1) Agent Durastanti stepping into the Lincoln's path, (2) Agent Durastanti's first shots, and (3) whether Agent Durastanti could have stepped out of the way. But the Court found Plaintiff's contention that the Lincoln "inched away" carefully maneuvering past the agent's SUV was "belied by the video."[17] The Court then found that Agent Durastanti's exact location was immaterial "given that Agent Durastanti undoubtedly was in the Lincoln's path in a very confined area" because the video captures him emerging from behind the Expedition and then on the hood of the Lincoln.[18] As to the first shots, the Court concluded that "while Agent Durastanti's position when he fired the first shots is not visible, the sound of the shots can be heard and less than a second expires between the moment the shots were fired and the moment Agent Durastanti appeared in the video on the hood of the Lincoln. Though logic would seem to

---

[13] _Id_. at *2-3.
[14] _Ronquillo_, 720 F. App'x at 437-40.
[15] 607 F.3d at 664-67.
[16] _Id_. at 664.
[17] _Id_. at 664-65, fn. 7.
[18] _Id_. at 665.

dictate that Agent Durastanti was in front of the Lincoln when he fired the shots (and could not have been to the side of the Lincoln as Mr. Thomas suggests), he certainly was in close proximity."[19] Lastly, the Court found that whether Agent Durastanti could have stepped out of the way was immaterial, "given that officers do not always have to use the least restrictive means as long as their conduct is reasonable."[20] The Tenth Circuit reversed the district court's denial of summary judgment, finding that the video evidence sufficiently captured the events such that no material dispute of fact remained and that the officer's use of force was objectively reasonable.[21]

Just as in *Ronquillo*, *Durastanti*, *Bryner* and the other cases cited herein, the court can view the bodycam videos and compilation video in frame-by-frame mode and disregard the allegations in the complaint that are contradicted. Although portions of the bodycam videos are not perfectly clear, the indisputable presence of an open knife lying in the grass next to Mr. Harmon's outstretched right hand, when viewed in the context of Mr. Harmon's body movements, corroborates Officer Fox's statements that Mr. Harmon pulled a knife and threatened him with it. Plaintiffs argue that the Court must accept their allegation that Mr. Harmon was unarmed because a knife is not clearly shown in Mr. Harmon's hand (nor is his hand clearly empty) in any of the bodycam videos at the precise moment that Officer Fox fired his weapon. But this argument ignores the complete picture presented by the three bodycam videos – particularly when viewed together in the time-synchronized layout. Officer Robinson's bodycam video clearly shows an open knife lying in the grass next to the location of Mr. Harmon's outstretched right arm and hand on the ground. Based on Mr. Harmon's body

---

[19] *Id*. at 665.
[20] *Id*. at 665.
[21] *Id*. at 665-66.

movements after Officer Fox fired his weapon, and specifically, the movements of Mr. Harmon's

right arm and hand as Mr. Harmon spun to the right and ultimately fell onto the ground with his

right arm and hand outstretched, it would have been impossible for Mr. Harmon to have

produced the knife from a concealed location in the interim. Officer Robinson's video shows this

knife just moments after Officer Fox fired his weapon, and while Officer Fox remained with his

weapon trained on Mr. Harmon to cover Officer Robinson as he secured Mr. Harmon, which

negates the attempt by Plaintiffs to argue that the knife was not Mr. Harmon's, or that it was

"confused" with the knife used by Officer Fox to cut off Mr. Harmon's clothing.[22] The videos

clearly show Mr. Harmon's feet turned towards the officers and that the position of Mr.

Harmon's right arm and hand were raised in a "stabbing" or hostile attacking position such that a

reasonable officer could conclude Mr. Harmon intended to stab the officers. The videos do not

support a jury finding that Mr. Harmon took no hostile or provocative action towards Officer Fox

and the Court should not adopt Plaintiffs' "visible fiction" that Mr. Harmon was unarmed and

fleeing.[23]

### B.   The actions of Officer Fox were objectively reasonable and Plaintiff cannot show a violation of clearly established law.

Use of deadly force is only justified if the officer had "probable cause to believe that

there was a threat of serious physical harm to himself or others."[24] Courts regularly rely on video

---

[22]   Review of Officer Fox's bodycam video in the minutes after the shooting occurs depicts the actions of Officer Fox in returning to his car from which he retrieved a knife and then cutting the clothing from Mr. Harmon in order to render first aid. These actions occurred long after the moments in Officer Robinson's bodycam in which the knife wielded by Mr. Harmon is observed and bear no relation whatsoever.

[23]   *Scott*, 550 U.S. at 381.

[24]   *Pauly v. White*, 874 F.3d 1197 (10th Cir. 2017), *cert. denied*, 138 S. Ct. 2650, 201 L. Ed. 2d 1063 (2018).

footage when making the legal determination of objective reasonableness.[25] As discussed above, based on the video footage, no reasonable jury could find that Mr. Harmon was unarmed, not threatening and merely fleeing when Officer Fox fired his weapon. It was reasonable for Officer Fox to conclude that Mr. Harmon intended to stab him or the other officers. Moreover, the videos clearly establish that Officer Fox did not have an opportunity for deliberation but rather he had perhaps a split second to avoid being stabbed – insufficient time to issue a command or warning to Mr. Harmon to drop the weapon. Therefore, the use of deadly force by Officer Fox was objectively reasonable and no constitutional violation is shown.

Officer Fox is also entitled to qualified immunity because Plaintiffs do not offer any Tenth Circuit authority showing the law was clearly established and they make no effort to distinguish the case cited by Defendants, *Estate of Larsen v. Murr*.[26] Moreover, the cases cited by Plaintiffs involve circumstances that starkly contrast with the situation faced by Officer Fox. For example, in *Tenorio v. Pitzer*,[27] officers were called to the scene of an intoxicated suspect who reportedly had a knife to his own throat. When the officers arrived, the suspect was carrying a small kitchen knife by his side, had threatened no one, and was walking slowly at the moment he was shot, which was well "before he was within striking distance of [the officer]."[28] Unlike Mr. Harmon, the suspect was not charging the officer in close proximity with a knife and had

---

[25] *Bryner v. Utah*, 429 F. App'x 739, 747 (10th Cir. 2011) (unpublished) (concluding that from review of video of the event, no reasonable jury could conclude that the use of force that occurred rose to the level of a constitutional violation).

[26] *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2009).

[27] 802 F.3d 1160, 1162 (10th Cir. 2015).

[28] *Id.* at 1164-65.

made no slicing or stabbing motions before deadly force was used. Similarly, *Zuchel v. City & Cty. of Denver*[29] involved a suspect who was not charging and made no threatening motions, and fundamentally unlike the case here, no knife was ever found. Plaintiffs have cited to no authority finding that the use of force in the situation faced by Officer Fox – a suspect with arm and hand raised, holding a knife, and moving towards the officers less than 5 feet away after suddenly fleeing from arrest – violated the Fourth Amendment.

## II.     Plaintiffs Fail to State an Equal Protection Violation.

Plaintiffs' reliance on raw and largely irrelevant statistics do not plausibly show either the discriminatory effect or the discriminatory purpose required to state an equal protection violation. Plaintiffs allege no facts, either direct or circumstantial, that show that Officer Fox's use of deadly force was motivated by racial animus, or that Mr. Harmon's race otherwise played a role in this incident.

Because Plaintiffs' claim is a claim of racially selective law enforcement, Plaintiffs "must demonstrate that the defendant's actions had a discriminatory effect and were motivated by a discriminatory purpose."[30] "The discriminatory purpose need not be the only purpose, but it must be a motivating factor in the decision."[31] Although plaintiffs can use statistical evidence to show selective law enforcement practices,[32] such evidence "alone is rarely enough to show discriminatory purpose." [33] For example, in *Blackwell*, the plaintiff brought an Equal Protection Clause claim, alleging that he was stopped, detained, and subjected to heightened inspections at

---

[29] *997 F.2d 730, 735-37* (10th Cir. 1993).
[30] *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003).
[31] *Id*.
[32] *Id*.
[33] *Blackwell v. Strain*, 496 F. App'x 836, 840 (10th Cir. 2012) (unpublished).

the New Mexico port of entry ("POE") because he is black.[34] To prove his case, he alleged the

following facts:

> law enforcement activities at the POE produce "race[ ] based differentials in outcomes";
> his "data tends to show that vehicles operated by Black truckers are subjected to
> inspections or searches at a much higher rate than vehicles operated by non-Black
> truckers"; his data "tends to show that when MTD personnel cannot tell the ethnicity of a
> driver prior to instigating law enforcement activity, the percentage of Black truckers
> subjected to enforcement activity closely corresponds to the percentage of Black truckers
> on the road"; there is "a significant disparity between the percentage of Black truckers
> reporting delays due to inspections and searches (51.7%) and the percentage of other
> truckers reporting delays (28.3%)"; and "30.6% of the arrests by Officer Strain at the
> POE are Blacks, even though Black truckers make up only 14.6% of the truckers passing
> through the POE.[35]

Yet, this statistical evidence was not sufficient to show discriminatory purpose because the

statistical data concerned the actions of officers at the POE as a whole, rather than the conduct of

the individual officer defendant that stopped the plaintiff.[36] Thus, the Tenth Circuit held that the

plaintiff failed to show that the _named_ _defendant_ was motivated by a discriminatory purpose.[37]

In addition, the Court found that any statistical evidence used to infer discriminatory intent

"requires reliable comparison data."[38] Such data, in order to be useful, should include "a reliable

measure of the demographics of the relevant population, a means of telling whether the data

represent similarly situated individuals, and a point of comparison to the actual incidence of

crime among different racial or ethnic segments of the population."[39]

---

[34] _Id._ at 837.
[35] _Id._ at 841.
[36] _Id._
[37] _Id._ at 843.
[38] _Id._ at 840.
[39]

Here, Plaintiffs' alleged "statistics" at best concern actions of an entire police force (or Salt Lake County as a whole, with no relevance whatsoever to the Salt Lake City police force) and relate to incidents that do not involve African Americans or use of lethal force.[40] These incidents bear no relevance to Officer Fox or the circumstances at hand. Moreover, Plaintiffs offer no baseline for comparison to similarly situated white suspects. Accordingly, Plaintiffs' conclusory assertion that "Mr. Harmon's [black] race was a substantially motivating factor in Defendant Fox's decision to use excessive force against him" is not entitled to a presumption of truth, and Plaintiffs' equal protection claim fails.

III.   **Plaintiffs' Remaining Claims Likewise Fail.**

Because Plaintiffs' constitutional claims against Officer Fox fail, Plaintiffs' claims against the City for municipal liability fail as a matter of law. In addition, Plaintiffs' state law claims and claims under the Utah Constitution also fail, to the extent the Court retains jurisdiction.

<u>**CONCLUSION**</u>

Defendants' motion to dismiss should be granted.

---

[40]  Pls. Compl., ECF No. 6-1, at ¶¶ 126-31 (asserting statistics for Salt Lake County, describing an incident involving Dillon Taylor, who was part Hispanic, describing an incident involving James Barker, who was white, and describing a settlement involving allegations of a single incident of documenting gang members – none of whom were alleged to have been arrested).

DATED this 4th day of November, 2019.

/s/ Catherine L. Brabson

CATHERINE L. BRABSON
MARK E. KITTRELL
*Attorneys for Defendants Salt Lake City and*
*Officer Clinton Fox*

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of November, 2019, a true and correct copy of the **REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS** was electronically filed with the Clerk of the Court, which sent notice to:

Andrew G. Deiss
Corey D. Riley
DEISS LAW PC
10 West 100 South, Suite 425
Salt Lake City, UT 84101
adeiss@deisslaw.com
criley@deisslaw.com

/s/ Lindsay A. Ross

**143**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ESTATE OF PATRICK HARMON SR.; PATRICK HARMON II, as Personal Representative of the Estate of Patrick Harmon Sr. and heir of Patrick Harmon Sr.; TASHA SMITH, as heir of Patrick Harmon Sr., | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** |
| Plaintiffs, | Case No. 2:19-cv-00553-RJS-CMR |
| v. | Chief Judge Robert J. Shelby |
| SALT LAKE CITY, a municipality; and OFFICER CLINTON FOX, in his individual capacity, | Magistrate Judge Cecilia M. Romero |
| Defendants. | |

This case arises out of the 2017 shooting of a Black man by a white Salt Lake City police officer.  An important question in the case is whether the officer is entitled to qualified immunity under existing law.  While the events at issue in this case occurred nearly three years ago, this Memorandum Decision and Order issues in the midst of an important national conversation concerning race and policing.  That conversation was brought into sharp focus by the recent death of George Floyd.

Floyd died on May 25, 2020, after officers assigned to the Minneapolis Police Department responded to a 9-1-1 call concerning an alleged attempted forgery in progress.  The interactions between those officers and Floyd have been widely reported and are shown on videos viewed millions of times on social media and television.  Those events sparked as many as 2,000 protests throughout the United States and around the world.  It is estimated that with

between 15 million and 26 million participants in the United States alone, the protests were collectively the largest in our nation's history.

Floyd's death came on the heels of numerous high-profile deaths of Black men and women in interactions with police officers in recent years.  These events and others carried the Black Lives Matter movement into the mainstream and invigorated discussion and debate on a wide range of issues surrounding law enforcement and race, including calls in some circles to change the qualified immunity laws this court must apply in this ruling.

The court is cognizant of this moment and the context in which it must decide legal questions presented in this case about the shooting death of a Black man by a white Salt Lake City police officer.  Because it would be inappropriate to do so, this court expresses no opinion whatsoever about the current protests, movements, counter-movements, opinions, other cases around the country, the wisdom of current qualified immunity laws, or any other matters touching on the important issues we are grappling with as a nation.  Rather, as it is required to do in the context of determining qualified immunity, and as it labors to do in every case, the court attempts in this Memorandum Decision and Order to faithfully apply the precedent established by the appellate courts to the specific facts and arguments here presented by the parties.

## INTRODUCTION

On August 13, 2017, Salt Lake City police officer Clinton Fox—a white man—shot and killed Patrick Harmon, Sr.—a Black man.  The events leading to Harmon's death were captured on body cameras worn by three officers at the scene.  The body-cam footage includes seven critical seconds immediately before the shooting.  During those chaotic seconds, Officer Fox observed Harmon resist arrest, begin to flee, turn back towards the officers, assault an officer, begin to flee in the opposite direction, again turn back towards the officers, and—according to

Officer Fox—pull a knife before suddenly moving towards Officer Fox who was several feet away.  When Officer Fox shot Harmon, he believed Harmon was armed with a knife and coming towards him.

Harmon's estate and children bring five claims against Officer Fox and Salt Lake City: (1) a Fourth Amendment excessive force claim against Officer Fox pursuant to 42 U.S.C. § 1983, (2) a municipal liability claim against Salt Lake City pursuant to § 1983, (3) a Fourteenth Amendment Equal Protection claim against both Officer Fox and Salt Lake City pursuant to § 1983, (4) a wrongful death claim under Utah law against Officer Fox, and (5) an Excessive Rigor Clause claim under Utah's constitution against both Officer Fox and Salt Lake City.[1]

Defendants move to dismiss all of Plaintiffs' claims, arguing Officer Fox is entitled to qualified immunity and Plaintiffs cannot separately maintain an action against Salt Lake City if the court concludes Officer Fox did not violate Harmon's constitutional rights.[2]

The court has carefully reviewed and considered the parties' filings and received oral argument at a hearing on February 6, 2020.[3]  For the reasons explained below, Defendants' Motion to Dismiss[4] is GRANTED.  Plaintiffs' first and second claims for relief are dismissed with prejudice.  Plaintiffs' third, fourth, and fifth claims for relief are dismissed without prejudice.  Plaintiffs may file an amended complaint within 28 days should they wish to attempt to replead the claims dismissed without prejudice.

---

[1] *See* Dkt. 2-1 (Complaint) ¶¶ 134–94.

[2] *See* Dkt. 12.

[3] Dkt. 28.

[4] Dkt. 12.

## BACKGROUND

Resolution of Defendants' Motion to Dismiss largely turns on the evidence the court is permitted to consider at this early stage of the proceedings and the legal standard dictating how the court may consider that evidence.  Most notably, Plaintiffs object to the court considering some of Defendants' exhibits.[5]  To clarify how the court determined the relevant facts, the court first outlines below the Federal Rule of Civil Procedure 12(b)(6) standard under which Defendants move to dismiss, then addresses Plaintiffs' evidentiary objection before finally recounting the facts.

### I.   Legal Standard for Rule 12(b)(6) Motions

Defendants move to dismiss Plaintiffs' claims pursuant to Rule 12(b)(6).[6]  Under Rule 12(b)(6), the court will dismiss claims that are inadequately pled – that is, where the complaint fails "to state a claim upon which relief can be granted."[7]  To avoid dismissal under this rule, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[8]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[9]  In other words, "[t]he allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief."[10]  This does not require "detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-

---

[5] *See* Dkt. 18 at 4–5.

[6] Dkt. 12 at 9–10.

[7] Fed. R. Civ. P. 12(b)(6).

[8] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and citation omitted).

[9] *Id.* (citation omitted).

[10] *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).

harmed-me accusation."[11]  Indeed, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do."[12]

While the Rule 12(b)(6) analysis is typically confined to the plausible allegations within the complaint, the court may consider "the attached exhibits and documents incorporated into the complaint by reference."[13]  The court may also consider exhibits that are "indisputably authentic," "central to the plaintiff's claim," and "referred to in the complaint."[14]  If an exhibit "blatantly contradicts Plaintiff[s]' version of the events"[15] pled in the complaint, the court may "view[] the facts in the light depicted by the [exhibit]."[16]

Applying these standards, the court "first discard[s] allegations in the complaint that are 'legal conclusions' or 'threadbare' recitals of the elements of a cause of action, supported by mere conclusory statements."[17]  Next, the court "accepts as true the remaining, well-pleaded (that is, plausible, non-conclusory, and non-speculative) factual allegations and construe[s] them in the light most favorable to the plaintiff."[18]  But when those well-pleaded factual allegations are "blatantly contradicted" by a properly-considered exhibit, the court relies on the facts depicted by the exhibit.[19]

---

[11] *Iqbal*, 556 U.S. at 678 (quotation marks and citation omitted).

[12] *Id.* (quotation marks and citation omitted).

[13] *Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1201 (10th Cir. 2011) (citation omitted).

[14] *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) (citations omitted).

[15] *Estate of Ronquillo by and through Estate of Sanchez v. City and Cty. of Denver*, No. 16-cv-01664-CMA-KMT, 2016 WL 10843787, at *2 (D. Colo. Nov. 17, 2016) (quotation marks and citations omitted), *aff'd*, 720 F. App'x 434 (10th Cir. 2017) (unpublished).

[16] *Scott v. Harris*, 550 U.S. 372, 381 (2007).

[17] *Soto for Estate of Jimenez v. Bd. of Cty. Comm'rs of Caddo Cty., Okla.*, 748 F. App'x 790, 793 (10th Cir. 2018) (unpublished) (brackets omitted) (quoting *Iqbal*, 556 U.S. at 678).

[18] *Id.* (citing *Iqbal*, 556 U.S. at 679).

[19] *See Scott*, 550 U.S. at 380–81 ("The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.").

## II.     Plaintiffs' Objection

Defendants submitted with their Motion the officers' body-cam videos showing the events leading to Harmon's death[20] and frame-by-frame excerpts of those videos.[21]  Plaintiffs do not object to the court considering the body-cam videos.[22]  But Plaintiffs object to the court considering the frame-by-frame excerpts, arguing "[s]uch images can be taken out of context or selected to advance a particular narrative."[23]  The court fails to appreciate any material distinction between viewing the body-cam videos and pausing on significant moments, versus viewing frame-by-frame excerpts taken from those same videos.  Moreover, Plaintiffs do not argue the frame-by-frame excerpts are "doctored or altered" in any way.[24]  Plaintiffs' objection is OVERRULED.  The court will consider both the videos submitted and the frame-by-frame excerpts from those videos.

## III.    Background

Applying the standards above, the court now sets forth the facts relevant to Defendants' Motion.  These facts derive from the well-pleaded allegations in Plaintiffs' Complaint, and those portions of the body-cam videos and frame-by-frame excerpts that blatantly contradict Plaintiffs' allegations.[25]

---

[20] Dkt. 13, Exs. A–D.

[21] Dkt. 13, Exs. E–H.

[22] The court may consider the officers' body-cam videos because they are referred to in the Complaint and central to many of Plaintiffs' claims.  *See GFF Corp.*, 130 F.3d at 1384 ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.").

[23] Dkt. 18 at 5.

[24] *Scott*, 550 U.S. at 378 ("There are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened.").

[25] Defendants also submitted a Knife Scene Photos exhibit.  *See* Dkt. 13, Ex. I.  Although Plaintiffs do not object to the court considering this exhibit, it is outside the scope of a Rule 12(b)(6) motion because it is not central to the Plaintiffs' claims and is not referenced in the Complaint.  Thus, the court has not considered the Knife Scene Photos in ruling on Defendants' Motion.

### a. The Shooting

On August 13, 2017, Salt Lake City Police Department (SLCPD) Officer Kris Smith stopped Harmon, a Black man, for allegedly riding a bicycle without a red taillight.[26]  The stop occurred sometime at night.[27]  According to Officer Smith, Harmon initially identified himself with varying and inconsistent names but ultimately volunteered that he likely had an outstanding warrant for his arrest.[28]  At some point during this interaction, Officer Smith called for backup and returned to his patrol car to run a warrant check.[29]  Harmon calmly waited while Officer Smith ran the warrant check.[30]  SLCPD officers Clinton Fox and Scott Robinson later arrived on the scene.[31]  Officers Smith, Robinson, and Fox are all white men.[32]

Officer Smith eventually verified the outstanding warrant Harmon had reported and exclaimed to Officer Fox, "Yes! Excellent."  "We're going to go 82, 99, Fox2," indicating the officers should arrest Harmon on the felony warrant.[33]  Officer Smith then joined the other two officers, who were standing with Harmon.[34]  The officers told Harmon he was going to be

---

[26] Dkt. 2-1 (Complaint) ¶¶ 19–21; *see* Dkt. 13-1, Ex. A (Smith Body-cam).

[27] *See* Dkt. 13-1, Ex. A (Smith Body-cam).

[28] Dkt. 2-1 (Complaint) ¶¶ 22–23.

[29] *Id.* ¶¶ 23–24.

[30] *Id.* ¶ 24.

[31] *Id.* ¶¶ 24–25.

[32] *See* Dkt. 13-1, Ex. A (Smith Body-cam); *see also* Dkt. 13-3, Ex. C (Robinson Body-cam).

[33] Dkt. 2-1 (Complaint) ¶ 26.  In their Motion, Defendants allege that Harmon's outstanding felony warrant was for an aggravated assault.  Dkt. 12 at 20.  But Plaintiffs do not make this allegation in their Complaint.  And, in the body-cam videos, the officers never define what "We're going to go 82, 99, Fox2" means.  Thus, Defendants' unsworn allegation is outside the scope of a Rule 12(b)(6) motion and provides no basis for the court to treat the Motion as one for summary judgment.  Accordingly, this fact is excluded from consideration.  *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and *not excluded by the court*, the motion must be treated as one for summary judgment under Rule 56.") (emphasis added).

[34] Dkt. 2-1 (Complaint) ¶ 27.

arrested and asked him to remove his backpack.[35]  Harmon removed his backpack.[36]  Officer

Smith instructed Harmon to place his hands behind his back, and he complied.[37]  Officer Smith

and Officer Robinson each held one of Harmon's arms to handcuff them behind his back, and

Harmon initially allowed the officers to do this.[38]  While this was happening, Officer Fox stood

in front and to the right of Harmon.[39]

   Then everything changed.  The following events happened in a span of approximately

four seconds.[40]  Harmon suddenly broke away from Officers Smith and Robinson without

warning before they could apply the handcuffs[41] and Harmon began running north, away from

them.[42]  All three officers immediately chased Harmon.[43]  After running a few feet, Harmon

quickly pivoted left onto a sidewalk and turned south back towards the officers.[44]  Officer Fox

followed closely behind Harmon as he began running south down the sidewalk.[45]  Officer

Robinson positioned himself directly in Harmon's path and attempted to grab him.[46]  While

attempting to grab Harmon, Officer Robinson struck him near his head and neck, knocking a

cigarette out of Harmon's mouth.[47]  Harmon then threw Officer Robinson aside and continued

---

[35] *Id.* ¶ 28.

[36] *Id.*

[37] *Id.* ¶ 29.

[38] *Id.* ¶¶ 30–31.

[39] *Id.* ¶ 32.

[40] Dkt. 13-1, Ex. A (Smith Body-cam) at 8:13–17.

[41] *Id.* at 8:13–14.

[42] *Id.* at 8:14–15.

[43] *Id.* at 8:13–20.

[44] Dkt. 2-1 (Complaint) ¶ 37; Dkt. 13-1, Ex. A (Smith Body-cam) at 8:14–16.

[45] Dkt. 2-1 (Complaint) ¶¶ 38–39.

[46] *Id.* ¶ 40.

[47] *Id.* ¶ 41.

running south along the sidewalk past the officers.[48]  Officer Robinson fell towards the ground,

but caught himself before continuing to chase Harmon.[49]  At the same time Harmon threw

Officer Robinson, Officer Fox attempted unsuccessfully to grab Harmon with his left hand.[50]

Officer Fox then drew his service firearm with his right hand as Harmon ran by Officer Fox and

Officer Smith.[51]  To this point in the body-cam videos, nothing is clearly visible in either of

Harmon's hands.[52]

      The following events occurred in a span of approximately the next three seconds.[53]

Officer Fox pursued Harmon with his gun drawn,[54] Officer Smith drew his Taser and ran after

Harmon,[55] and Officer Robinson recovered from his near fall and resumed chasing Harmon.[56]

As Harmon ran from the officers, he turned his body and head to the left, back towards the

pursuing officers and began side-stepping away from them.[57]  Although Harmon was still

moving in a direction away from the officers, he was no longer running.[58]  While doing this, he

brought both of his hands together at chest height.[59]  Harmon's left arm dropped back down after

---

[48] Dkt. 13-1, Ex. A (Smith Body-cam) at 8:15–17; Dkt. 13-2, Ex. B (Fox Body-cam) at 1:03–04.

[49] Dkt. 13-1, Ex. A (Smith Body-cam) at 8:16–23; Dkt. 13-2, Ex. B (Fox Body-cam) at 1:03–04.

[50] Dkt. 13-1, Ex. A (Smith Body-cam) at 8:15–16.

[51] Id.

[52] Dkt. 2-1 (Complaint) ¶ 44.

[53] Dkt. 13-1, Ex. A (Smith Body-cam) at 8:17–20.

[54] Dkt. 2-1 (Complaint) ¶ 47.

[55] Id. ¶ 51; Dkt. 13-1, Ex. A (Smith Body-cam) at 8:17–20.

[56] Dkt. 13-1, Ex. A (Smith Body-cam) at 8:16–23.

[57] Id. at 8:17–18.

[58] Id.

[59] Id. at 8:18–19.  Plaintiffs allege that "[a]t no point in the bodycam footage can Harmon be seen [] using both hands to open a folding knife." Dkt. 2-1 (Complaint) ¶ 124.  Although the body-cam videos do not clearly show Harmon opening a folding knife, they unmistakably show him bringing his hands together at chest height.  Dkt. 13-1, Ex. A (Smith Body-cam) at 8:18–19.

his hands came together, but his right arm remained bent at the elbow and at chest height.[60]

Harmon then slightly crouched and started back towards the officers with his right arm bent and

raised to his chest.[61]   Officer Fox was closest to Harmon—approximately five to seven feet from

him—when Harmon suddenly changed direction back towards the officers.[62]   Officer Fox then

shot Harmon three times while yelling, "I'll [expletive] shoot you!"[63]   The first two shots hit

Harmon's torso, while the third shot entered his right leg, injuring his femoral artery and vein.[64]

At about the same time Officer Fox shot Harmon, Officer Smith fired his Taser,[65] hitting

Harmon in the chest.[66]   Except for Officer Fox's yelling, no officer issued any commands or

warnings to Harmon before Officer Fox shot him.[67]   Harmon did not audibly threaten the officers

during this incident[68] and was unarmed when he was shot.[69]

---

[60] *Id.*

[61] *Id.*  The body-cam videos blatantly contradict Plaintiffs' allegation that "[a]t no point in their interaction did Harmon come back at the officers." Dkt. 2-1 (Complaint) ¶ 103.  In fact, the body-cam videos show Harmon came back at the officers two times during the confrontation.  Harmon first came back at the officers when he stopped running north, turned south, and ran back through the officers.  *See* Dkt. 13-1, Ex. A (Smith Body-cam) at 8:14–16.  And Harmon came back at the officers a second time when he stopped running south and turned back north towards the pursuing officers with his right hand raised.  *See id.* at 8:17–19; *see also* Dkt. 2-1 (Complaint) at 17–19 (showing pictures of Harmon turning towards the officers with his feet pointing towards the officers and his right arm raised).

[62] Dkt. 13-1, Ex. A (Smith Body-cam) at 8:19–20.

[63] *Id.* at 8:19–21; Dkt. 13-2, Ex. B (Fox Body-cam) at 1:04–08.

[64] Dkt. 2-1 (Complaint) ¶ 87.

[65] Dkt. 2-1 (Complaint) ¶ 54.

[66] Dkt. 13-3, Ex. C (Robinson Body-cam) at 2:20–25.

[67] Dkt. 2-1 (Complaint) ¶¶ 56–57.

[68] *Id.* ¶ 58.  The court accepts Plaintiffs' allegations concerning what was and was not said during the seven seconds leading to the shooting because the allegations are not blatantly contradicted by the body-cam videos' audio.  *See Bryner v. Utah*, 429 F. App'x 739, 746 (10th Cir. 2011) (unpublished) ("Since there is no sound, we must accept Mr. Bryner's allegation that he was verbally berated by Deputy Rowley for not complying with the clerk's request that he go to the first floor to file his documents.").

[69] Dkt. 2-1 (Complaint) ¶ 141.

Upon being shot, Harmon immediately fell to the ground,[70] and the officers appeared to be in a state of shock.[71]  Officer Smith then stated into his radio, "Priority, shots fired. Start medical."[72]  Without drawing his firearm, Officer Robinson approached Harmon, who was lying face-down on the ground.[73]  Neither Officer Fox nor Officer Smith warned Officer Robinson that Harmon had a knife or that Officer Robinson should look for or secure a knife.[74]  Officer Robinson said, "okay, cover him [inaudible]," as Officer Fox kept his gun trained on Harmon and replied, "I got him."[75]  Officer Robinson did not search the area or Harmon's hands or clothing for a knife or other weapons.[76]  As Officer Robinson reached to handcuff Harmon, a knife was on the ground next to Harmon's right hand.[77]  Officer Robinson did not report to Officer Fox or Officer Smith that he found a knife.[78]  Although the officers later claimed a knife was recovered near where Harmon had fallen, Officer Robinson did not secure a knife while approaching Harmon.[79]

Officer Smith then approached Harmon, who began screaming in pain but otherwise remained still.[80]  Officer Robinson handcuffed Harmon and examined his body for gunshot

---

[70] Dkt. 2-1 (Complaint) ¶ 55.

[71] Id. ¶ 59.

[72] Id. ¶ 60.

[73] Id. ¶¶ 61–62.

[74] Id. ¶¶ 64–65.

[75] Dkt. 13-1, Ex. A (Smith Body-cam) at 8:27–29; Dkt. 13-2, Ex. B (Fox Body-cam) at 1:14–15.

[76] Dkt. 2-1 (Complaint) ¶¶ 66–68.

[77] Dkt 13-3, Ex. C (Robinson Body-cam) at 1:33–35.  The court accepts Plaintiffs' allegation that Harmon was unarmed when he was shot because the officers' body-cam videos do not blatantly contradict it.  It is unclear from the videos whether Harmon ever had a knife in his hand before he was shot.  Although it is reasonable to infer that the knife found next to Harmon was the knife he allegedly pulled on the officers, the court may not draw this inference in Defendants' favor at this procedural stage of the proceedings.  See Soto, 748 F. App'x at 793.

[78] Dkt. 2-1 (Complaint) ¶ 69.

[79] Id. ¶ 70.

[80] Id. ¶ 63.

wounds.[81]  Officer Robinson instructed Harmon to roll onto his left side, but Harmon could not

because he was incapacitated.[82]  Officer Robinson rolled Harmon onto his side and back,[83]

revealing a large blood stain on the back of Harmon's pants, above his left buttock, as Harmon

was hemorrhaging blood from his right thigh.[84]  Officer Fox told the other officers he was going

to get gloves and ran to his car.[85]  Officer Smith began removing Harmon's pants by pulling

them down.[86]  When Officer Fox returned from his car, he began cutting Harmon's clothing off

with a knife.[87]

At this point, other SLCPD officers arrived.[88]  Officer Robinson and one of the other

officers had the following exchange:

> Unnamed Officer: Any evidence that we're looking to - -
> Officer Robinson: There was a knife somewhere.
> Unnamed Officer: [Inaudible]
> Officer Robinson: Yeah [inaudible] he pulled out the knife.[89]

Harmon was pronounced dead just after midnight.[90]

### b.  The SLCPD Investigation

After the shooting, the SLCPD conducted an internal investigation during which Officer

Fox provided a recorded interview.[91]  In it, Officer Fox repeatedly stated that he shot and killed

---

[81] *Id.* ¶¶ 71–74.

[82] *Id.* ¶¶ 75–76.

[83] *Id.* ¶ 76.

[84] *Id.* ¶¶ 79–80.

[85] *Id.* ¶ 78.

[86] *Id.* ¶ 83.

[87] *Id.* ¶ 82.

[88] *Id.* ¶ 85.

[89] Dkt. 13-3, Ex. C (Robinson Body-cam) at 3:55–4:03.

[90] Dkt. 2-1 (Complaint) ¶ 86.

[91] *Id.* ¶¶ 90–91.

Harmon because he reached for and produced a knife.[92]  Specifically, Officer Fox stated, "As

soon as [Harmon] started running, both of his hands went to his right pocket.  The moment he

started going for the pocket, and I don't remember exactly what he said but I remember it was to

the effect of, 'You'll get cut,' 'I'm gonna cut you' or something.  I know that I heard it.  I know

that I processed it."[93]  Officer Fox also stated, "And I can't remember but I think, I think [Officer

Smith] was telling [Harmon] to stop."[94]

Officer Fox described his perspective of the moments after Harmon pushed past Officer

Robinson: "I see what [Harmon is] doing, I see his hands are going for his right pocket still" and

"the entire time the guy is running, I can see him going for that right pocket."[95]  Officer Fox

continued: "When [Harmon] broke direction and he started going [n]orth on the sidewalk again,

he was still going for that pocket."[96]  Prior to shooting Harmon, Officer Fox claimed Harmon

"stopped, turned, and came back at [the officers]."[97]

When Officer Fox was asked why he chose to shoot, he answered:

When he first started going in his pocket, and again, I don't remember exactly
what he said but I know it was to the effect of 'I'll cut you' or 'You're going to
get cut,' he said something to that effect, I immediately believed that he was
going for a weapon and it was most likely going to come out as a knife.  At that
point I knew that was a lethal weapon, and every bit of my training from post to
until – we actually had a lineup training that day and the sergeant had watched –
had us watch a video and it was the video of the officer in South Carolina where
he was confronting the guy and he drew a TASER, the guy ended up having a gun
and we had talked about never leading into a situation where if there could be a
potential for lethal force that we use a less lethal weapon.[98]

---

[92] *Id.* ¶ 92.

[93] *Id.* ¶ 93.

[94] *Id.* ¶ 96.

[95] *Id.* ¶¶ 98–99.

[96] *Id.* ¶ 100.

[97] *Id.* ¶ 102 (brackets omitted).

[98] *Id.* ¶ 107.

Officer Fox reiterated how his training impacted his decision to draw his gun on Harmon, "through every bit of training you don't respond to a knife or a lethal weapon with a less lethal option. So, that's why I drew my gun."[99]

Plaintiffs seem to contend the body-cam videos disprove the recorded statements made by Officer Fox. Specifically, Plaintiffs allege that none of the body-cam videos show Harmon reaching for his right pocket.[100] Plaintiffs further allege Harmon can be heard in none of the body-cam videos making any statement about cutting Officer Fox.[101] Because these additional allegations are not blatantly contradicted by the body-cam video, the court accepts them as true for purposes of the Rule 12(b)(6) analysis below. As it must, the court also views these facts at this stage in the light most favorable to Plaintiffs.

But to the extent Plaintiffs invite the further negative inference that Officer Fox was untruthful in his statements – because the things he reported cannot clearly be seen or heard on the body-cam videos – that negative inference lacks support in the videos. During the seven seconds between Harmon breaking away from the officers and Officer Fox shooting him, the body-cam videos obviously do not capture everything that occurred.[102] Specifically, the audio in the videos is largely obscured and muffled by sounds caused by the officers chasing Harmon. The images on the videos are often blurred and shaky during the critical moments as the officers are moving very quickly and the nighttime lighting is often poor.

In any event, the veracity of the post-shooting statements made by Officer Fox is immaterial under the objective reasonableness standard the court is required to apply when

---

[99] *Id.* ¶ 108 (brackets omitted).

[100] *Id.* at ¶ 94.

[101] *Id.* at ¶ 95.

[102] *See* Dkt. 13-1, Ex. A (Smith body-cam); Dkt. 13-2, Ex. B (Fox body-cam); Dkt. 13-3, Ex. C (Robinson body-cam).

evaluating the totality of the circumstances as Plaintiffs allege and the body-cams depict under the *Graham* factors described below.  As noted throughout this ruling, the court assumes for purposes of resolving Defendants' motion that Harmon was unarmed at the time Officer Fox shot him.

### c.  SLCPD's History of Race-based Policing and Use of Force

In January 2016, the SLCPD settled a lawsuit that alleged the SLCPD had engaged in a racially-motivated gang sweep of a local high school, exclusively targeting and arresting Latino, African-American, and Pacific Islander students.[103]  That settlement includes a requirement that "SLCPD officers shall not use race, color, ethnicity, or national origin in exercising discretion to conduct warrantless stop or search, or to seek a warrant."[104]

SLCPD officers have a history of shooting people.[105]  In August 2014, an SLCPD officer shot and killed Dylan Taylor, an unarmed 20-year old.[106]  In January 2015, an SLCPD officer shot and killed James Barker, in part because he was armed with a snow shovel.[107]  In February 2016, an SLCPD officer shot and paralyzed a seventeen-year-old who had been carrying a mop handle.[108]  In 2018, police shot seven people in Salt Lake County, including four people of color.[109]  All three fatal police shootings in Salt Lake County in 2018 involved people of color.[110]

---

[103] *Id.* ¶ 131.

[104] *Id.*

[105] *Id.* ¶ 126–30.

[106] *Id.* ¶ 129.  The Complaint makes no allegation concerning Taylor's race.  *Id.*

[107] *Id.* ¶ 130.  The Complaint makes no allegation concerning Barker's race.  *Id.*

[108] *Id.* ¶ 132.  The Complaint makes no allegation concerning the seventeen-year-old's race.  *Id.*

[109] *Id.* ¶ 126.

[110] *Id.* ¶ 127.

### d.  Procedural History

Plaintiffs commenced this civil action against Defendants in Utah state court in July 2019,[111] asserting five causes of action against Officer Fox and Salt Lake City.[112]  First, under 42 U.S.C. § 1983, Plaintiffs claim Officer Fox used excessive force against Harmon in violation of the Fourth Amendment.[113]  Second, Plaintiffs claim Salt Lake City, as a municipality, is liable for Officer Fox's use of excessive force under § 1983.[114]  Third, again relying on § 1983, Plaintiffs claim both Defendants violated Harmon's right to equal protection under the Fourteenth Amendment.[115]  Fourth, Plaintiffs claim Officer Fox wrongfully caused Harmon's death under Utah law.[116]  And fifth, Plaintiffs claim both Defendants violated the Excessive Rigor Clause of the Utah Constitution.[117]

Shortly after Plaintiffs filed their state court Complaint, Defendants removed the action to this court[118] and moved to dismiss Plaintiffs' claims.[119]  In their Motion, Defendants invoke Rule 12(b)(6) to argue Officer Fox is entitled to qualified immunity on Plaintiffs' Fourth Amendment claim and that Plaintiffs have failed to plead a plausible Fourteenth Amendment claim against Officer Fox.[120]  Defendants argue the claims against Salt Lake City should be dismissed because Plaintiffs cannot maintain claims against Salt Lake City if the underlying claims against Officer

---

[111] Dkt. 2 at 2.

[112] *See* Dkt. 2-1 (Complaint) ¶¶ 134–94.

[113] *Id.* ¶¶ 134–50.

[114] *Id.* ¶¶ 151–68.

[115] *Id.* ¶¶ 169–80.

[116] *Id.* ¶¶ 181–88.

[117] *Id.* ¶¶ 189–94.

[118] *See* Dkt. 2.

[119] *See* Dkt. 12.

[120] *Id.* at 10.

Fox are dismissed.[121]  Lastly, Defendants argue the court should decline to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims if the federal claims are dismissed.[122]

## ANALYSIS

A municipality may not be liable if one of its officers has not committed an "underlying constitutional violation."[123]  Because Plaintiffs' federal claims against Salt Lake City depend on their constitutional claims against Officer Fox, the court first addresses the claims against him.  Next, the court turns to Plaintiffs' claims against Salt Lake City.  Finally, the court addresses Plaintiffs' Utah state law claims against Defendants.

### I.   Plaintiffs' Fourth Amendment Excessive Force Claim Against Officer Fox

#### a.   Legal Standard for Qualified Immunity

Officer Fox argues he is entitled to qualified immunity on Plaintiffs' Fourth Amendment claim[124] in which Plaintiffs allege he used excessive force against Harmon.[125]  An "[i]ndividual defendant[] named in a § 1983 action may raise a defense of qualified immunity, which shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law."[126]  This defense "not only protects public employees from liability, but also protects them from the burdens of litigation."[127]  "Although qualified immunity defenses are

---

[121] *See id.* at 20.

[122] *See id.* at 21.

[123] *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) (citations omitted).

[124] Dkt. 12 at 10–19.

[125] Dkt. 2-1 (Complaint) ¶ 139.

[126] *Doe v. Woodard*, 912 F.3d 1278, 1289 (10th Cir. 2019) (citation omitted).

[127] *A.M. v. Holmes*, 830 F.3d 1123, 1134 (10th Cir. 2016) (brackets and citation omitted).

typically resolved at the summary judgment stage, district courts may grant motions to dismiss on the basis of qualified immunity."[128]

At the motion to dismiss stage, qualified immunity is subject "to a more challenging standard of review than would apply on summary judgment"[129] because "it is the defendant's conduct *as alleged in the complaint* that is scrutinized for objective legal reasonableness."[130] Nevertheless, the court applies "the same [Rule 12(b)(6)] standard in evaluating dismissal in qualified immunity cases as to dismissals generally."[131]

When a defendant asserts qualified immunity, "the plaintiff bears a heavy two-part burden."[132]  First, the plaintiff must plausibly allege that "the defendant's actions violated a constitutional or statutory right."[133]  Second, the plaintiff must demonstrate "that the right was clearly established at the time of the conduct at issue."[134]  In other words, to overcome qualified immunity at the motion to dismiss stage, "plaintiffs must [1] allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights, and [2] that those rights were clearly established at the time."[135]  "[I]f the plaintiff fails to establish either prong of the two-pronged qualified immunity standard, the defendant prevails on the defense,"[136] and "the court must grant the defendant qualified immunity."[137]

---

[128] *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014).

[129] *Id.* (citations omitted).

[130] *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).

[131] *Robbins*, 519 F.3d at 1249 (citation omitted).

[132] *Thomas*, 765 F.3d at 1194 (quotation marks and citation omitted).

[133] *Id.* (citation omitted).

[134] *Id.* (quotation marks and citation omitted).

[135] *Robbins*, 519 F.3d at 1249.

[136] *A.M.*, 830 F.3d at 1134–35 (citations omitted).

[137] *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (citation omitted).

The court may decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."[138]  Here, the court begins with the first prong of qualified immunity—whether Plaintiffs have pleaded a plausible constitutional violation against Officer Fox.  Because the court concludes that Plaintiffs fail to plead a plausible excessive force claim against Officer Fox, the court will not reach the "clearly established" prong of qualified immunity.

### b.  Plaintiffs Have Not Pled a Plausible Constitutional Violation

The Fourth Amendment "guarantees citizens the right to be secure in their persons . . . against unreasonable . . . seizures."[139]  "[T]he use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."[140]  Under the Fourth Amendment, an officer's use of deadly force is constitutional "if a reasonable officer in the defendant's position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others."[141]  Indeed, "[a]n officer's use of deadly force in self-defense is not constitutionally unreasonable,"[142] and "[a] reasonable officer need not await the glint of steel before taking self-protective action; by then, it is often . . . too late."[143]  Accordingly, "[a] reasonable perception of imminent danger, even if mistaken, may be consistent with the reasonable use of deadly force."[144]

---

[138] *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

[139] *Graham v. Connor*, 490 U.S. 386, 394 (1989) (ellipses in original) (quotation marks omitted).

[140] *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).

[141] *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004) (citation omitted).

[142] *Romero v. Bd. of Cty. Comm'rs of Cty. of Lake, State of Colo.*, 60 F.3d 702, 704 (10th Cir. 1995) (citation omitted).

[143] *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) (quotation marks and citation omitted).

[144] *Estate of Ronquillo by and through Estate of Sanchez v. City and Cty. of Denver*, 720 F. App'x 434, 439 (10th Cir. 2017) (unpublished) (citation omitted).

The reasonableness of an officer's use of deadly force "depends both on whether the [officer was] in danger at the precise moment that [he] used force and on whether [the officer's] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force."[145]  The officer's conduct is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[146]  The court views the officer's conduct from the "on-scene perspective" because officers "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary."[147]

To assess the reasonableness of an officer's use of deadly force, "courts are to consider the totality of the circumstances"[148] and "pay careful attention to the facts and circumstances of the particular case."[149]  In *Graham v. Connor*, the Supreme Court identified three non-exclusive factors to consider as part of this analysis: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."[150]  The court "analyze[s] these factors at the precise moment that the officer used force."[151]  Importantly, this analysis enjoys "no bright line rules" and "in the end the inquiry is always whether, from the

---

[145] *Sevier v. City of Lawrence, Kan.*, 60 F.3d 695, 699 (10th Cir. 1995) (citations omitted).  Plaintiffs allege in the Complaint that Officer Fox "created the need for deadly force . . . through his own reckless, deliberate conduct."  Dkt. 2-1 (Complaint) ¶¶ 144–145.  Plaintiffs do not, however, assert this argument in their response to Defendants' Motion. *See* Dkt. 18.  Therefore, the court does not address this argument other than to note the body-cam videos blatantly contradict any allegation that Officer Fox recklessly or deliberately created the need for deadly force during his encounter with Harmon.

[146] *Estate of Larsen*, 511 F.3d at 1259 (citation omitted).

[147] *Id.* at 1259–60 (citation omitted).

[148] *Jiron*, 392 F.3d at 414 (citation omitted).

[149] *Sevier*, 60 F.3d at 699 (quotation marks, brackets, and citation omitted).

[150] *Graham*, 490 U.S. at 396 (citation omitted).

[151] *Ronquillo*, 720 F. App'x at 438 (citation omitted).

perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force."[152]

Defendants argue the *Graham* factors justify Officer Fox's use of deadly force.[153] Plaintiffs do not address in their response the first and third *Graham* factors.[154]  Instead, they focus on the second factor, arguing that Officer Fox could not have reasonably perceived Harmon to be an immediate threat.[155]  Carefully considering the totality of the circumstances, including each *Graham* factor, the court concludes Officer Fox's use of deadly force was legally objectively reasonable.

### i.    The Severity of Harmon's Crimes

The first *Graham* factor—the severity of Harmon's crimes—modestly supports Officer Fox's use of force.  In evaluating this factor, the court may consider any criminal act that occurs during the police-citizen encounter and is not limited to only considering the crime that caused the encounter.[156]  Generally, violent or felony crimes support an officer using more force than would be reasonable for nonviolent crimes or crimes classified as misdemeanors or less.[157]

At the time Officer Fox shot Harmon, a reasonable officer on the scene would know Harmon was wanted on a felony warrant and could have believed Harmon committed a nonviolent infraction in addition to two misdemeanors.  Initially, Officer Smith stopped Harmon

---

[152] *Estate of Larsen*, 511 F.3d at 1260, 1262 (citation omitted).

[153] Dkt. 12 at 14–18.

[154] Dkt. 18 at 8–10.

[155] *Id.* at 9–10.

[156] *See Clark v. Bowcutt*, 675 F. App'x 799, 807 (10th Cir. 2017) (unpublished) (including in its analysis of the first *Graham* factor the citizen's initial crime—public urination—and his subsequent offense—fleeing from a traffic stop.).

[157] *See id.* ("Felonies are deemed more severe.") (citation omitted); *see also Casey v. City of Fed. Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007) ("Officer Sweet was faced with somebody who had committed a misdemeanor in a particularly harmless manner, which reduces the level of force that was reasonable for him to use."); *Ronquillo*, 720 F. App'x at 438 (weighing the first *Graham* factor in favor of the citizen even though he had committed a felony because none of his "alleged crimes were accompanied by violence.").

for riding a bicycle without a red taillight—a nonviolent infraction.[158]  Shortly after the stop,

Officer Smith discovered Harmon was wanted on an outstanding felony warrant and shared that

information with Officer Fox.[159]  When the officers tried to arrest Harmon, he broke away and

fled—a class B misdemeanor.[160]  Instead of continuing to flee, however, Harmon turned back

towards the officers and assaulted Officer Robinson by throwing him to the ground—a class A

misdemeanor.[161]  Although Harmon's initial crime would not justify much, if any, force to

effectuate a seizure, a reasonable officer under the circumstances could determine additional

force was necessary to seize an individual with an outstanding felony warrant who assaulted an

officer in an attempt to evade arrest.[162]

### ii.   A Reasonable Officer Could Have Believed Harmon Posed a Serious and Immediate Threat to Officer Fox

The second *Graham* factor—the immediate threat Harmon posed to the officers—

strongly supports Officer Fox's use of deadly force.  The Tenth Circuit has established four non-

exclusive factors for assessing the threat posed to officers during an encounter: "(1) whether the

officers ordered the suspect to drop his weapon, and the suspect's compliance with police

commands; (2) whether any hostile motions were made with the weapon towards the officers; (3)

the distance separating the officers and the suspect; and (4) the manifest intentions of the

suspect."[163]  Here, the first factor weighs in Plaintiffs' favor, while the remaining three factors

support the conclusion that Harmon posed a serious and immediate threat to Officer Fox.

---

[158] Salt Lake City, Utah, Code §§ 12.80.065 and 12.80.200.

[159] Dkt. 2-1 (Complaint) ¶ 26.

[160] Utah Code Ann. § 76-8-305(1)(a).

[161] *Id.* § 76-5-102.4(2)(a).

[162] These criminal acts alone would not justify the use of deadly force.  *See Garner*, 471 U.S. at 9–12.

[163] *Estate of Larsen*, 511 F.3d at 1260 (citations omitted).

First, accepting as true Plaintiffs' well-pleaded allegations, the officers never ordered Harmon to drop a weapon.[164]  Thus, he never had the opportunity to comply, and a reasonable officer could not have perceived this as a threat.

Plaintiffs argue the second factor weighs in their favor because Harmon was unarmed.[165] But the relevant inquiry here is not whether Harmon was armed, "the relevant question here is whether the officers acted reasonably in light of the mistaken perception that [Harmon]" was armed with a knife.[166]  The court finds they did.

Specifically, the second time Harmon turned back toward the officers, a reasonable officer could have perceived Harmon's actions as hostile motions with a weapon directed at Officer Fox.  After throwing Officer Robinson, Harmon ran a few steps before turning back towards the officers.[167]  He then stopped running, looked back at the officers, and began to side-shuffle away from them.[168]  While side-shuffling, Harmon's hands came together in front of his chest.[169]  His left hand then dropped down, but his right arm and hand stayed raised at his chest in a manner a reasonable officer could view as a threatening, stabbing stance.[170]  With his arm still raised and his body slightly crouched, Harmon started back towards Officer Fox, who was only approximately five to seven feet from Harmon.[171]  All of this happened at great speed in a matter of seconds.  Officer Fox shot Harmon at the moment he started back towards the

---

[164] Defendants argue Harmon failed to comply with the officers' attempt to arrest him and, as a result, this factor favors Officer Fox's use of force.  Dkt. 12 at 16.  But these facts are more relevant to the third *Graham* factor, where the court addresses them.

[165] Dkt. 18 at 8–10.

[166] *Estate of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1171 (10th Cir. 2020).

[167] Dkt. 13-1, Ex. A (Smith Body-cam) at 8:16–19.

[168] *Id.* at 8:17–20.

[169] *Id.*

[170] *Id.*

[171] *Id.* at 18–19.

officers[172] because, according to Officer Fox, Harmon had a knife and was coming back at them.[173]  Although the court assumes for purposes of resolving the Motion to Dismiss that Officer Fox was mistaken in believing Harmon had a knife, that belief was not unreasonable. Indeed, these facts—all of which occurred in approximately three seconds—support the conclusion that a reasonable officer could have believed Harmon had a knife and was attempting to harm Officer Fox.[174]

Third, the distance between Officer Fox and Harmon—approximately five to seven feet—was short enough that Officer Fox could have reasonably believed Harmon posed an immediate threat.  The body-cam videos show how quickly Harmon moved throughout the seven critical seconds, establishing that he could close the gap between himself and Officer Fox in a moment.

Fourth, although Harmon never verbally threatened the officers, he physically assaulted Officer Robinson while attempting to evade arrest.  Thus, Harmon demonstrated his intention to fight the officers if necessary, rather than be apprehended.[175]

In sum, a reasonable officer confronted with the events Officer Fox faced could have believed Harmon posed a serious and immediate threat to the officers.  Although the body-cam videos did not capture everything that occurred with perfect clarity, "it is nevertheless readily

---

[172] *Id.* at 19–21.

[173] Dkt. 2-1 (Complaint) ¶¶ 92, 102.

[174] *See Thomas v. Durastanti*, 607 F.3d 655, 666 (10th Cir. 2010) ("Although Agent Durastanti's reasonable perceptions are what matters, he had mere seconds to react, and his actions in firing the first couple of shots were reasonable, even if mistaken.  An officer may be found to have acted reasonably even if he has a mistaken belief as to the facts establishing the existence of exigent circumstances.") (citations omitted).

[175] *Estate of Larsen*, 511 F.3d at 1260 ("Indeed, even if an officer reasonably, but mistakenly, believed that a suspect was likely to fight back . . . the officer would be justified in using more force than in fact was needed.") (ellipses in original) (quotation marks, brackets, and citation omitted).

apparent to [the court] from examining the video[s] that [Harmon] posed an immediate threat to [Officer Fox's] safety."[176]

### iii. Harmon was Resisting Arrest

The third *Graham* factor—whether Harmon was "actively resisting arrest"—also favors immunity for Officer Fox's decision to use deadly force.[177]  From the moment Harmon broke free of the officers attempting to handcuff him to the moment Officer Fox shot him, Harmon was actively resisting arrest.[178]  And, contrary to Plaintiffs' allegations,[179] the body-cam videos clearly show Harmon was not merely fleeing from the officers when he was shot.[180]  Instead, the videos show Harmon turned back towards the officers (a second time) while side-stepping away from them, his hands came together in front of his chest, and his right arm remained raised at chest height as he came back at Officer Fox.[181]

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving"—the very circumstances Officer Fox faced.[182]  After carefully weighing the totality of these circumstances, the court concludes a reasonable officer in Officer Fox's position could believe Harmon posed an immediate threat of serious physical harm.  Accordingly, Officer Fox's use of deadly force was legally justified, and Officer Fox is entitled to qualified immunity on Plaintiffs' Fourth Amendment violation claim.  The claim is dismissed with prejudice.

---

[176] *Clark*, 675 F. App'x at 808.

[177] *Graham*, 490 U.S. at 396 (citation omitted).

[178] *See* Dkt. 13-1, Ex. A (Smith Body-cam) at 8:13–20.

[179] *See* Dkt 2-1 (Complaint) ¶ 50; *see also* Dkt. 18 at 9–10.

[180] Dkt. 13-1, Ex. A (Smith Body-cam) at 8:17–20.

[181] *Id.*

[182] *Graham*, 490 U.S. at 396–97.

## II.    Plaintiffs' Fourteenth Amendment Claim Against Officer Fox

"[E]ven if the actions of the police are acceptable under the Fourth Amendment," they may nevertheless violate the Equal Protection Clause of the Fourteenth Amendment,[183] which "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the law.'"[184]  Racially selective law enforcement violates the Equal Protection Clause.[185]  To state a racially selective law enforcement claim, Plaintiffs must plausibly allege "that [Officer Fox's] actions [1] had a discriminatory effect and [2] were motivated by a discriminatory purpose."[186]

Defendants do not challenge the sufficiency of Plaintiffs' allegations concerning the discriminatory effect of Officer Fox's actions.[187]  Instead, they argue Plaintiffs' Equal Protection claim should be dismissed because Plaintiffs fail to sufficiently allege that Officer Fox's decision to shoot Harmon was motivated by a discriminatory purpose.[188]  The court agrees.

To establish a discriminatory purpose, Plaintiffs must allege "that discriminatory intent was a motivating factor" in Officer Fox's decision to shoot Harmon.[189]  Parties generally rely on "direct evidence of police motivation" or "statistical comparisons" to show discriminatory intent.[190]  Plaintiffs here do not rely on any direct evidence to allege that Officer Fox shot Harmon because of his race.  Instead, they argue that their conclusory allegations are supported by sufficient statistical and historical data concerning SLCPD's "record of racially biased

---

[183] *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1166 (10th Cir. 2003).

[184] *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citation omitted).

[185] *Marshall*, 345 F.3d at 1166–67.

[186] *Id.* at 1168 (citation omitted).

[187] *See* Dkt. 12 at 20 (arguing only that Plaintiffs fail to state a cognizable Equal Protection claim because they fail to allege that Officer Fox's decision to shoot Harmon was motivated by racial animus).

[188] *Id.*

[189] *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006) (quotation marks and citation omitted).

[190] *Marshall*, 345 F.3d at 1168.

policing" and "use of deadly force" to establish discriminatory purpose.[191]  Plaintiffs' allegations are legally insufficient.

First, Plaintiffs make in their Complaint only two direct allegations that Officer Fox's decision to shoot Harmon was motivated by discriminatory intent: (1) Harmon was Black and Officer Fox was white, and (2) "Harmon's race was a substantial motivating factor in Defendant Fox's decision to use excessive force against him."[192]  Without more, the first allegation does not "support an inference of racial animus."[193]  And the second allegation is merely a legal conclusion that the court may not consider at this Rule 12(b)(6) stage.[194]

Second, racially selective law enforcement claims "draw on what the Supreme Court has called 'ordinary equal protection standards.'"[195]  One of those standards is that Plaintiffs have the burden of "prov[ing] that the decisionmakers in [their] case acted with discriminatory purpose."[196]  In other words, the relevant inquiry is whether Officer Fox acted with discriminatory intent, not whether other officers in the SLCPD or Salt Lake County act with discriminatory intent.[197]

---

[191] Dkt. 18 at 12–13.

[192] Dkt. 2-1 (Complaint) ¶ 176.

[193] *Green v. Corr. Corp. of America*, 401 F. App'x 371, 376 (10th Cir. 2010) (unpublished) ("Mere differences in race do not, by themselves, support an inference of racial animus.") (citations omitted).

[194] *See Iqbal*, 556 U.S. at 678–79; *see also Requena v. Roberts*, 893 F.3d 1195, 1210 (10th Cir. 2018) ("Requena's general allegations of racial animus and discriminatory intent are too vague and conclusory to state a claim.").

[195] *Marshall*, 345 F.3d at 1168 (citation omitted).

[196] *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987).

[197] *See United States v. Coleman*, 483 F. App'x 419, 420–21 (10th Cir. 2012) (unpublished) (". . . the statistics are of no help to Mr. Coleman.  No help because to prove an Equal Protection claim he must prove that the decisionmakers in *his* case acted with discriminatory purpose. . . . And the statistics he asks us to take notice of do not even purport to speak to *that* question, saying nothing one way or the other about the practices of the undisputed decision maker in this case, Officer Alvarez.").

None of Plaintiffs' statistical or historical allegations relate to or even mention Officer Fox.[198]  Plaintiffs do not allege that Officer Fox was involved in the "racially motivated gang sweep of a local high school" or the subsequent legal settlement.[199]  They do not allege that Officer Fox was involved in the shootings between police and "people of color" in 2018.[200]  They do not allege that Officer Fox was involved in any of the "high-profile examples" that are "indicative of the culture of . . . racially charged police tactics."[201]  And Plaintiffs never explain how their statistical allegation—"[i]n a city that is just 2.7% Black, SLCPD used force against Black persons in 13.1% of all use of force incidents between January 2017 and December 2018"—relates in any way to Officer Fox.[202]  Therefore, Plaintiffs' statistical and historical allegations are irrelevant to the question presented[203] and provide no indication that Officer Fox acted with discriminatory intent when he shot Harmon.

At bottom, Plaintiffs have failed to state an actionable Equal Protection claim against Officer Fox.  This claim is dismissed without prejudice.

---

[198] *See* Dkt. 2-1 (Complaint) ¶¶ 125–133, 169–80.

[199] *Id.* ¶ 131.

[200] *Id.* ¶¶ 126–27.

[201] *Id.* ¶¶ 129–30, 132–33.

[202] *See id.* ¶ 175; Dkt. 18 at 12–13.  Further, Plaintiffs never explain how their statistics satisfy the Tenth Circuit's framework for analyzing statistics' impact on the discriminatory purpose inquiry.  *See Marshall*, 345 F.3d at 1168 (explaining that statistics can indicate a discriminatory purpose when they include "a reliable measure of the demographics of the relevant population, . . . a means of telling whether the data represent similarly situated individuals, . . . and a point of comparison to the actual incidence of crime among different racial or ethnic segments of the population.") (citations omitted).

[203] *See Blackwell v. Strain*, 496 F. App'x 836, 841 (10th Cir. 2012) (unpublished) (concluding that statistical data was irrelevant when it concerned a police department as a whole, rather than the conduct of the defendant police officer); *Coleman*, 483 F. App'x at 421 (concluding "it would be a gross misuse of statistical data to extrapolate about Officer Alvarez's conduct in particular merely from aggregate data that covers many other individuals.") (citation omitted).

### III.   Plaintiffs' Fourth and Fourteenth Amendment Claims Against Salt Lake City Necessarily Fail

"[T]o establish municipal liability, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged."[204]  But "[a] municipality may not be held liable where there was no underlying constitutional violation by any of its officers."[205]  Because the court concludes Officer Fox violated neither the Fourth Amendment nor the Fourteenth Amendment, Plaintiffs cannot maintain independent municipal liability claims against Salt Lake City.  Accordingly, Plaintiffs' second cause of action is dismissed with prejudice, and Plaintiffs' third cause of action is dismissed without prejudice.

### IV.   Plaintiffs' State Law Claims

"Under 28 U.S.C. § 1367(c)(3), the district court may decline to exercise supplemental jurisdiction over state-law claims if it has dismissed all claims over which it has original jurisdiction."[206]  "Indeed, [the Tenth Circuit has] directed courts that they should usually do so in these circumstances."[207]  As explained above, the court has dismissed all of Plaintiffs' federal claims.  Accordingly, the court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims and dismisses them without prejudice.

### CONCLUSION

Defendants' Motion to Dismiss[208] is GRANTED as follows:

- Plaintiffs' First Claim for Relief is dismissed with prejudice;

---

[204] *Hinton*, 997 F.2d at 782 (citation omitted).

[205] *Id.* (citations omitted).

[206] *Phan v. Colo. Legal Servs.*, 769 F. App'x 520, 527 (10th Cir. 2019) (unpublished) (quotation marks omitted).

[207] *Id.* (citing *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011).

[208] Dkt. 12.

- Plaintiffs' Second Claim for Relief is dismissed with prejudice;

- Plaintiffs' Third Claim for Relief is dismissed without prejudice;

- Plaintiffs' Fourth Claim for Relief is dismissed without prejudice; and

- Plaintiffs' Fifth Claim for Relief is dismissed without prejudice.

Plaintiffs may file an amended complaint within 28 days should they wish to attempt to replead the claims dismissed without prejudice.  If an amended complaint is not received within that time period, the court will close the case.

SO ORDERED this 10th day of July 2020.

BY THE COURT:

ROBERT J. SHELBY
United States Chief District Judge

**173**

Andrew G. Deiss (7184)
Corey D. Riley (16935)
Deiss Law PC
10 West 100 South, Suite 700
Salt Lake City, Utah 84101
(801) 433-0226
adeiss@deisslaw.com
criley@deisslaw.com

Qusair Mohamedbhai (pro hac vice)
Nicholas A. Lutz (pro hac vice)
2701 Lawrence Street, Suite 100
Denver, Colorado 80205
(303) 578-4400 (p)
(303) 578-4401 (f)
qm@rmlawyers.com
nl@rmlawyers.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ESTATE OF PATRICK HARMON SR.; PATRICK HARMON II, as Personal Representative of the Estate of Patrick Harmon Sr., and heir of Patrick Harmon Sr., TASHA SMITH, as heir of Patrick Harmon Sr., <br><br> Plaintiff, <br> vs. <br><br> SALT LAKE CITY, a municipality; and OFFICER CLINTON FOX, in his individual capacity, <br><br> Defendants. | **NOTICE OF APPEAL** <br><br> Case No. 19-cv-00553-RJS-CMR <br><br> Chief Judge Robert J. Shelby <br><br> Magistrate Judge Cecilia M. Romero |

**174**

Notice is hereby given that the Estate of Patrick Harmon Sr., Patrick Harmon II, and Tasha Smith, Plaintiffs in the above named case, hereby appeal to the United States Court of Appeals for the Tenth Circuit from the Memorandum Decision and Order Granting Defendants' Motion to Dismiss entered in this action on July 10, 2020.

Dated: August 10, 2020,                    DEISS LAW PC

                                           s/ *Andrew G. Deiss*
                                           Andrew G. Deiss
                                           Corey D. Riley
                                           10 West 100 South, Suite 425
                                           Salt Lake City, Utah 84101
                                           Telephone: (801) 433-0226
                                           adeiss@deisslaw.com
                                           criley@deisslaw.com

                                           RATHOD | MOHAMEDBHAI LLC

                                           Qusair Mohamedbhai (pro hac vice)
                                           Nicholas A. Lutz (pro hac vice)
                                           2701 Lawrence Street, Suite 100
                                           Denver, Colorado 80205
                                           (303) 578-4400 (p)
                                           (303) 578-4401 (f)

**175**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ESTATE OF PATRICK HARMON SR.; PATRICK HARMON II, as Personal Representative of the Estate of Patrick Harmon and heir of Patrick Harmon Sr.; TASHA SMITH, as heir of Patrick Harmon Sr., <br><br> Plaintiffs, <br><br> v. <br><br> SALT LAKE CITY, a municipality; and OFFICER CLINTON FOX, in his individual capacity, <br><br> Defendants. | **ORDER GRANTING PLAINTIFFS' MOTION FOR REMAND TO STATE COURT** <br><br> Case No. 2:19-cv-00553-RJS-CMR <br><br> Chief Judge Robert J. Shelby <br><br> Magistrate Judge Cecilia M. Romero |

The court has before it Plaintiffs' Motion for Remand to State Court.[1] Having reviewed the Motion, and for good cause appearing, the court GRANTS the Motion and REMANDS Plaintiffs' state-law claims (Claims Four and Five) to the Utah Third District Court, Case No. 190905238.

SO ORDERED this 13th day of August 2020.

BY THE COURT:

_____
ROBERT J. SHELBY
United States Chief District Judge

---

[1] Dkt. 30.

**176**

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ESTATE OF PATRICK HARMON SR.; PATRICK HARMON II, as Personal Representative of the Estate of Patrick Harmon Sr. and heir of Patrick Harmon Sr.; TASHA SMITH, as heir of Patrick Harmon Sr., <br><br> Plaintiffs, <br><br> v. <br><br> SALT LAKE CITY, a municipality; and OFFICER CLINTON FOX, in his individual capacity, <br><br> Defendants. | **JUDGMENT IN A CIVIL CASE** <br><br> Case No. 2:19-cv-00553-RJS-CMR <br><br> Chief Judge Robert J. Shelby <br><br> Magistrate Judge Cecilia M. Romero |

The court has granted Defendants' Motion to Dismiss. Accordingly, IT IS ORDERED AND ADJUDGED that judgment be entered in favor of Defendants Salt Lake City and Officer Clinton Fox and against Plaintiffs Estate of Patrick Harmon Sr., Patrick Harmon II, and Tasha Smith on Plaintiffs' First and Second Claims for Relief.

DATED this 14th day of August 2020.

BY THE COURT

ROBERT J. SHELBY
United States Chief District Judge

1

**177**

FILED
United States Court of Appeals
Tenth Circuit

November 10, 2021

Christopher M. Wolpert
Clerk of Court

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

ESTATE OF PATRICK HARMON, SR;
PATRICK HARMON, II, as personal
representative of the estate of Patrick
Harmon, Sr. and heir of Patrick Harmon,
Sr.; TASHA SMITH, as heir of Patrick
Harmon, Sr.,

      Plaintiffs - Appellants,

v.

SALT LAKE CITY, a municipality;
CLINTON FOX, in his individual capacity,

      Defendants - Appellees.

No. 20-4085
(D.C. No. 2:19-CV-00553-RJS-CMR)
(D. Utah)

_____

### ORDER AND JUDGMENT[*]
_____

Before **BACHARACH**, **KELLY**, and **CARSON**, Circuit Judges.
_____

Plaintiffs-Appellants, the Estate of Patrick Harmon, Patrick Harmon, II, and

Tasha Smith (collectively the Estate) appeal from the district court's dismissal of its

Fourth Amendment excessive force and municipal liability claims. Estate of Patrick

Harmon v. Salt Lake City, 471 F. Supp. 3d 1203 (D. Utah 2020). The district court

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

dismissed based on qualified immunity.  This court has jurisdiction under 28 U.S.C. §
1291, and we reverse and remand to the district court for further proceedings.

## Background

Around 10:00 p.m. on August 13, 2017, Salt Lake City Police Department
(SLCPD) Officer Kris Smith stopped Patrick Harmon for riding a bicycle without a
red taillight, in violation of a local traffic ordinance.  Joint App. 13.  According to
Officer Smith, Mr. Harmon gave inconsistent names when he asked Mr. Harmon to
identify himself.  Id.  During their discussion, Mr. Harmon informed Officer Smith
that he probably had an outstanding warrant from an incident that occurred years ago.
Id.  Officer Smith then radioed for backup and returned to his car to check for a
warrant.  Id.

While Officer Smith was running the check, SLCPD Officers Clinton Fox and
Scott Robinson arrived on scene.  Id.  After a few minutes, Officer Fox verified the
outstanding warrant and said, "Yes!  Excellent.  We're going to go 82, 99, Fox 2,"
meaning that Mr. Harmon should be arrested.  Id. at 13–14.  The officers approached
Mr. Harmon, told him that he was going to be arrested.  Id. at 14.  Mr. Harmon
begged the officers to let him go, but complied with a request that he remove his
backpack.  Id.  Officers Smith and Robinson began placing Mr. Harmon's hand
behind his back to handcuff him and Officer Fox stood in front.  Id. at 14–15.

Before the officers could place him in handcuffs, Mr. Harmon broke free from
their grip and ran north, away from the officers.  Id. at 15–16.  After a few steps, Mr.

Harmon turned left onto the sidewalk and began running back south down the sidewalk.  Id. at 16–17.  Officer Robinson placed himself in Mr. Harmon's path and, in an attempt to grab him, struck Mr. Harmon near his head and neck.  Id. at 17.  Mr. Harmon pushed past him, and Officer Robinson fell to the ground.  Id. at 17–18.  Mr. Harmon continued running down the sidewalk and the officers continued to chase.  Id. at 17–23.  Officer Fox drew his firearm, and Officer Smith drew his taser.  Id.

Seconds later, Mr. Harmon looked back at the officers turning his body left, while side-stepping away from the officers.  See Ex. B, at 1:05–1:06; Ex. F.  Mr. Harmon brought his hands together at chest height then dropped his left arm to the side while leaving his right arm bent at chest height.  Id.  With his firearm pointed at Mr. Harmon, Officer Fox yelled, "I'll fucking shoot you," and almost immediately fired three shots at him.  Joint App. 24.  The bullets struck Mr. Harmon in the left arm, right hip/thigh, and left buttock.  Id. at 29–30.  Mr. Harmon fell face down on the ground and began yelling out in pain.  Id. at 27.  Mr. Harmon was pronounced dead just after midnight due to the gunshot wounds, including one that hit his femoral artery and vein.  Id. at 30.

As the SLCPD investigated the scene, Officer Fox stated that he shot Mr. Harmon because he saw Mr. Harmon reach for and produce a knife.  Id.  Officer Fox claims he saw Mr. Harmon reach for his pocket as he was running, and that Mr. Harmon made statements such as "I'm gonna cut you" and "I'll fucking stab you." Id. at 31–32.  The Estate disputes this description of the events.  The Estate's complaint contends that Mr. Harmon was unarmed, the video does not show a knife

visibly in his hands, and Mr. Harmon cannot be heard saying anything in the video.

Id.  The SLCPD did recover a knife from the area that was branded "Castleview

Hospital," which is a rural hospital at which Mr. Harmon never worked.  Id. at 33.

Additionally, a still frame from the video shows the open knife on the ground near

Mr. Harmon's right hand after he fell to the ground.  See Ex. H, at 1:34.23.

In July 2019, the Estate and Mr. Harmon's two children brought this action

against Officer Fox and Salt Lake City.  The complaint asserts five claims: (1) an

excessive force claim against Officer Fox; (2) a municipal liability claim against Salt

Lake City for Officer Fox's excessive force; (3) an equal protection claim against

both defendants; (4) a wrongful death claim under Utah law; and (5) an unnecessary

rigor claim under Utah law.  Joint App. 37–45.  The Defendants moved to dismiss

based on qualified immunity and failure to state a claim.  Id. at 4, 49–77.

The district court dismissed the excessive force claims because the use of force

was justified, and dismissed the equal protection claim for lack of discriminatory

purpose.  See Estate of Harmon, 471 F. Supp. 3d at 1218–24.  As the federal claims

were dismissed, the district court declined to exercise supplemental jurisdiction over

the state law claims.  Id. at 1225.  The Estate appeals the district court's decision as

to the excessive force claims against Officer Fox and Salt Lake City.  See Aplt. Br. at

3 n.2.  The Estate contends that the district court erroneously rejected its version of

the facts by relying on the video evidence which it found supported the Defendants.

Aplt. Br. at 18.

## Discussion

This court reviews de novo a district court's dismissal under Federal Rule of Civil Procedure 12(b)(6). <u>Waller v. City & Cnty. of Denver</u>, 932 F.3d 1277, 1282 (10th Cir. 2019).  Under that review, the court accepts well-pleaded allegations as true and construes them in the light most favorable to the plaintiff. <u>Id.</u>  While the court will ordinarily consider only the complaint's pleadings on a motion to dismiss, there is a limited exception that is applicable here. <u>See id.</u>  That exception allows a court to "consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." <u>Id.</u> (citation omitted).  Here, we may consider the body-cam videos and still frame excerpts because they were referred to in the complaint and neither party disputes their authenticity.  Where there is video evidence, the court continues to accept all well-pleaded allegations as true unless they are "blatantly contradicted by the record." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007); <u>Estate of Ronquillo ex rel. Estate of Sanchez v. City & Cnty. of Denver</u>, 720 F. App'x 434, 437 (10th Cir. 2017) (unpublished)[1] (applying this standard in the motion to dismiss context).  This usually involves a "version of events [that] is so utterly discredited by the record that no reasonable jury could have believed [the plaintiff's version]." <u>Scott</u>, 550 U.S. at 380.

---

[1] We cite this and other unpublished dispositions only for their persuasive value.  10th Cir. R. 32.1.

### A. Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009). Thus, when the qualified-immunity defense was raised, the Estate was required to show that "(1) the defendant violated a statutory or constitutional right, and (2) the right was clearly established at the time of the violation." <u>A.N. ex rel. Ponder v. Syling</u>, 928 F.3d 1191, 1196 (10th Cir. 2019). "Asserting a qualified immunity defense via a Rule 12(b)(6) motion . . . subjects the defendant to a more challenging standard of review than would apply on summary judgment," because at this stage in the proceedings the defendant's conduct as alleged in the complaint "is scrutinized for objective legal reasonableness." <u>Thomas v. Kaven</u>, 765 F.3d 1183, 1194 (10th Cir. 2014) (citations and quotations omitted). Accepting the Estate's well-pleaded allegations as true, we think the Estate has plausibly alleged a violation of clearly established law.

> 1. <u>Constitutional Violation: Excessive Force Under the Fourth Amendment</u>

In an excessive force case, a plaintiff must prove that an officer's actions were "objectively unreasonable." <u>Estate of Valverde ex rel. Padilla v. Dodge</u>, 967 F.3d 1049, 1060 (10th Cir. 2020). When assessing objective reasonableness, the court considers the "totality of the circumstances" and reviews the officer's actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Id.</u> (quoting <u>Thomson v. Salt Lake Cnty.</u>, 584 F.3d 1304, 1313 (10th

Cir. 2009)).  This court has held deadly force is justified only if "a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or others."  Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1260 (10th Cir. 2008) (quoting Jiron v. City of Lakewood, 392 F.3d 410, 415 (10th Cir. 2004)).  The Supreme Court has highlighted three relevant factors for determining whether a use of force was excessive: (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight."[2]  Graham v. Connor, 490 U.S. 386, 396 (1989). The second factor is most important.  Pauly v. White, 874 F.3d 1197, 1215–16 (10th Cir. 2017).

With respect to the first Graham factor, the facts alleged by the Estate weigh slightly in favor of use of force.  We may consider any criminal act involved in the police encounter at hand.  See Clark v. Bowcutt, 675 F. App'x 799, 807 (10th Cir. 2017) (unpublished).  Mr. Harmon was initially stopped for riding a bicycle without a red taillight, but was later determined to have an outstanding felony warrant.  Joint App. 13–14.  Thus, while the initial infraction would not justify use of force, the

---

[2] Defendants contend that the Estate has waived any arguments regarding the first and third Graham factors.  Aplee. Br. at 18, 31.  However, we have reviewed the district court's hearing on the motion to dismiss, and it is apparent the district court entertained arguments concerning the Graham factors, even some not raised by the parties, and remarked that, in addition to marching through the factors, it recognized that the totality of the circumstances was paramount.  Joint App. 201–05.  Were there any doubt, the district court addressed them in its opinion.  See United States v. Williams, 504 U.S. 36, 41–43 (1992).

outstanding felony warrant — despite being years old — slightly favors the use of force.  See Vette v. K-9 Unit Deputy Sanders, 989 F.3d 1154, 1170 (10th Cir. 2021).

The district court also considered an assault against Officer Robinson (a misdemeanor under Utah law) in its analysis of this Graham factor.  Estate of Harmon, 471 F. Supp. 3d at 1220.  The Estate's complaint states that Mr. Harmon "pushed past" Officer Robinson.  Joint App. 17–18.  One can hardly conclude that the encounter could only be characterized as an assault based on the body-cam footage.  See Exs. A–C.  As such, we cannot consider that alleged assault here.  See Emmett v. Armstrong, 973 F.3d 1127, 1135 (10th Cir. 2020).

The third Graham factor weighs in favor of defendants.  The Estate does not dispute that Mr. Harmon was attempting to evade arrest.  The body-cam footage shows Mr. Harmon resisting arrest as he pushed past the officers while running away.  See Exs. A–C.  Therefore, this factor supports some use of force.  See Graham, 490 U.S. at 396.

Turning to the second and most important Graham factor — the immediate threat Mr. Harmon posed to the safety of the officers — the facts alleged along with the video evidence do not render the Estate's version of events a "visible fiction," Scott, 550 U.S. at 381, thereby supporting the use of deadly force.  We use the four non-exclusive factors stated in Estate of Larsen in evaluating the degree of threat posed to the officers during an encounter: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon toward the officers; (3)

the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." 511 F.3d at 1260. The district court concluded that the second <u>Graham</u> factor "strongly supports" the use of force because Mr. Harmon was not far from the officers and a reasonable officer could have believed that Mr. Harmon had a knife and was attempting to harm Officer Fox. <u>See</u> <u>Estate of Harmon</u>, 471 F. Supp. 3d at 1220–22. In reviewing the complaint as well as the body-cam footage at this stage, one cannot say, consistent with the standards for ruling on a motion to dismiss based on qualified immunity, that the Estate's version of facts is blatantly contradicted. In viewing the well-pled allegations in the light most favorable to the Estate, Mr. Harmon was unarmed and did not start back toward the officers. Accepting these facts as true, use of deadly force would not be justified. Accordingly, the district court erred in its assessment of the second <u>Graham</u> factor. We must conclude this factor, at this stage, favors the Estate.

While the third and fourth <u>Estate of Larsen</u> factors favor the defendants, the first and second favor the Estate. With respect to the third factor, there was around five to seven feet separating the officers and Mr. Harmon. <u>See</u> <u>Estate of Larsen</u>, 511 F.3d at 1260–61 (noting that a 7- to 20-foot separation justified force). With respect to the fourth factor, Mr. Harmon manifested the intention to evade arrest by running and pushing past an officer, but no verbal threats made by Mr. Harmon can be heard on the video. <u>See</u> <u>Estate of Booker v. Gomez</u>, 745 F.3d 405, 412 n.3 (10th Cir. 2014) (assuming no profanities were yelled where video evidence lacked audio).

As to the first Estate of Larsen factor, the officers never ordered Mr. Harmon to drop a weapon.  Joint App. 27.  In fact, the only statement that is audible on the video is Officer Fox yelling "I'll fucking shoot you" immediately before he shot Mr. Harmon.  Joint App. 24.  In assessing the second factor, the district court relied heavily on the hostile motions it found Mr. Harmon to have made.  The district court found that: (1) Mr. Harmon threw Officer Robinson; (2) Mr. Harmon stood in "a threatening, stabbing stance"; and (3) Mr. Harmon "started back towards Officer Fox."  Estate of Harmon, 471 F. Supp. 3d at 1220–21.  But the approximately three seconds of relevant video footage cannot bear so much weight, let alone blatantly contradict, the Estate's well-pleaded factual allegations.  The district court erred in making these findings.  See Emmett, 973 F.3d at 1135.

First, it is not clear from the video that Mr. Harmon threw Officer Robinson to the ground.  The Estate alleges that Mr. Harmon merely "pushed past" Officer Robinson, Joint App. 17, and the video does not blatantly contradict that allegation.  Second, the fact that Mr. Harmon stopped running with his right arm raised does not clearly constitute "a threatening, stabbing stance."  The Estate alleges that Mr. Harmon turned his head to look back at the officers as he continued to run.  Joint App. 22.  The video footage is simply too blurry and the sequence of events too quick to blatantly contradict this allegation.  See Kalbaugh v. Jones, 807 F. App'x 826, 829 (10th Cir. 2020) (unpublished).  Third, the Estate's complaint states that Mr. Harmon did not "come back at the officers."  Joint App. 31.  Again, the video evidence does

not clearly contradict this view, and the fact that Mr. Harmon was shot in his left buttock supports this allegation.  See id. at 29–30.

The district court is correct that the relevant inquiry here is whether Officer Fox acted reasonably in light of a mistaken perception that Mr. Harmon was armed with a knife.  See Estate of Smart v. City of Wichita, 951 F.3d 1161, 1171 (10th Cir. 2020).  This is because "[a]n officer may be found to have acted reasonably even if he has a mistaken belief as to the facts."  Thomas v. Durastanti, 607 F.3d 655, 666 (10th Cir. 2010).  However, when viewing the evidence in the light most favorable to the Estate, we think a jury could conclude that Officer Fox unreasonably perceived Mr. Harmon to be armed with a knife.  See Bond v. City of Tahledquah, 981 F.3d 808, 822 (10th Cir. 2020), rev'd on other grounds, --- U.S. ----, No. 20-1668, 2021 WL 4822664 (Oct. 18, 2021) (per curiam).[3]  There was no knife visible in the video, and the complaint states that Mr. Harmon was unarmed.  Joint App. 8, 18–19, 31–32. Accepting the Estate's allegations as true, Mr. Harmon's movements would not reasonably be considered hostile motions posing an immediate threat to the officers' safety.  At this stage, acknowledging that further discovery could clarify these issues, we must conclude that the second Graham factor favors the Estate.  See Truman v. Orem City, 1 F.4th 1227, 1238 (10th Cir. 2021).

---

[3] The Court reversed the Tenth Circuit's denial of qualified immunity in Bond based upon the lack of clearly established law and limited the reach of its decision to that element.  City of Tahledquah v. Bond, 2021 WL 4822664, at *2.

In sum, the district court erred in drawing conclusions about Mr. Harmon's movements that were contrary to the Estate's allegations and were not blatantly contradicted by the record including the video footage. Based on the totality of the circumstances, a reasonable trier of fact could view Officer Fox's actions as objectively unreasonable. Accordingly, the Estate has established a plausible claim that Mr. Harmon's right to be free from excessive use of force under the Fourth Amendment was violated.

2. Clearly Established Law

The Estate is also required to show that the alleged constitutional violation was clearly established at the time of the violation. See Clark v. Wilson, 625 F.3d 686, 690 (10th Cir. 2010). "A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Estate of Reat v. Rodriguez, 824 F.3d 960, 964 (10th Cir. 2016) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)). Clearly established law "should not be defined at a high level of generality" but should be "particularized to the facts of the case." White v. Pauly, 137 S. Ct. 548, 552 (2017) (citations and quotations marks omitted). Typically, this requires a Tenth Circuit or Supreme Court decision on point. Tenorio v. Pitzer, 802 F.3d 1160, 1163–64 (10th Cir. 2015). "Nevertheless, our analysis is not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law." Reavis ex rel. Estate of Coale v. Frost, 967 F.3d 978, 992 (10th Cir. 2020).

There have been numerous cases in this circuit involving an officer shooting of an unarmed (or knife-wielding) person.  For example, in <u>Walker v. City of Orem</u>, we stated, "[i]t was specifically established that where an officer had reason to believe that a suspect was only holding a knife, not a gun, and the suspect was not charging the officer and had made no slicing or stabbing motions toward him," an officer's use of deadly force was unreasonable.  451 F.3d 1139, 1160 (10th Cir. 2006) (citing <u>Zuchel v. City & Cnty. of Denver</u>, 997 F.2d 730, 735–36 (10th Cir. 1993)).  <u>Tenorio</u> held that where Mr. Tenorio had taken three steps toward the officers with a kitchen knife and ignored several police commands to drop his weapon, the law was clearly established that deadly force is objectively unreasonable.  802 F.3d at 1166. Considering the court must assume that Mr. Harmon was not armed with a knife at this stage in the case, and that he was not charging toward Officer Fox, there is clearly established law supporting the Estate's Fourth Amendment claim against Officer Fox.

### B.  Salt Lake City's Municipal Liability

As we reverse the district court's ruling as to Officer Fox, we also reverse its ruling as to Salt Lake City to allow the district court to fully assess whether there is a viable claim for municipal liability.  <u>See</u> <u>Lowe v. Town of Fairland</u>, 143 F.3d 1378, 1381 (10th Cir. 1998).

190

REVERSED and REMANDED for further proceedings.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge

**191**

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert
Clerk of Court

Jane K. Castro
Chief Deputy Clerk

November 10, 2021

Mr. Nicholas A. Lutz
Mr. Qusair Mohamedbhai
Rathod Mohamedbhai
2701 Lawrence Street, Suite 100
Denver, CO 80205

Mr. Corey D. Riley
Deiss Law
10 West 100 South, Suite 700
Salt Lake City, UT 84101

RE:  **20-4085, Estate of Patrick Harmon, et al v. Salt Lake City, et al**
     Dist/Ag docket: 2:19-CV-00553-RJS-CMR

Dear Counsel:

Enclosed is a copy of the order and judgment issued today in this matter. The court has
entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. Rule 40(a)(1), any petition for rehearing must be filed within
14 days after entry of judgment. Please note, however, that if the appeal is a civil case in
which the United States or its officer or agency is a party, any petition for rehearing must
be filed within 45 days after entry of judgment. Parties should consult both the Federal
Rules and local rules of this court with regard to applicable standards and requirements.
In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length,
and no answer is permitted unless the court enters an order requiring a response. *See* Fed.
R. App. P. Rules 35 and 40, and 10th Cir. R.35 and 40 for further information governing
petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court

cc:     Catherine L. Brabson
        Mark E. Kittrell
        David F. Mull
        Katherine Nichols


CMW/djd

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert                                                    Jane K. Castro
Clerk of Court                                                      Chief Deputy Clerk

December 02, 2021

Mr. D. Mark Jones
United States District Court for the District of Utah
351 South West Temple
Salt Lake City, UT 84101

RE:    **20-4085, Estate of Patrick Harmon, et al v. Salt Lake City, et al**
       Dist/Ag docket: 2:19-CV-00553-RJS-CMR

Dear Clerk:

Pursuant to Federal Rule of Appellate Procedure 41, the Tenth Circuit's mandate in the
above-referenced appeal issued today. The court's November 10, 2021 judgment takes
effect this date. With the issuance of this letter, jurisdiction is transferred back to the
lower court.

Please contact this office if you have questions.

                                   Sincerely,

                                   Christopher M. Wolpert
                                   Clerk of Court

cc:     Catherine L. Brabson
        Mark E. Kittrell
        Nicholas A. Lutz
        Qusair Mohamedbhai
        David F. Mull
        Katherine Nichols
        Corey D. Riley

CMW/djd

**194**

Katherine R. Nichols (#16711)
SALT LAKE CITY CORPORATION
P.O. Box 145478
451 South State Street, Suite 505A
Salt Lake City, Utah 84114-5478
Telephone:  (801) 535-7788
Facsimile:  (801) 535-7640
katherine.nichols@slcgov.com

*Attorneys for Defendants Salt Lake City and Officer Clinton Fox*

---

## IN THE UNITED STATES DISTRICT COURT
## STATE OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ESTATE OF PATRICK HARMON SR.; PATRICK HARMON II, as Personal Representative of the Estate of Patrick Harmon Sr., and heir of Patrick Harmon Sr., TASHA SMITH, as heir of Patrick Harmon, Sr.,<br><br>Plaintiffs,<br><br>vs.<br><br>SALT LAKE CITY, a municipality; and OFFICER CLINTON FOX, in his individual capacity,<br><br>Defendants. | Case No. 2:19-cv-00553-HCN-CMR<br><br>**ANSWER**<br><br>District Judge Howard C. Nielson, Jr.<br><br>Magistrate Judge Cecilia M. Romero |

Defendants Salt Lake City and Salt Lake City Police Officer Clinton Fox (together, "**Defendants**"), by and through their counsel of record, hereby answer the Complaint as follows:

## INTRODUCTION

Defendants deny Plaintiffs' Introduction section.

## JURISDICTION AND PARTIES

1.      The allegations of this paragraph constitute legal conclusions to which no response is necessary; to the extent a response is required, Defendants deny.

2.      Admitted that the incident occurred within Salt Lake County. The remaining allegations of this paragraph constitute legal conclusions to which no response is necessary; to the extent a response is required, Defendants deny.

3.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the same.

4.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the same.

5.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the same.

6.      Defendant Salt Lake City admits it is a municipal corporation, duly organized and existing under the laws of the State of Utah, located in Salt Lake County. To the extent this paragraph alleges anything further, Defendants deny those allegations.

7.      Admitted that Officer Fox was a citizen of the United States and a resident of Utah and was acting under color of state law in his capacity as a law enforcement officer employed by Salt Lake City at the time of the incident that is the subject of this litigation. Defendants deny the remaining allegations of this paragraph.

## FACTUAL BACKGROUND

8.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the same.

9.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the same.

10.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the same.

11.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the same.

12.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the same.

13.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the same.

14.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the same.

15.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the same.

16.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the same.

17.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the same.

18.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the same.

19.      Admitted.

20.      Admitted.

21.     Admitted that Officer Smith observed Mr. Harmon ride his bicycle across six lanes of traffic and a median on State Street and that his bicycle did not have a required red taillight. Officer Smith stopped Mr. Harmon to discuss the situation. Defendants deny the remaining allegations of this paragraph.

22.     Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

23.     Admitted that Mr. Harmon stated he likely had an outstanding warrant and that Officer Smith radioed for other officers to assist him. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself. Defendants deny the remaining allegations of this paragraph.

24.     Admitted that Officer Smith returned to his vehicle multiple times and eventually was able to run a warrant check while Mr. Harmon waited. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself. Defendants deny the remaining allegations of this paragraph.

25.     Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

26.     Admitted that Officer Smith was eventually able to verify the warrant and indicated that Mr. Harmon should be taken into custody for an outstanding second-degree felony charge. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself. Defendants deny the remaining allegations of this paragraph.

27.     Admitted that Officer Smith exited his patrol car and approached Mr. Harmon with Officers Fox and Robinson. Defendants deny the remaining allegations of this paragraph.

28.     Admitted that the Officers told Mr. Harmon he was going to be arrested and ordered him to remove his backpack. Admitted that Mr. Harmon removed his backpack. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself. Defendants deny the remaining allegations of this paragraph.

29.     Admitted that the Officers ordered Mr. Harmon to place his hands behind his back so that he could be handcuffed and that Mr. Harmon begged the Officers to let him go. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself. Defendants deny that Mr. Harmon complied. Defendants deny the remaining allegations of this paragraph.

30.     Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

31.     Admitted that Mr. Harmon initially allowed the Officers to place his hands behind his back, but then he suddenly yanked his arms away from the Officers and fled. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself. Defendants deny the remaining allegations of this paragraph.

32.     Admitted that Officers Smith and Robinson stood behind Mr. Harmon as they attempted to place him into handcuffs and that Officer Fox stood in front of the three men and to the side. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself. Defendants deny the remaining allegations of this paragraph.

33.     Admitted that as Officers Smith and Robinson attempted to handcuff Mr. Harmon, Mr. Harmon pulled his arms away, broke free, and began to flee. Defendants further answer that

the encounter was captured by body-worn camera, which speaks for itself. Defendants deny the remaining allegations of this paragraph.

34.     Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

35.     Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

36.     Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

37.     Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

38.     Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

39.     Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

40.     Admitted that Officer Robinson attempted to grab Mr. Harmon. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself. Defendants deny the remaining allegations of this paragraph.

41.     Admitted that Officer Robinson attempted to grab Mr. Harmon. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself. Defendants deny the remaining allegations of this paragraph.

42.     Admitted that Officer Fox obtained his gun with his right hand and reached toward Mr. Harmon with his left hand. Defendants further answer that the encounter was captured by

body-worn camera, which speaks for itself. Defendants deny the remaining allegations of this paragraph.

43.     Admitted that Mr. Harmon threw Officer Robinson to the ground and continued running past Officers Smith and Robinson. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself. Defendants deny the remaining allegations of this paragraph.

44.     Denied.

45.     Denied.

46.     Denied.

47.     Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

48.     Denied.

49.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the same.

50.     Denied.

51.     Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

52.     Admitted that Officer Fox stated, "I'll fucking shoot you," and fired three shots. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself. Defendants deny the remaining allegations of this paragraph.

53.     Denied.

54.     Denied.

201

55. Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

56. Denied.

57. Denied.

58. Denied.

59. Denied.

60. Admitted that Officer Smith radioed, "Priority, shots fired, start medical" less than two seconds after Officer Fox fired his weapon. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself. Defendants deny the remaining allegations of this paragraph.

61. Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

62. Admitted that Officer Robinson approached Mr. Harmon with his hand on his weapon and asked Officer Fox to "cover" him, and Officer Fox did cover him with his weapon trained on Mr. Harmon. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself. Defendants deny the remaining allegations of this paragraph.

63. Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

64. Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

65. Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

66.     Denied.

67.     Denied.

68.     Denied.

69.     Denied.

70.     Admitted that the Officers recovered a knife next to Mr. Harmon's outstretched right hand. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself. Defendants deny the remaining allegations of this paragraph.

71.     Denied.

72.     Denied.

73.     Admitted that Officer Robinson placed Mr. Harmon's hands into handcuffs. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself. Defendants deny the remaining allegations of this paragraph.

74.     Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

75.     Denied.

76.     Denied.

77.     Denied.

78.     Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

79.     Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

80.     Denied.

81.     Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

82.     Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

83.     Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

84.     Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

85.     Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

86.     Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

87.     Admitted. Defendants further answer that the medical examiner's report speaks for itself.

88.     Denied.

89.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the same.

90.     Admitted.

91.     Admitted that Officer Fox participated in an interview with other law enforcement agencies pursuant to the OICI Protocol. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

92.     Defendants answer that the interview speaks for itself and deny any allegations inconsistent therewith.

93.     Defendants answer that the interview speaks for itself and deny any allegations inconsistent therewith.

94.     Denied.

95.     Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

96.     Defendants answer that the interview speaks for itself and deny any allegations inconsistent therewith.

97.     Admitted. Defendants further answer that the encounter was captured by body-worn camera, which speaks for itself.

98.     Defendants answer that the interview speaks for itself and deny any allegations inconsistent therewith.

99.     Defendants answer that the interview speaks for itself and deny any allegations inconsistent therewith.

100.     Defendants answer that the interview speaks for itself and deny any allegations inconsistent therewith.

101.     Defendants answer that the interview speaks for itself and deny any allegations inconsistent therewith.

102.     Defendants answer that the interview speaks for itself and deny any allegations inconsistent therewith.

103.     Denied.

104.    Defendants answer that the interview speaks for itself and deny any allegations inconsistent therewith.

105.    Defendants answer that the interview speaks for itself and deny any allegations inconsistent therewith.

106.    The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

107.    Defendants answer that the interview speaks for itself and deny any allegations inconsistent therewith.

108.    Defendants answer that the interview speaks for itself and deny any allegations inconsistent therewith.

109.    Defendants answer that the interview speaks for itself and deny any allegations inconsistent therewith.

110.    Admitted that a knife was recovered next to Mr. Harmon's outstretched right hand. Defendants deny the remaining allegations.

111.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the same.

112.    Admitted.

113.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the same.

114.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the same.

115.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the same.

116.    Denied.

117.    Denied.

118.    Denied.

119.    Defendants answer that the report speaks for itself and deny any allegations inconsistent therewith.

120.    Admitted that Officer Fox used a knife retrieved from his car to cut off Mr. Harmon's clothing. Defendants deny the remaining allegations.

121.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the same.

122.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the same.

123.    Admitted.

124.    Denied.

125.    Denied.

126.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the same.

127.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the same.

128.    Denied.

129.     Admitted. Defendants further answer that the allegation is rendered incomplete by a lack of further information and context.

130.     Admitted. Defendants further answer that the allegation is rendered incomplete by a lack of further information and context, including that the individual was a white man and that he attacked an officer who sustained fractures to the arm and foot.

131.     Admitted. Defendants further answer that the allegation is rendered incomplete by a lack of further information and context.

132.     Admitted. Defendants further answer that the allegation is rendered incomplete by a lack of further information and context, including that the individual pleaded guilty to aggravated assault.

133.     Denied.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. 1983 - Fourth Amendment through Fourteenth Amendment**
**Excessive Force**
**(Against Officer Fox)**

134.     Defendants incorporate by reference their responses to the allegations set forth in all preceding paragraphs as if fully set forth herein.

135.     The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

136.     The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

137.     The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

138.    The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

139.    The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

140.    Denied.

141.    The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

142.    The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

143.    The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

144.    The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

145.    The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations. Denied that Mr. Harmon posed no danger, that Mr. Harmon was unarmed, or that Mr. Harmon was fleeing.

146.    The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

147.    The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

148.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore deny the same. Defendants deny that Plaintiff are entitled to any relief or damages.

149.     The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

150.     The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations. Defendants deny that Plaintiff are entitled to any relief or damages.

## SECOND CLAIM FOR RELIEF
**42 U.S.C. §1983 - Fourth Amendment through Fourteenth Amendment**
**Deliberately Indifferent Policies, Practices, Customs, Training, Supervision, and**
**Ratification**
**Fourteenth Amendment**
**(Defendant City of Salt Lake)**

151.     Defendants incorporated by reference their responses to the allegations set forth in all preceding paragraphs as if fully set forth herein.

152.     The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

153.     The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

154.     The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

155.     The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

156.    The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

157.    Denied.

158.    The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

159.    The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

160.    Admitted that Officer Fox did not receive discipline related to the encounter with Mr. Harmon.

161.    The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

162.    The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

163.    The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

164.    The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

165.    The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

166.    The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations. Defendants deny that Plaintiff are entitled to any relief or damages.

167.   The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations. Defendants deny that Plaintiff are entitled to any relief or damages.

168.   The allegations state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations. Defendants deny that Plaintiff are entitled to any relief or damages.

## THIRD CLAIM FOR RELIEF
### 42 U.S.C. §1983- Fourteenth Amendment
### Equal Protection Clause
### (All Defendants)

169.   Defendants incorporate by reference their responses to the allegations set forth in all proceeding paragraphs as if fully set forth herein.

170.   This claim has been dismissed and no response is necessary. The allegations also state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

171.   This claim has been dismissed and no response is necessary. The allegations also state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

172.   This claim has been dismissed and no response is necessary. The allegations also state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

173.   This claim has been dismissed and no response is necessary. To the extent a response is required, Defendants deny the allegations.

174.    This claim has been dismissed and no response is necessary. To the extent a response is required, Defendants deny the allegations.

175.    This claim has been dismissed and no response is necessary. To the extent a response is required, Defendants deny the allegations.

176.    This claim has been dismissed and no response is necessary. The allegations also state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

177.    This claim has been dismissed and no response is necessary. The allegations also state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

178.    This claim has been dismissed and no response is necessary. The allegations also state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

179.    This claim has been dismissed and no response is necessary. The allegations also state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations.

180.    This claim has been dismissed and no response is necessary. The allegations also state a legal conclusion to which no response is required; to the extent a response is required, Defendants deny the allegations. Defendants deny that Plaintiff are entitled to any relief or damages.

**FOURTH CLAIM FOR RELIEF**
**U.C.A. § 78B-106-Death of a Person Caused by Wrongful Act**
**Utah State law**
**(Defendant Fox)**

181.    Defendants incorporate by reference their responses to the allegations set forth in

all preceding paragraphs as if fully set forth herein.

182.    Denied.

183.    Denied.

184.    Denied.

185.    Denied.

186.    Denied.

187.    Denied.

188.    Denied.

**FIFTH CLAIM FOR RELIEF**
**Article I, Section IX of the Utah State Constitution**
**Excessive Rigor**
**(All Defendants)**

189.    Defendants incorporate by reference their responses to the allegations set forth in

all preceding paragraphs as if fully set forth herein.

190.    Denied.

191.    Denied.

192.    Denied.

193.    Denied.

194.    Denied.

Defendants deny all allegations unless specifically admitted herein.

**214**

## <u>FIRST AFFIRMATIVE DEFENSE</u>

The Complaint fails to state a claim upon which relief can be granted.

## <u>SECOND AFFIRMATIVE DEFENSE</u>

Plaintiffs' claims are barred in whole or in part because Defendants did not violate Plaintiffs' or Mr. Harmon's constitutional rights.

## <u>THIRD AFFIRMATIVE DEFENSE</u>

Plaintiffs' claims are barred in whole or in part by qualified immunity or governmental immunity.

## <u>FOURTH AFFIRMATIVE DEFENSE</u>

Plaintiffs' damages, if any, were not proximately caused by any policy, practice or custom of Defendant Salt Lake City Corporation or its employees.

## <u>FIFTH AFFIRMATIVE DEFENSE</u>

Plaintiffs' damages, if any, were not proximately caused by any failure to train or supervise.

## <u>SIXTH AFFIRMATIVE DEFENSE</u>

Plaintiffs' damages, if any, were caused by Mr. Harmon's actions, negligence, or illegal conduct.

## <u>SEVENTH AFFIRMATIVE DEFENSE</u>

Plaintiffs' claims are barred in whole or in part by the doctrine of legal justification.

## <u>EIGHTH AFFIRMATIVE DEFENSE</u>

Plaintiffs' claimed injuries were caused in whole or in part by independent intervening or superseding cause.

## NINTH AFFIRMATIVE DEFENSE

Plaintiffs' claim for punitive damages is barred by Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, federal common law, Article I, Sections 7 and 10 of the Utah Constitution, and Utah Code Ann. § 63G-7-603.

## TENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred in whole or in part because Defendants acted in good faith, without malice, and their acts were justified or reasonable under the circumstances.

## ELEVENTH AFFIRMATIVE DEFENSE

Defendants are absolutely immune from Plaintiffs' state law claims and those claims are barred by the Governmental Immunity Act of Utah, including, but not limited to, Utah Code §§ 63G-7-201, 63G-7-202 and 63G-7-301.

## TWELFTH AFFIRMATIVE DEFENSE

Defendants' potential liability for any state law claims is limited to the maximum sum provided by Utah Code § 63G-7-604.

## THIRTEENTH AFFIRMATIVE DEFENSE

Any alleged injury or damage Plaintiffs sustained was caused or contributed to by the fault of Mr. Harmon, which equals or exceeds that of Defendants, if any, thus barring recovery pursuant Utah Code §§ 78B-5-817 through 78B-5-823.

Defendants assert that there may be other defenses which are unknown at this time, but which may arise as discovery proceeds in this litigation and, therefore, reserve the right to assert such defenses in the future.

## **PRAYER FOR RELIEF**

WHEREFORE, Defendants pray that Plaintiffs' Complaint against the Defendants be dismissed, that Plaintiffs take nothing thereby, that Defendants be awarded their attorneys' fees and costs incurred in defending this action, and for such other and further relief as this Court shall deem proper.

DATED: March 23, 2022.

SALT LAKE CITY CORPORATION


*/s/ Katherine R. Nichols*
Katherine R. Nichols

*Attorney for Defendants Salt Lake City and Officer Clinton Fox*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that March 23, 2022, a true and correct copy of the foregoing **ANSWER**

was electronically filed with the Clerk of the Court, which sent notice to:

Corey D. Riley
Andrew Deiss
DEISS LAW PC
10 West 100 South, Suite 425
Salt Lake City, UT 84101
criley@deisslaw.com
adeiss@deisslaw.com

Qusair Mohamedbhai
Nicholas A. Lutz
2701 Lawrence Street, Suite 100
Denver, CO 80205
qm@rmlawyers.com
nl@rmlaywers.com

*Attorneys for Plaintiffs*

  /s/  Lindsay Ross

**218**

Katherine R. Nichols (#16711)
SALT LAKE CITY CORPORATION
P.O. Box 145478
451 South State Street, Suite 505A
Salt Lake City, Utah 84114-5478
Telephone:  (801) 535-7788
Facsimile:  (801) 535-7640
katherine.nichols@slcgov.com

*Attorneys for Defendants Salt Lake City and Officer Clinton Fox*

## IN THE UNITED STATES DISTRICT COURT
## STATE OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ESTATE OF PATRICK HARMON SR.; PATRICK HARMON II, as Personal Representative of the Estate of Patrick Harmon Sr., and heir of Patrick Harmon Sr., TASHA SMITH, as heir of Patrick Harmon, Sr.,<br><br>        Plaintiffs,<br><br>    vs.<br><br>SALT LAKE CITY, a municipality; and OFFICER CLINTON FOX, in his individual capacity,<br><br>        Defendants. | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:19-cv-00553-HCN-CMR<br><br>District Judge Howard C. Nielson, Jr.<br>Magistrate Judge Cecilia M. Romero |

Pursuant to Federal Rule of Civil Procedure 56, Defendants Salt Lake City Corporation and Officer Clinton Fox (together, "**Defendants**") submit this *Motion for Summary Judgment* and respectfully request the Court grant summary judgment dismissing Plaintiffs' remaining claims with prejudice and on the merits.

**219**

# TABLE OF CONTENTS

INTRODUCTION AND RELIEF REQUESTED ........................................................................ 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................................ 2

I.     Patrick Harmon's Criminal History ................................................................................ 2

II.    Officer Fox's Extensive Military and Law Enforcement Background. .............................. 3

III.   The Subject Incident. ...................................................................................................... 4

       A.     The Officers Attempt to Arrest Mr. Harmon for an Outstanding Felony
              Aggravated Assault Warrant ................................................................................ 4

       B.     Mr. Harmon Breaks Free and Flees, Throws Officer Robinson to the Ground, and
              Threatens the Officers. ........................................................................................ 6

       C.     Mr. Harmon Stops Fleeing and Turns Back Toward the Officers with a Knife. ..... 8

       D.     Mr. Harmon's Knife Is Laying in the Grass Next to His Right Arm ................... 13

       E.     Procedural History. ........................................................................................... 16

LEGAL STANDARD ............................................................................................................. 17

ARGUMENT ........................................................................................................................ 18

I.     PLAINTIFFS' EXCESSIVE FORCE CLAIM FAILS AS A MATTER OF LAW ......... 18

       A.     The Undisputed Evidence Establishes Officer Fox's Use of Force Was
              Objectively Reasonable Under the Circumstances. ............................................ 18

              1.     Mr. Harmon engaged in multiple serious crimes. ..................................... 19

              2.     Mr. Harmon posed an immediate threat of safety to the Officers. ........... 19

                     a.     Officer Fox did not feasibly have time to issue an order to Mr.
                            Harmon ....................................................................................... 21

                     b.     Mr. Harmon made hostile motions toward Officer Fox. .............. 21

                     c.     Mr. Harmon was approximately five to seven feet from Officer
                            Fox when he turned back toward him with the knife .................... 23

   d. Mr. Harmon manifested the intention to attack the Officers with his knife ................................................................................ 24

   e. Officer Fox was faced with tense, rapidly evolving circumstances. ...................................................................................... 25

  3. Mr. Harmon was actively resisting arrest ................................. 26

 B. Officer Fox Is Entitled to Qualified Immunity Because Any Alleged Constitutional Violation Was Not Clearly Established at the Time. ................... 27

II. PLAINTIFFS' *MONELL* CLAIM FAILS AS A MATTER OF LAW ........................... 28

III. PLAINTIFFS' STATE-LAW CLAIMS FAIL AS A MATTER OF LAW ..................... 29

 A. Plaintiffs' Wrongful Death Claim Against Officer Fox Fails as a Matter of Law. ....................................................................................... 29

  1. Officer Fox is immune from suit under sovereign immunity. .................. 29

  2. Officer Fox's use of force did not constitute a wrongful or neglectful act. ...................................................................... 30

 B. Plaintiff's Unnecessary Rigor Claim Against Defendants Fails as a Matter of Law. .............................................................................. 31

  1. The undisputed evidence establishes Defendants did not violate Mr. Harmon's unnecessary rigor rights. ........................................... 31

  2. Officer Fox's Use of Force Did Not Constitute a Flagrant Violation of Mr. Harmon's Constitutional Rights. .............................. 32

CONCLUSION ..................................................................................... 34

# TABLE OF AUTHORITIES

## Cases

*Ainsworth v. Park City Police Dep't*,
  No. 2:19-CV-00462-HCN, 2021 WL 288579 (D. Utah Jan. 27, 2021) ................................... 29

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................. 17

*Bott v. DeLand*, 922 P.2d 732 (Utah 1996) ................................................................. 31

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................... 17

*City of Tahlequah, Okla. v. Bond*, 142 S. Ct. 9 (2021) ................................................ 27

*Coronado v. Olsen*, No. 20-4118, 2022 WL 152124 (10th Cir. Jan. 18, 2022) .......................... 23

*Dettle v. Richfield City*, No. 2:13-CV-357-DAK, 2014 WL 4354424 (D. Utah Sept. 2, 2014) ... 33

*Dexter v. Bosko*, 2008 UT 29, 184 P.3d 592 ................................................... 31, 32, 33

*Estate of Larsen v. Murr*, 511 F.3d 1255 (10th Cir. 2009) ...................................... 20, 23, 25, 28

*Estate of Taylor v. Salt Lake City*, 16 F.4th 744 (10th Cir. 2021) ................................ 24

*Estate of Valverde v. Dodge*, 967 F.3d 1049 (10th Cir. 2020) ................................... 17, 21

*Farrell v. Montoya*, 878 F.3d 933 (10th Cir. 2017) ...................................................... 27

*Henry v. Storey*, 658 F.3d 1235 (10th Cir. 2011) ......................................................... 25

*Hinton v. City of Elwood, Kan.*, 997 F.2d 774 (10th Cir. 1993) .................................... 29

*Holland v. Harrington*, 268 F.3d 1179 (10th Cir. 2001) ............................................. 18

*Jensen v. IHC Hosps., Inc.,* 944 P.2d 327 (Utah 1997) ............................................... 31

*Kuchcinski v. Box Elder Cty.*, 2019 UT 21, 450 P.3d 1056 ......................................... 32

*Lennen v. City of Casper*, No. 21-8040, 2022 WL 612799 (10th Cir. Mar. 2, 2022) ................. 24

*Mullenix v. Luna*, 577 U.S. 7 (2015) ................................................................. 27, 28

*Phillips v. James*, 422 F.3d 1075 (10th Cir. 2005) ..................................................... 18

*Porter v. Daggett Cnty.*,
    No. 2:18-CV-00389-DBB, 2022 WL 558295 (D. Utah Feb. 24, 2022) .................................. 33

*Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4 (2021) ...................................................... 27

*Rowell v. Bd. of Cty. Comm'rs. of Muskogee Cty., Okla*., 978 F.3d 1165 (10th Cir. 2020) ......... 17

*Saucier v. Katz*, 533 U.S. 194 (2001) ................................................................. 18, 20

*Scott v. Harris*, 550 U.S. 372 (2007) ...................................................................... 17

*Spackman v. Bd. of Educ. of Box Elder Cty.*, 2000 UT 87, 16 P.3d 533 ............................... 31, 33

*State v. Newland*, 2010 UT App 380, 253 P.3d 71 ...................................................... 33

*Tennessee v. Garner*, 471 U.S. 1 (1985) ................................................................. 21

*Thomas v. Durastanti*, 607 F.3d 655 (10th Cir. 2010) ................................................. 17

*Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154 (10th Cir. 2021) .................................. 20

*White v. Pauly*, 137 S. Ct. 548 (2017) ................................................................... 27

## Statutes

42 U.S.C. § 1983 .............................................................................................. 1

Article I, § IX of the Utah Constitution .............................................................. 2, 31

Salt Lake City Code §§ 12.80.065, -.140, -.200 ...................................................... 19

Utah Code § 63G-7-101 ................................................................................. 29, 30

Utah Code Ann. § 63G-7-102 ............................................................................. 30

Utah Code Ann. § 63G-7-202 ............................................................................. 30

Utah Code Ann. § 76-2-408 ............................................................................... 15

Utah Code Ann. § 76-5-103 ............................................................................... 19

Utah Code Ann. § 76-8-305 ............................................................................... 19

Utah Code Ann. § 78B-3-106 ................................................................................ 2, 30

**Rules**

Fed. R. Civ. P. 56 ........................................................................................................ 17

## <u>INTRODUCTION AND RELIEF REQUESTED</u>

In his nearly ten years of law enforcement experience, Salt Lake City Police Officer Clinton Fox had never been as terrified as he was on the evening of August 13, 2017. During what should have been a routine arrest for an outstanding warrant, the suspect Patrick Harmon suddenly took off running. Officer Fox and the two other officers on scene gave chase. As Mr. Harmon was running, Officer Fox saw him reach for his right pocket and heard him say he would "cut" the officers. Officer Fox thought Mr. Harmon might have a knife and drew his service weapon. One officer grabbed Mr. Harmon's shirt, but Mr. Harmon threw him to the ground and kept running. As Officer Fox continued to give chase, Mr. Harmon stopped running and looked back toward the Officers. He then planted his right foot, brought his arms together in front of his body, and turned back toward Officer Fox with his right arm raised in the air. The Officers' shaky bodycam videos do not quite capture what Officer Fox clearly saw at that moment: A knife in Mr. Harmon's hand.

As he came to a quick stop approximately five feet away, Officer Fox heard Mr. Harmon say, "I'll fucking stab you." Officer Fox reflexively shouted, "I'll fucking shoot you," as he fired his weapon three times. Mr. Harmon fell to the ground, and the knife lay next to his outstretched right hand. The Officers rendered first aid until medical arrived, but Mr. Harmon died from the gunshot wounds. From the time Mr. Harmon fled from the Officers until the moment Officer Fox fired his weapon, a mere six seconds elapsed.

Mr. Harmon's estate and heirs filed suit asserting five causes of action: (1) Section 1983 claim for excessive force under the Fourth Amendment against Officer Fox; (2) Section 1983 claim for municipal liability against Salt Lake City; (3) Section 1983 claim under the Equal Protection

Clause against Officer Fox and the City[1]; (4) Wrongful death claim under Utah Code section 78B-3-106 against Officer Fox; and (5) Unnecessary rigor claim under Article I, section IX of the Utah Constitution against Officer Fox and the City. Chief Judge Shelby granted Defendants' motion to dismiss, holding the evidence from the Officers' bodycam videos established there was no constitutional violation. The Tenth Circuit reversed, concluding that "at this stage" and "with the standards for ruling on a motion to dismiss," the Court was obligated to accept as true Plaintiffs' allegation that Mr. Harmon was unarmed and did not start back toward the Officers.

On summary judgment, however, Plaintiffs cannot rest on their allegations. They must come forward with evidence. Plaintiffs deposed all three Officers on scene and took written discovery. For the reasons stated below, Plaintiffs do not have evidence to sustain their qualified immunity burden on summary judgment. The loss of Mr. Harmon's life is undeniably tragic. But Officer Fox was given little option. Officer Fox saw Mr. Harmon had pulled a knife on him from five feet away and reasonably believed Mr. Harmon intended to stab him. In the terrible and chaotic circumstances he faced, Officer Fox's split-second decision to use deadly force was objectively reasonable. Plaintiffs' remaining claims should be dismissed with prejudice.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.    Patrick Harmon's Criminal History.

1.    In the 1990s, in his home state of Missouri, Mr. Harmon was charged and pled guilty to felony stealing, and was sentenced to five years in prison.[2]

2.    In Utah, from 2000 to 2015, Mr. Harmon was arrested and charged with numerous

---

[1] This Court dismissed Plaintiffs' Equal Protection claim, and Plaintiffs did not appeal. *See* ECF No. 29.
[2] Docket, Case No. 22901-02614-01 (Mo. 21st Cir. Ct.), Exhibit 1.

crimes, including felony burglary and felony robbery involving a firearm, and served several years in prison as a result. After being released, Mr. Harmon was charged with several more crimes; he pled guilty to felon in possession of a firearm, was convicted of assault, and was sentenced to 51 months in federal prison.[3]

     3.     In 2015 and 2016, Mr. Harmon was again charged with multiple crimes. In particular, in October 2016, Mr. Harmon was charged with second-degree felony aggravated assault and providing false information to a peace officer. Mr. Harmon twice struck an individual in the face, such that the individual sustained multiple facial fractures and required reconstructive surgery. Mr. Harmon pled guilty to the former charge in exchange for the latter being dismissed. After receiving his guilty plea, the Court released Mr. Harmon from custody; however, Mr. Harmon failed to appear for his sentencing hearing in April 2017, and the Court issued a $10,000 cash-only warrant for his arrest. Mr. Harmon faced a sentence of 1-15 years.[4]

     4.     On August 13, 2017, Mr. Harmon had three active warrants, including for the felony aggravated assault, two counts of providing false identity, and six class A and B misdemeanor drug charges.[5]

## II.    Officer Fox's Extensive Military and Law Enforcement Background.

     5.     In 1999, after graduating high school, Officer Fox enlisted in the Marines. He served six years active duty and one year in the reserves. Officer Fox deployed four times—including twice to Ramadi, Iraq—for a total of two years and was engaged in active combat.[6]

---

[3] *See* Docket, Case No. 001901372 (Utah 2d Dist. Ct.), Docket, Case No. 001902478 (Utah 2d Dist. Ct.); Docket, Case No. 061906238 (Utah 3d Dist. Ct.), Docket, Case No. 1:07-CR-00113 (D. Utah), Exhibit 2.
[4] Criminal Information & Docket, Case No. 161402877 (3d Dist. Ct.), Exhibit 3.
[5] Active Warrants, Aug. 14, 2017 (SLCC_001327), Exhibit 4.
[6] Deposition of Officer Fox, June 17, 2022 ("**Fox Deposition**"), at 10:5–11:20, Exhibit 5.

6.     Upon retirement from the military, Officer Fox joined law enforcement, serving in the Tooele County Sheriff's Office for nearly seven years as a dispatcher, corrections officer, and deputy sheriff on patrol.[7]

7.     Officer Fox participated in sniper school and joined the Tooele County sniper cadre. He also trained to become a firearms instructor and developed and ran a firearms training program for Tooele County's correctional officers. He continues to serve as a firearms instructor.[8]

8.     Officer Fox then served as a patrol officer in West Valley City from June 2013 until joining the Salt Lake City Police Department ("**SLCPD**") in March 2016, where he served on patrol and continues to do so. Officer Fox also volunteers for the SWAT team.[9]

9.     At the time of the incident, Officer Fox had served in the military and law enforcement for 17 years.[10] The present incident is the only time Officer Fox has ever fired his weapon as a law enforcement officer.[11]

## III.     The Subject Incident.

### A.     The Officers Attempt to Arrest Mr. Harmon for an Outstanding Felony Aggravated Assault Warrant.

10.     On the evening of August 13, 2017, SLCPD Officer Kris Smith was on patrol in downtown Salt Lake City. Just after 10:00 p.m., Officer Smith observed Mr. Harmon commit traffic violations on his bicycle; in particular, Mr. Harmon crossed all six lanes of traffic and the median without using a hand signal and without having the required rear taillight on his bicycle.

---

[7] *Id.* at 19:15–25, 22:7–21, 29:6–13.
[8] Declaration of Officer Fox ("**Fox Declaration**"), ¶ 3, Exhibit 6.
[9] Ex. 5, Fox Deposition at 38:18–39:21, 48:2–6, 56:21–57:7.
[10] *Id.* at 10:16–19, 20:15–19.
[11] *Id.* at 26:10–14, 47:5–7, 61:12–62:9; *see also id.* at 61:25–62:2 (Officer Fox's only other use of his service weapon in law enforcement was to dispatch an injured deer).

**228**

In fact, Officer Smith nearly struck Mr. Harmon with his vehicle. Officer Smith therefore initiated

a stop with Mr. Harmon on the west side of State Street at approximately 1000 South.[12]

11.     Officer Smith asked Mr. Harmon his name. Mr. Harmon gave Officer Smith several

incorrect names, including the first name "Peace." Each time, Officer Smith returned to his vehicle

to run a warrant check in the electronic database against the name Mr. Harmon provided.[13]

12.     After several unsuccessful attempts to identify Mr. Harmon, Officer Smith

requested backup. Within approximately two minutes, Officers Fox and Scott Robinson arrived.[14]

13.     Officer Robinson went to the passenger-side window of Officer Smith's vehicle

while Officer Fox proceeded directly to speak with Mr. Harmon, who at the time was straddling

his bicycle next to the curb in front of Officer Smith's vehicle.[15]

14.     As Officers Smith and Robinson attempted to identify Mr. Harmon in the database,

Officer Fox asked Mr. Harmon to step off his bike and he put the bike's kickstand down.[16]

15.     Officer Fox engaged Mr. Harmon in a discussion. Mr. Harmon told Officer Fox he

was trying to get right with God and was trying to take care of his warrants. Officer Fox noted that

Mr. Harmon appeared "normal" at first but then became more "anxious or agitated."[17]

16.     Mr. Harmon asked Officer Fox if he could have a cigarette, to which Officer Fox

---

[12] Deposition of Officer Smith, June 16, 2022 ("**Smith Deposition**"), at 58:5–61:5, Exhibit 7; Declaration of Officer Smith ("**Smith Declaration**"), ¶ 4, Exhibit 8; *see also* Officer Smith Body-worn Camera ("**Smith BWC**") at 0:00, Exhibit 9. For each of the bodycam videos, there is no audio recording during the first 30 seconds. This is because each bodycam takes video (not audio) continuously, and when an officer activates the bodycam, it then stores the 30 seconds of video that occurred prior to activation and begins recording audio at the time of activation.

[13] Ex. 7, Smith Deposition at 64:8–65:16; Ex. 9, Smith BWC at 0:00–4:00.

[14] Ex. 9, Smith BWC at 4:05–6:50.

[15] *Id.* at 6:50; Officer Robinson Body-worn Camera ("**Robinson BWC**") at 0:00–0:30, Exhibit 10.

[16] Ex. 5, Fox Deposition at 123:1–10; Ex. 9, Smith BWC at 6:58–7:40; Ex. 10, Robinson BWC at 0:00–0:05.

[17] Ex. 5, Fox Deposition at 124:13–125:16.

agreed. In Officer Fox's experience, it is common for individuals who believe they are going to be arrested to attempt to have a last cigarette before being taken to jail.[18]

17.     Officer Smith eventually located an outstanding second-degree felony warrant for aggravated assault for Mr. Harmon. He informed Officer Robinson, "We're going to go 82, 99, Fox 2," indicating they would take Mr. Harmon into custody for a second-degree felony warrant.[19]

18.     Both Officers Smith and Robinson put on their patrol gloves and walked back to where Officer Fox and Mr. Harmon were standing.[20]

19.     When they came alongside him, Officer Fox noted the two Officers had put on their patrol gloves, which Officer Fox understood to mean the Officers were going to put Mr. Harmon in handcuffs and arrest him. Officer Fox was also aware that, at this time, the county jail was only accepting arrests for felony warrants.[21]

20.     Officer Smith informed Mr. Harmon he was under arrest for the outstanding warrant. Mr. Harmon became visibly upset and begged the officers to let him go.[22]

**B.     Mr. Harmon Breaks Free and Flees, Throws Officer Robinson to the Ground, and Threatens the Officers.**

21.     Officer Smith asked Mr. Harmon to take off his backpack, and Officer Robinson helped Mr. Harmon place the backpack on the ground.[23]

22.     Officers Smith and Robinson moved into position behind Mr. Harmon to place him

---

[18] Ex. 5, Fox Deposition at 124:13–125:16; Ex. 6, Fox Declaration ¶ 4.
[19] Ex. 7, Smith Deposition at 74:1–6; Ex. 9, Smith BWC at 6:50–7:15; Ex. 10, Robinson BWC at 0:12–25; Deposition of Officer Robinson, June 16, 2022 ("**Robinson Deposition**"), at 21:2–8, Exhibit 11.
[20] Ex. 9, Smith BWC at 7:20–26.
[21] Ex. 6, Fox Declaration ¶ 6.
[22] Ex. 9, Smith BWC at 6:50–7:15; Officer Fox BWC ("**Fox BWC**") at 0:22–1:01, Exhibit 12.
[23] Ex. 9, Smith BWC at 7:55–8:10; Combined Officers Body-worn Cameras ("**Combined BWC**") at 0:00–0:12, Exhibit 13.

in handcuffs. Officer Smith ordered Mr. Harmon to place his hands behind his back, and Mr. Harmon initially complied.[24]

23.     Officer Robinson grabbed Mr. Harmon's left hand and Officer Smith grabbed his right hand. As Officers Robinson and Smith were bringing Mr. Harmon's hands together behind his back to apply handcuffs, Mr. Harmon suddenly broke free of their grasp and ran north, toward the sidewalk and away from the Officers.[25]

24.     All three Officers gave chase.[26] Officer Fox initially believed he could get to Mr. Harmon in time to tackle him.[27]

25.     As Mr. Harmon ran, Officer Fox saw him reach for his right pocket.[28]

26.     Officer Robinson also saw Mr. Harmon reach toward his right pocket.[29]

27.     Officer Smith saw Mr. Harmon reach toward his waist as he ran.[30]

28.     Officer Fox heard Mr. Harmon use the word "cut" and say something to the effect of "I'll cut you."[31]

29.     Officer Smith heard Mr. Harmon say, "I'm going to stab or cut," but could not remember whether Mr. Harmon said "stab" or "cut" first. Officer Smith did not process Mr. Harmon's statement until after the fact.[32]

---

[24] Ex. 9, Smith BWC at 8:10–8:13; Ex. 12, Fox BWC at 0:55–1:01; Ex. 10, Robinson BWC at 1:10–1:15; Ex. 13, Combined BWC at 0:12–0:15.
[25] Ex. 9, Smith BWC at 8:13–8:20; Ex. 12, Fox BWC at 1:01–1:07; Ex. 10, Robinson BWC at 1:15–1:22; Ex. 13, Combined BWC at 0:15–0:22.
[26] Ex. 9, Smith BWC at 8:13–8:20; Ex. 12, Fox BWC at 1:01–1:07; Ex. 10, Robinson BWC at 1:15–1:22; Ex. 13, Combined BWC at 0:15–0:22.
[27] Ex. 5, Fox Deposition at 206:14–22.
[28] *Id.* at 133:11–17.
[29] Ex. 11, Robinson Deposition at 29:13–15, 30:6–11.
[30] Ex. 7, Smith Deposition at 85:17–23.
[31] Ex. 5, Fox Deposition at 133:12–14.
[32] Ex. 7, Smith Deposition at 85:16–23.

30.     Officer Robinson heard Mr. Harmon say, "I'll stab or I'll cut or I'll fucking stab you, something along those lines."[33]

31.     Officer Robinson managed to grab Mr. Harmon's shirt as he fled. As a result, Mr. Harmon spun around to his left and faced Officer Robinson.[34]

32.     Officer Robinson attempted to grab Mr. Harmon around the neck, but Mr. Harmon shoved Officer Robinson, causing Officer Robinson to fall backward approximately ten feet onto the grass to the west of the sidewalk.[35]

33.     Because Officer Fox saw Mr. Harmon reaching for his pocket and heard him say he would "cut," he believed Mr. Harmon intended to stab Officer Robinson with a knife.[36]

34.     Officer Fox therefore drew his weapon and was determining how to fire without harming Officer Robinson. When Officer Robinson fell to the side and Mr. Harmon kept running, Officer Fox was relieved because he believed he would not have to use his weapon.[37]

**C.     Mr. Harmon Stops Fleeing and Turns Back Toward the Officers with a Knife.**

35.     After shoving Officer Robinson, Mr. Harmon started running again, heading south on the sidewalk. Officers Fox and Smith pursued while Officer Robinson got up off the ground.[38]

36.     Officer Fox observed Mr. Harmon continuing to reach for his right pocket.[39]

37.     As he ran, Mr. Harmon started turning back toward the Officers. He then slowed

---

[33] Ex. 11, Robinson Deposition at 30:6–11.
[34] Ex. Smith BWC at 8:15–16; Ex. 10, Robinson BWC at 1:15–17; Ex. 11, Robinson Deposition at 23:9–23, 45:5–21.
[35] Ex. 9, Smith BWC at 8:15–8:17; Ex. 12, Fox BWC at 1:02–1:04; Ex. 10, Robinson BWC at 1:16–1:19; Ex. 11, Robinson Deposition at 23:9–17.
[36] Ex. 6, Fox Declaration ¶¶ 7–9; Ex. 5, Fox Deposition at 206:14–22.
[37] Ex. 6, Fox Declaration ¶¶ 9–10; Ex. 5, Fox Deposition at 135:9–12.
[38] Ex. 9, Smith BWC at 8:15–18; Ex. 12, Fox BWC at 1:03–1:05.
[39] Ex. 5, Fox Deposition at 134:13–16.

and started to side-shuffle south along the sidewalk as he turned his head and shoulders back in the direction of the Officers.[40]

    38.    Mr. Harmon brought both his hands together in front of his chest.[41]

 

**Ex. 15, Smith still-frame photo (SLCC_002715); Ex. 14, Fox still-frame photo (SLCC_002607).**

    39.    Mr. Harmon side-shuffled several more steps to the south and continued rotating his torso back toward the Officers. Mr. Harmon dropped his left arm and kept his right arm raised at chest-height with his elbow bent.[42]

    40.    Mr. Harmon then planted his right foot perpendicular to the sidewalk, so that his right foot was in a 9 o'clock position from the Officers and his left foot was at a 7 o'clock position. Mr. Harmon bent his knees slightly into a crouching position.[43]

---

[40] Ex. 9, Smith BWC at 8:16–8:18; Ex. 12, Fox BWC at 1:05–1:06; Officer Fox BWC still-frame photos, Exhibit 14; Officer Smith BWC still-frame photos, Exhibit 15.
[41] Ex. 9, Smith BWC at 8:16–8:18; Ex. 12, Fox BWC at 1:05–1:06; Ex. 14, Fox still-frames; Ex. 15, Smith still-frames.
[42] Ex. 9, Smith BWC at 8:16–8:18; Ex. 12, Fox BWC at 1:05–1:06; Ex. 14, Fox still-frames; Ex. 15, Smith still-frames.
[43] Ex. 9, Smith BWC at 8:16–8:18; Ex. 12, Fox BWC at 1:05–1:06; Ex. 14, Fox still-frames; Ex. 15, Smith still-frames.

 

**Ex. 15, Smith still-frame photo (SLCC_002744); Ex. 14, Fox still-frame photo (SLCC_002640).**

41.     Officer Fox, who had been pursuing Mr. Harmon, saw Mr. Harmon plant his right foot and begin turning back toward him. In response, Officer Fox also came to a quick stop approximately five feet away from Mr. Harmon.[44]

42.     Officer Smith likewise saw Mr. Harmon plant his foot and begin turning back toward him. Because Mr. Harmon was no longer running away and had presented his chest toward Officer Smith, Officer Smith determined he could prevent Mr. Harmon from fleeing again by utilizing his Taser. He therefore drew his Taser.[45]

43.     At this point, Officer Robinson was still getting up off the ground, and he saw Officers Smith and Fox stop moving "because Mr. Harmon had turned around" and "had turned back towards Officer Fox."[46]

44.     Officer Robinson began drawing his firearm. He testified he did so "because I saw something and heard something that made me think that I needed my gun, including I'll fucking

---

[44] Ex. 5, Fox Deposition at 136:15–22; Ex. 12, Fox BWC at 1:05–1:06; Ex. 14, Fox still-frames.
[45] Ex. 7, Smith Deposition at 83:6–84:19.
[46] Ex. 11, Robinson Deposition at 24:1–22.

stab or I'll cut or whatever he was saying, reaching for his pocket. Those are the things that I remember very clearly."[47]

45.     Officer Fox believed Mr. Harmon had stopped and was turning back because he had retrieved the object he had been reaching for in his pocket. He scanned Mr. Harmon and located Mr. Harmon's hands in front of his body. At that moment, Officer Fox saw that Mr. Harmon had a knife in his right hand pointed toward Officer Fox:

> So as soon as he planted his right foot, as he was doing that, he yelled at me and he said I'll fucking stab you. As he planted that right foot and he said that, I thought oh, no, whatever was in his pocket, he got out. So from seeing his foot, I looked, I was trying to see if his hand was still in his pocket, it wasn't. By the time I was able to track and find his hand, his hand was up somewhere chest to shoulder heighth and he was holding a knife.[48]

46.     Officer Fox was a "[h]undred percent" certain he saw a knife in Mr. Harmon's right hand.[49]

47.     At this point, Mr. Harmon was around five to seven feet away from Officer Fox.[50]

48.     Officer Fox believed Mr. Harmon intended to use the knife to harm him and using his firearm was "[p]robably the only option to defend myself to stop him from stabbing me."[51]

49.     Officer Fox also believed that neither Officer Smith nor Officer Robinson was aware Mr. Harmon had a knife. Officer Fox was afraid one of the other Officers would attempt to tackle Mr. Harmon and that Mr. Harmon would stab him with the knife.[52]

---

[47] Ex. 11, Robinson Deposition at 24:1–5, 26:18–24, 43:12–44:4.
[48] Ex. 5, Fox Deposition at 137:12–20.
[49] *Id.* at 137:23–138:6.
[50] Ex. 9, Smith BWC at 8:19–8:20; Ex. 12, Fox BWC at 1:05–1:07; Ex. 10, Robinson BWC at 1:20–1:22; Ex. 13, Combined BWC at 0:23–0:23; Ex. 14, Fox still-frames; Ex. 15, Smith still-frames.
[51] Ex. 5, Fox Deposition at 172:6–15.
[52] *Id.* at 140:4–7; Ex. 6, Fox Declaration ¶ 12.

50.      Officer Fox heard Mr. Harmon say, "I'll fucking stab you."[53]

51.      Officer Fox reflexively shouted, "I'll fucking shoot you" and fired three shots in quick succession.[54]

52.      At the same time, Officer Smith fired his Taser.[55] Officer Fox did not learn Officer Smith had fired his taser until later that night.[56]

53.      When asked if he intended the statement, "I'll fucking shoot you" to be an opportunity for Mr. Harmon to surrender, Officer Fox testified:

> I did not intend for it to be anything. I think it was more of a response to the "I'll fucking stab you," and I think that it was just something that through the split second it was happening hearing that, it was just, as I'm trying to perceive everything, just what came out.[57]

54.      Officer Fox testified he did not give Mr. Harmon more time to surrender because Mr. Harmon "was turning back at me with a knife in his hand and he said he would stab me."[58]

55.      From the time Mr. Harmon broke free to the time Officer Fox fired his weapon, approximately six seconds elapsed.[59]

56.      Officer Robinson testified, "It was a chaotic six seconds."[60]

57.      Even with over 15 years of law enforcement experience, the encounter with Mr. Harmon was the scariest situation Officer Fox has faced.[61]

---

[53] Ex. 5, Fox Deposition at 137:12–14, 140:8–15.
[54] Ex. 9, Smith BWC at 8:18–8:20; Ex. 12, Fox BWC at 1:05–1:06.
[55] Ex. 9, Smith BWC at 8:18–8:20.
[56] Ex. 5, Fox Deposition at 141:13–18, 139:3–4.
[57] *Id*. at 140:8–15.
[58] *Id.* at 140:4–7.
[59] Ex. 9, Smith BWC at 8:13–8:19; Ex. 12, Fox BWC at 1:01–1:07; Ex. 10, Robinson BWC at 1:15–1:21; Combined BWC at 0:15–0:21.
[60] Ex. 11, Robinson Deposition at 30:16.
[61] Ex. 6, Fox Declaration ¶ 14.

**D.      Mr. Harmon's Knife Is Laying in the Grass Next to His Right Arm.**

58.      After Officer Fox fired his weapon, Mr. Harmon spun to the right and fell to the ground with his right arm outstretched.[62]

59.      Officer Smith immediately radioed, "Priority, shots fired. Start medical."[63]

60.      Officer Robinson cautiously approached Mr. Harmon and told Officer Fox, "Hey cover him, I'm going to go in [inaudible] assist." Officer Fox responded, "I got him," and remained in position with his weapon trained on Mr. Harmon.[64]

61.      As Officer Robinson approached Mr. Harmon, he passed an open knife lying in the grass a few inches from where Mr. Harmon's right hand landed as he fell.[65] The knife next to Mr. Harmon's right hand is depicted in still-frame photos from Officer Robinson's bodycam:

 

**Ex. 16, Robinson still-frames with knife circled (SLCC_002669, SLCC_002689).**

[62] Ex. 12, Fox BWC at 1:06–1:10; Ex. 10, Robinson BWC at 1:22–1:37; Ex. 13, Combined BWC at 0:22–0:25.
[63] Ex. 9, Smith BWC at 8:20–8:25; Ex. 12, Fox BWC at 1:10–1:12.
[64] Ex. 10, Robinson BWC at 1:28–1:31; Ex. 9, Smith BWC at 8:27–8:30; Ex. 12, Fox BWC at 1:14–1:16; Ex. 13, Combined BWC at 0:24–0:31.
[65] Ex. 10, Robinson BWC at 1:33–35; Ex. 13, Combined BWC at 0:35–0:36; Robinson BWC still-frame photos, <u>Exhibit 16</u>.

**237**

62.     Officer Robinson applied handcuffs to Mr. Harmon, observed that he was bleeding from his arm, and rolled him onto his side in a recovery position.[66]

63.     The Officers began to administer aid to Mr. Harmon, repeatedly telling Mr. Harmon to "stay with us." Officer Fox ran back to his patrol car to retrieve medical gloves and his knife, which he used to remove Mr. Harmon's clothes to expose the gunshot wounds.[67]

64.     When additional officers responded to the scene, they asked who had fired the shots and instructed Officer Fox to go wait by his patrol car while they took his place rendering aid to Mr. Harmon. Officer Fox complied and exhorted the other officers to "[g]o help, go help." Officer Fox then walked to his car and placed his knife on the hood.[68]

65.     While rendering aid to Mr. Harmon, Officer Robinson told an officer who had just arrived "[t]here was a knife somewhere" that should be collected for evidence and that "he pulled out the knife." A little while later Officer Robinson asked Officer Fox, "Did you grab the knife?" to which Officer Fox responded, "No, I have my knife where I tried to cut his pants off. They were covered in blood, so I just left my knife on the hood of my car."[69]

66.     At the time of his deposition—nearly five years after the incident—Officer Robinson could not recall whether he saw the knife in Mr. Harmon's hand. He recalled observing the knife lying next to Mr. Harmon's right hand when he approached Mr. Harmon.[70]

67.     Mr. Harmon later died from the gunshot wounds.

68.     After the incident, a team from the Unified Police Department ("**UPD**") arrived at

---

[66] Ex. 10, Robinson BWC at 1:34–2:05.
[67] Ex. 12, Fox BWC at 1:49–3:12; Ex. 9, Smith BWC at 8:44–10:30; Ex. 10, Robinson BWC at 1:46–5:50.
[68] Ex. 12, Fox BWC at 3:12–3:18; Ex. 9, Smith BWC at 10:22–45.
[69] Ex. 10, Robinson BWC at 3:55–4:03; Ex. 9, Smith BWC at 13:19–29; Ex. 12, Fox BWC at 6:06–19.
[70] Ex. 11, Robinson Deposition at 29:19–31:1.

**238**

the scene to perform an investigation of the officer-involved critical incident ("**OICI**").[71] They observed and documented a knife near where Mr. Harmon fell in the grass area.[72]

69.     UPD submitted its OICI report to the Salt Lake County District Attorney to screen for criminal charges. The DA concluded that "Officer Fox's use of deadly force was 'justified' under Utah State law."[73] The Federal Bureau of Investigation in concert with the Civil Rights Section of the U.S. Department of Justice also reviewed the incident and "determined the evidence did not establish a prosecutable violation of federal criminal civil rights statutes."[74]

70.     While pursuing Mr. Harmon, Officer Smith did not know Mr. Harmon had a knife, and he did not learn Mr. Harmon had a knife until finding out from the media weeks later.[75]

71.     When asked what went through his mind at the moment he heard Officer Fox fire his weapon, Officer Smith testified: "Truthfully? What the fuck."[76]

72.     Officer Smith explained: "[W]hat I perceived was different than what he [Officer Fox] saw and in my head I had not seen a knife or any other reason, so I was trying to figure out exactly what he saw and why he felt it was appropriate to fire his pistol."[77]

---

[71] *See* Unified Police Department OICI Report (excerpts due to length and file size), Exhibit 17. UPD is a separate department from SLCPD. It serves eight cities and communities but does not have jurisdiction over Salt Lake City, which is instead served by the SLCPD. *See* Unified Police Department, *About UPD, available at* https://www.updsl.org/page_about.php. Utah law requires an outside agency to conduct the OICI investigation. Utah Code Ann. § 76-2-408.

[72] *See, e.g.*, Ex. 17, UPD OICI Rep. at SLCC_001093–94 (report that "[n]ear the blood was a folding silver colored knife"); *id.* at SLCC_001105–12 (Forensic Investigator Ryan Andrews reporting that he photographed "a silver 'Castleview Hospital' brand folding knife" in the "lawn area," which was marked as evidence item number 12); *id.* at SLCC_001887–89 (OICI investigator's photograph of the knife near where Mr. Harmon fell).

[73] District Attorney Screening Letter, Oct. 4, 2017 (SLCC_000653), Exhibit 18.

[74] F.B.I. Screening Letter, Dec. 8, 2017 (SLCC_000646), Exhibit 29.

[75] Ex. 7, Smith Deposition at 85:24–86:24, 88:22–25.

[76] *Id.* at 86:12–14.

[77] *Id.* at 86:15–20.

73.     If Officer Smith had known Mr. Harmon had a knife, he would have used his service weapon instead of his Taser.[78]

74.     A toxicology report indicated that at the time of his death, Mr. Harmon had THC (the active ingredient in marijuana), amphetamine, and methamphetamine in his system. According to the independent lab that performed the analysis, "[b]lood levels of 200 - 600 ng/mL have been reported in methamphetamine abusers who exhibited violent and irrational behavior." Mr. Harmon's methamphetamine blood level was 270 ng/mL.[79]

**E.     Procedural History.**

75.     Plaintiffs filed the Complaint in state court, asserting five causes of action. Defendants removed the matter to this Court.[80]

76.     The Court granted Defendants' motion to dismiss, dismissing Plaintiffs' claims for excessive force, equal protection, and municipal liability, and declining to exercise supplemental jurisdiction over the state-law claims. The Court remanded the state-law claims to state court.[81]

77.     Plaintiffs appealed their claims for excessive force and municipal liability, and the Tenth Circuit reversed and remanded those claims to this Court.[82]

78.     On May 16, 2022, the Court vacated its order of remand and exercised supplemental jurisdiction over Plaintiffs' state-law claims.[83]

---

[78] Ex. 8, Smith Declaration ¶ 5.
[79] NMS Labs Toxicology Report, Aug. 29, 2017 (SLCC_000207), Exhibit 20.
[80] ECF Nos. 2-1, 2.
[81] ECF Nos. 29, 34.
[82] ECF No. 40. Plaintiffs did not appeal the equal protection claim. *See id.*
[83] ECF Nos. 60, 61.

**<u>LEGAL STANDARD</u>**

The Court "shall" grant summary judgment if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendants, as movants, bear the initial burden of showing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden shifts to Plaintiff to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Judgment is required if the party bearing the burden of proof "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

Moreover, while generally all reasonable inferences are drawn in Plaintiffs' favor, "that is not true to the extent that there is clear contrary video evidence of the incident at issue." *Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010). The Supreme Court mandates that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court *should not* adopt that version of the facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also Rowell v. Bd. of Comm'rs. of Muskogee Cty.*, 978 F.3d 1165, 1171 (10th Cir. 2020) ("[W]e cannot ignore clear, contrary video evidence in the record depicting the events as they occurred."); *Est. of Valverde v. Dodge*, 967 F.3d 1049, 1055 (10th Cir. 2020) ("To the extent that the synchronized video unmistakably establishes facts, we are to apply them, even if they are contrary to other evidence, such as testimony."). The Court must therefore disregard Plaintiffs' story if it amounts to a "visible fiction" and instead "view[] the facts in the light depicted by the videotape." *Scott*, 550 U.S. at 381.

## ARGUMENT

### I.  PLAINTIFFS' EXCESSIVE FORCE CLAIM FAILS AS A MATTER OF LAW.

Plaintiffs allege Officer Fox violated Mr. Harmon's rights under the Fourth Amendment. Plaintiffs' claim fails because the undisputed evidence establishes that Officer Fox's use of deadly force was objectively reasonable given the circumstances. Additionally and alternatively, any alleged violation of Mr. Harmon's constitutional rights was not clearly established at the time, and thus Officer Fox is entitled to qualified immunity as a matter of law.

When a defendant raises a qualified immunity defense a plaintiff must satisfy a heavy two-part burden for the claim to survive summary judgment. *Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2005). First, the plaintiff must establish that the facts, viewed in the light most favorable to plaintiff, show that the challenged conduct violated a constitutional right. *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Second, the plaintiff must demonstrate the right at issue was clearly established on the date in question. *Id.* at 1080. The Court may consider these two questions in either order, but a failure to establish either inquiry is fatal to a plaintiff's claim. *Holland v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001). Here, Plaintiffs cannot satisfy their burden under either part of the inquiry.

### A.  The Undisputed Evidence Establishes Officer Fox's Use of Force Was Objectively Reasonable Under the Circumstances.

Claims of excessive force are analyzed under the Fourth Amendment's objective reasonableness standard, judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly

evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. In *Graham*, the Supreme Court articulated three factors courts should consider in making this assessment: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396. Ultimately, however, "the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Id.* Here, all three factors weigh in favor of Officer Fox's use of force.

### 1.    Mr. Harmon engaged in multiple serious crimes.

The first *Graham* factor considers the severity of the crime. A reasonable officer in Officer Fox's position would have probable cause to believe multiple crimes occurred. Mr. Harmon committed traffic infractions. *See* Salt Lake City Code §§ 12.80.065, -.140, -.200. Mr. Harmon had an outstanding warrant for aggravated assault, a second-degree felony. Mr. Harmon also fled from the Officers attempting to arrest him, a class B misdemeanor. *See* Utah Code Ann. § 76-8-305(1)(a). Mr. Harmon then assaulted Officer Robinson, a class A misdemeanor. *See id.* § 76-8-305(1)(a). Finally, Mr. Harmon committed aggravated assault by making a threat to do bodily injury to Officer Fox with a dangerous weapon and an accompanied show of immediate force, a first-degree felony. *See id.* § 76-5-103. This factor—severity of the crime—therefore weighs in favor of a finding of objective reasonableness. *See Arnold v. City of Olathe*, 35 F.4th 778, 792 (10th Cir. 2022) (recognizing felonies constitute "serious crime[s]" under the first *Graham* factor).

### 2.    Mr. Harmon posed an immediate threat of safety to the Officers.

The second factor considers "whether the suspect poses an immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396. The Tenth Circuit has held this factor "is

**243**

undoubtedly the most important and fact intensive factor in determining the objective reasonableness of an officer's use of force." *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021) (citations omitted).

"Deadly force is justified under the Fourth Amendment if a reasonable officer in Defendants' position would have had probable cause to believe that there was a *threat of serious physical harm to themselves* or to others." *Est. of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) (citations omitted) (emphasis in original). Additionally, "[b]ecause police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation, the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." *Saucier*, 533 U.S. at 205 (citations omitted). For this reason, "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Id.* In other words, "[a] reasonable officer need not await the 'glint of steel' before taking self-protective action; by then, it is often . . . too late to take safety precautions." *Est. of Larsen*, 551 F.3d at 1260 (second alteration in original) (citations omitted).

In *Larsen,* the Tenth Circuit set forth the following non-exclusive factors to assess the degree of threat facing an officer in cases involving the use of deadly force: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." 511 F.3d at 1260. Considering these factors and the totality of the circumstances, a

reasonable officer in Officer Fox's shoes would have probable cause to believe Mr. Harmon presented a threat of serious physical harm to himself or the other officers.

### a.  Officer Fox did not feasibly have time to issue an order to Mr. Harmon.

The first *Larsen* factor considers whether the Officers ordered Mr. Harmon to drop the knife and whether Mr. Harmon complied. Tenth Circuit precedent holds this factor is neutral in circumstances where, as here, the suspect was not "already holding a weapon when first observed by officers." *Est. of Valverde v. Dodge*, 967 F.3d 1049, 1061 (10th Cir. 2020). In other words, a "warning need be given *only when feasible*." *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985)) (emphasis added). Here, the evidence shows it was not feasible for Officer Fox to give a command or warning to Mr. Harmon once he produced the knife. During the chaotic chase, which lasted a total of six seconds, Mr. Harmon did not produce the weapon until he had already stopped and was turning back toward Officer Fox from a few feet away. The most Officer Fox could muster was to shout, "I'll fucking shoot you" as he simultaneously fired his weapon, which he explained was a reflexive reaction immediately mirroring Mr. Harmon's threat of "I'll fucking stab you." This factor is therefore neutral.

### b.  Mr. Harmon made hostile motions toward Officer Fox.

The second factor addresses whether a reasonable officer could believe Mr. Harmon made "any hostile motions" with the weapon toward the Officers. This factor weighs heavily in favor of the use of force. The evidence establishes that Mr. Harmon stopped running away from the Officers, planted his right foot, and began turning back toward Officer Fox with his right hand raised in the air and his body slightly crouched. At that moment, Officer Fox saw the knife in Mr. Harmon's hand and believed Mr. Harmon was going to stab him.

**245**



**Ex. 15, Smith still-frames (SLCC_002744).**



**Ex. 14, Fox still-frames (SLCC_002640).**

Planting his foot, turning back toward the Officers, and raising his arm in the air with a

knife in hand—all from a few feet away—constitute hostile motions. Additionally, as with the

other factors, "[w]e do not look at whether [the suspect] actually intended to harm the officers . . .,

but rather whether a reasonable officer could have believed a threat of serious physical harm existed at the time." *Coronado v. Olsen*, No. 20-4118, 2022 WL 152124, at *4 (10th Cir. Jan. 18, 2022). In light of Mr. Harmon's conduct, a reasonable officer would believe Mr. Harmon had made hostile motions with a knife. This factor weighs in favor of Officer Fox's use of force.

> c.   <u>Mr. Harmon was approximately five to seven feet from Officer Fox when he turned back toward him with the knife.</u>

The next factor is the distance between Mr. Harmon and the Officers at the time force was used. This factor weighs heavily in favor of Officer Fox. The uncontroverted video evidence shows that at the time Officer Fox fired his weapon, he was only a few feet away from Mr. Harmon, having attempted to come to an abrupt stop when Mr. Harmon unexpectedly planted his foot and started to turn back. At the time of the shots, Mr. Harmon was approximately five to seven feet away and possibly even closer, as shown in the still-frame photo below.



**Ex. 10, Robinson bodycam at 1:20:06.**

The Tenth Circuit has held this distance (and even distances significantly longer than what existed here) weighs in favor of an officer's use a deadly force. For example, in *Larsen*, the Court held this factor weighed in the officer's favor where a suspect was holding a knife from "somewhere between 7 and 20 feet" from the officers. 511 F.3d at 1261; *see also Lennen v. City*

*of Casper*, No. 21-8040, 2022 WL 612799, at *8 (10th Cir. Mar. 2, 2022) (unpublished) (holding factor weighed in favor of deadly force where suspect held sword "approximately a car length away from" officer and was "within a stride or two of being able to strike").

          d.    <u>Mr. Harmon manifested the intention to attack the Officers with his knife.</u>

The final *Larsen* factor considers the "manifest intentions" of the suspect. The Tenth Circuit has explained that "[t]he term 'manifest' is of central importance to the understanding and application of this factor" because reasonableness under the Fourth Amendment "must be judged from the perspective of a reasonable officer on the scene, who is often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 770 (10th Cir. 2021) (citations omitted). Thus, "a key lesson here is that the focus of the inquiry is not on . . . what [the suspect] *subjectively* intended" but "how a reasonable officer on the scene would have assessed the manifest indicators of [the suspect's] intentions—that is, [the suspect's] actions." *Id.* (citation omitted) (first alteration and emphasis in original).

Here, Mr. Harmon's actions manifested an intent to avoid arrest by any means necessary, including violent confrontation with the Officers. From the outset of the encounter, Mr. Harmon sought to avoid arrest by providing a false name. When the Officers located the outstanding felony warrant Mr. Harmon knew existed, he begged them to let him go. He then fled from the Officers as they attempted to place him in handcuffs, threw Officer Robinson to the ground when he tried to grab Mr. Harmon, and threatened to "cut" and "fucking stab" the Officers. Finally, Mr. Harmon stopped fleeing but did not take any actions to manifest surrender or acquiescence. Rather, his body position—from his planted right foot, turned shoulders, and raised right arm—and the knife

in his hand all manifested an intent to violently square off with the Officers. Indeed, Officer Fox believed, from all of Mr. Harmon's actions, that Mr. Harmon intended to stab him with the knife.

These intentions are corroborated by information outside the knowledge of the Officers that night. In particular, Mr. Harmon had a number of controlled substances in his system, including THC and methamphetamine—the latter in an amount the laboratory indicated has "been reported in methamphetamine abusers who exhibited violent and irrational behavior." Additionally, Mr. Harmon already had significant interactions with the criminal justice system, including years-long stints in both state and federal prison. Only a few months before this encounter, Mr. Harmon pled guilty to aggravated assault—which carried a prison sentence of up to 15 years—but had failed to appear at his sentencing. He therefore had a substantial motivation to avoid arrest. *See Henry v. Storey*, 658 F.3d 1235, 1239 (10th Cir. 2011) (holding an officer could "reasonably conclude" a suspect posed an immediate threat to safety because "a driver caught with a stolen vehicle has strong incentive to evade arrest, given the seriousness of the crime"). This factor therefore heavily weighs in favor of Officer Fox.

e.   Officer Fox was faced with tense, rapidly evolving circumstances.

The Tenth Circuit has explained the *Larsen* factors are non-exhaustive, and the relevant inquiry remains the totality of the circumstances. *See Larsen*, 511 F.3d at 1260. In addition to the factors discussed above, this Court should consider the rapidly evolving and uncertain situation Officer Fox faced. In particular, while Mr. Harmon initially complied with his arrest, the situation rapidly changed when he determined to flee from the Officers. The resulting chase lasted only six seconds, and a lot happened during that incredibly short time. All three Officers chased after Mr. Harmon from different directions. Officer Robinson tried to tackle Mr. Harmon but was thrown to

the ground 10 feet away. Mr. Harmon changed direction not once, not twice, but three times. This chaotic scene culminated with Mr. Harmon pivoting back toward the Officers and raising his arm with a knife in his hand only a few feet away from Officer Fox. This was the proverbial "glint of steel" to which Officer Fox had only an instant to respond to. The fact that Officer Fox had to perceive, process, and react to everything that occurred in those six seconds—in what turned out to be a life-or-death situation—weighs heavily in favor of his use of force.

Analysis of these factors demonstrates that Officer Fox reasonably believed that Mr. Harmon posed immediate threat of serious harm to himself and the other Officers.

### 3. Mr. Harmon was actively resisting arrest.

The third *Graham* factor considers whether the suspect "is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Plaintiffs conceded Mr. Harmon was evading arrest by flight. *See, e.g.*, Compl. ¶¶ 28–50 (alleging the Officers told Mr. Harmon he was going to be arrested and that Mr. Harmon pulled his arms away, strained to break free, and ran from the Officers). The undisputed video evidence confirms that Mr. Harmon deliberately fled and sought to evade the Officers. Therefore, this factor also weighs in favor of Officer Fox.

\*      \*      \*

In sum, Officer Fox faced a terrifying situation in which Mr. Harmon went from compliant arrestee to deadly threat in mere seconds. We do not know what would have happened if Officer Fox had not fired his weapon at the exact moment he did. Mr. Harmon may have stood in place. He may have surrendered. Or he may have killed Officer Fox. The Constitution did not require Officer Fox to wait to find out before protecting his own life and the life of his fellow officers. Based on the factors above and given the totality of circumstances, Officer Fox's decision to use

deadly force was objectively reasonable. Plaintiff's excessive force claim fails as a matter of law.

**B.** **Officer Fox Is Entitled to Qualified Immunity Because Any Alleged Constitutional Violation Was Not Clearly Established at the Time.**

Plaintiffs' claim also fails for the independent reason that Officer Fox did not violate any clearly established law at the time of the encounter. To survive summary judgment as to the second qualified-immunity prong, Plaintiffs must show violation of a clearly established right that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (*per curiam*) (citations omitted). In other words, "for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (citations omitted). "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix*, 577 U.S. at 12 (citations omitted). "[T]o show that a right is clearly established, the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Farrell v. Montoya*, 878 F.3d 933, 937 (10th Cir. 2017).

Additionally, the Supreme Court has recently reaffirmed that "[t]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (citations omitted). And that "specificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* (alterations in original) (citations omitted); *accord City of Tahlequah, Okla. v. Bond*, 142 S. Ct. 9, 12 (2021).

Here, Plaintiffs cannot carry their burden to show Officer Fox's use of force was a clearly

established constitutional violation. Defendants are aware of no binding precedent indicating it was a constitutional violation to use deadly force where an individual being arrested on a second-degree felony warrant breaks free from officers to evade arrest, physically assaults an officer, verbally threatens the officers, and then stops fleeing, turns back toward the officers, and wields a knife from only a few feet away.

To the contrary, Tenth Circuit precedent establishes that the use of deadly force in similar circumstances *was* objectively reasonable. For example, in *Larsen*, officers responded to an emergency call that a suspect had threatened to kill someone or himself. 511 F.3d at 1260. As officers approached the suspect's home, the suspect stood alone on the front porch with a large knife. *Id.* Officers gave repeated commands to drop the knife. *Id.* Appearing agitated, the suspect raised the knife above his shoulder with the blade pointed outward. *Id.* The suspect took a step towards an officer who was somewhere between 7 and 20 feet away, and the officer fired his weapon. *Id.* at 1260–61. In affirming the district court, the Tenth Circuit held that the officer was faced with an armed suspect who appeared willing and able to attack with a knife, and reasonably concluded the suspect posed an immediate threat to his safety. *Id.* at 1263.

Plaintiffs thus cannot prove the law was "sufficiently clear that every reasonable official would have understood that what he is doing violates" the Fourth Amendment. *Mullenix*, 577 U.S. at 11. Because Plaintiffs cannot carry their burden to show Officer Fox violated clearly established law, he is entitled to qualified immunity.

## II. PLAINTIFFS' *MONELL* CLAIM FAILS AS A MATTER OF LAW.

Plaintiffs' *Monell* municipal liability claim against Salt Lake City fails. It is well-established that "[a] municipality may not be held liable where there was no underlying

constitutional violation by any of its officers." *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782

(10th Cir. 1993). Because Plaintiffs cannot establish a constitutional violation as a matter of law,

they likewise cannot maintain a cause of action against the City. *See Ainsworth v. Park City Police*

*Dep't*, No. 2:19-CV-00462-HCN, 2021 WL 288579, at *10 (D. Utah Jan. 27, 2021). The municipal

liability claim should therefore be dismissed with prejudice and on the merits.

## III.    PLAINTIFFS' STATE-LAW CLAIMS FAIL AS A MATTER OF LAW.

Plaintiffs asserted two claims grounded in Utah state law: (1) statutory wrongful death

against Officer Fox, and (2) violation of the Utah Constitution's Unnecessary Rigor Clause against

Officer Fox and Salt Lake City.[84] Each claim fails on the merits.

### A.    Plaintiffs' Wrongful Death Claim Against Officer Fox Fails as a Matter of Law.

Plaintiffs' claim for wrongful death against Officer Fox fails for two independent reasons.

First, Officer Fox is immune from suit because the Utah Legislature has not waived sovereign

immunity for claims against an employee and the undisputed evidence shows Officer Fox did not

act with willful misconduct. Second, Plaintiffs failed to show, as required by the wrongful death

statute, that Officer Fox committed a wrongful or neglectful act.

#### 1.    Officer Fox is immune from suit under sovereign immunity.

Plaintiffs' statutory wrongful death claim fails as a matter of law because it is barred by

the Governmental Immunity Act of Utah ("**GIAU**"). Utah Code Ann. §§ 63G-7-101 *et seq*.

Lawsuits brought against governmental entities or their employees are governed by the GIAU. *Id.*

§ 63G-7-101. Governmental entities and employees retain sovereign immunity unless the

---

[84] Compl. ¶¶ 181–88, 189–94, ECF No. 2-1.

Legislature has "expressly waived" that immunity in the GIAU. *Id.* § 63G-7-101(3). As it relates to a governmental employee, the GIAU provides that "a plaintiff's exclusive remedy" for an injury caused in the performance of an employee's duties is an action against the governmental entity. *Id.* § 63G-7-202(3)(a). Thus, a "plaintiff may not bring or pursue any civil action or proceeding based upon the same subject matter against the employee . . . whose act or omission gave rise to the claim, unless: (i) the employee acted or failed to act through fraud or willful misconduct." *Id.* § 63G-7-202(3)(c). "Willful misconduct" is defined as "the intentional doing of a wrongful act, or the wrongful failure to act, without just cause or excuse, where the actor is aware that the actor's conduct will probably result in injury." *Id.* § 63G-7-102(11).

Here, for the same reasons stated above in Part I, Officer Fox did not intentionally commit a wrongful act without just cause or excuse. To the contrary, Officer Fox's use of force was not wrongful but reasonable under the circumstances. The conduct likewise was *with* just cause or excuse, in light of the threat of immediate harm Mr. Harmon posed to the Officers. Because Plaintiffs cannot establish that Officer Fox acted with willful misconduct, the GIAU precludes any statutory claim against him.

### 2. Officer Fox's use of force did not constitute a wrongful or neglectful act.

Plaintiffs' statutory wrongful death claim also fails because they cannot establish the elements of their claim. To maintain a cause of action for wrongful death, Plaintiffs must show that "the death of a person is caused by the wrongful act or neglect of another." Utah Code Ann. § 78B-3-106(1). In other words, a "wrongful death cause of action is based on the underlying wrong done to the decedent," meaning Plaintiffs must establish an underlying theory of civil liability that constitutes a "wrongful act or neglect." *Jensen v. IHC Hosps., Inc.,* 944 P.2d 327, 332

**254**

(Utah 1997). Here, Plaintiffs claim the "wrongful act or neglect" is unnecessary rigor against Mr. Harmon. Plaintiffs' statutory wrongful death claim thus rises and falls with their unnecessary rigor claim. Therefore, because their unnecessary rigor claim fails for the reasons discussed below, *see* Part III.B, so too does their wrongful death claim.

**B.** <u>**Plaintiff's Unnecessary Rigor Claim Against Defendants Fails as a Matter of Law.**</u>

Plaintiffs' claim that Defendants violated Mr. Harmon's rights under Utah's Unnecessary Rigor Clause fails for two independent reasons. <u>First</u>, the undisputed evidence establishes that Officer Fox's use of force when faced with an armed individual threatening him with a knife from only a few feet away did not constitute unnecessary rigor. <u>Second</u>, and alternatively, Plaintiffs cannot carry their burden to establish that even if Officer Fox violated Mr. Harmon's right, that the violation was flagrant. Plaintiffs' claim therefore fails as a matter of law.

**1.** **The undisputed evidence establishes Defendants did not violate Mr. Harmon's unnecessary rigor rights.**

Article I, section 9 of the Utah Constitution states, in relevant part, "Persons arrested or imprisoned shall not be treated with unnecessary rigor." The Utah Supreme Court has explained "the guarantee against unnecessarily rigorous treatment . . . protects [prisoners and arrestees] against unnecessary abuse." *Dexter v. Bosko*, 2008 UT 29, ¶ 8, 184 P.3d 592 (alterations in original) (citations omitted). And the "applicable definition of 'abuse' focuses on 'needlessly harsh, degrading, or dehumanizing' treatment of prisoners." *Id.* (citations omitted). Crucially, the Utah Supreme Court has "emphasize[d] that unnecessary rigor must be treatment that is clearly excessive or deficient and unjustified." *Bott v. DeLand*, 922 P.2d 732, 741 (Utah 1996), *abrogated on other grounds by Spackman v. Bd. of Educ. of Box Elder Cty.*, 2000 UT 87, 16 P.3d 533. In

other words, "a constitutional violation is made out only when the act complained of presented a substantial risk of serious injury *for which there was no reasonable justification at the time*." *Dexter*, 2008 UT 29, ¶ 19 (emphasis added).

Here, the undisputed evidence establishes Officer Fox had a "reasonable justification at the time" for his use of force against Mr. Harmon. Mr. Harmon was being arrested for a violent felony, he begged the Officers not to return him to jail, he forcibly evaded arrest, he verbally threatened that he would cut the Officers, he threw Officer Robinson to the ground, and then he stopped fleeing and turned back toward the Officers with a knife in his hand from only a few feet away. Officer Fox believed that Mr. Harmon intended to use the knife against the Officers and that their lives were in danger. Additionally, approximately six seconds elapsed from when Mr. Harmon broke free of the Officers to when he turned and crouched with a knife in his hand, requiring that Officer Fox make a life-or-death decision in a split second. Had Officer Fox declined to shoot or even hesitated another second, Mr. Harmon could have closed the distance between himself and Officer Fox with one step and attacked Officer Fox with his knife. Because Mr. Harmon posed a real and immediate danger to the Officers, Officer Fox's decision to fire his weapon was reasonably justified and did not constitute unnecessary rigor.

Plaintiffs' claim against the City also fails as a result. "The first prong of our common law test for assessing municipal liability requires the court to determine whether the plaintiff's constitutional rights were violated." *Kuchcinski v. Box Elder Cty.*, 2019 UT 21, ¶ 39, 450 P.3d 1056. Because Mr. Harmon's rights were not violated, Plaintiffs' claim against the City fails.

### 2. Officer Fox's Use of Force Did Not Constitute a Flagrant Violation of Mr. Harmon's Constitutional Rights.

Plaintiffs' unnecessary rigor claim fails for the additional, independent reason that Officer

Fox's use of deadly force was not a "flagrant violation." The Utah Supreme Court has held that damages for a constitutional violation "are permitted only under appropriate circumstances." *Spackman*, 2000 UT 87, ¶ 22 (citation omitted). In particular, "a plaintiff must establish that he or she suffered a 'flagrant' violation of his or her constitutional rights." *Id.* ¶ 23. The Court explained:

> The flagrant violation element means that a defendant must have violated clearly established constitutional rights of which a reasonable person would have known. To be considered clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that [constitutional] right. The requirement that the unconstitutional conduct be flagrant ensures that a government employee is allowed the ordinary human frailties of forgetfulness, distractibility, or misjudgment without rendering [himself] liable for a constitutional violation.

*Dexter*, 2008 UT 29, ¶ 23 (quoting *Spackman*, 2000 UT 87, ¶ 23) (alterations in original). In other words, "simple negligence is not sufficient justification for a damage claim." *Bott*, 922 P.2d at 738. Indeed, even "an 'unreasonable mistake alone is insufficient to establish flagrant misconduct.'" *Dettle v. Richfield City*, No. 2:13-CV-357-DAK, 2014 WL 4354424, at *10 (D. Utah Sept. 2, 2014) (quoting *State v. Newland*, 2010 UT App 380, ¶ 22, 253 P.3d 71); *see also Porter v. Daggett Cnty.*, No. 2:18-CV-00389-DBB, 2022 WL 558295, at *14 (D. Utah Feb. 24, 2022) (recognizing the Utah standard "uses identical language as the standard" for the second prong of federal qualified immunity analysis).

Plaintiffs cannot meet their burden to show Officer Fox's use of force was a flagrant violation of Mr. Harmon's constitutional rights. A "reasonable official" placed in Officer Fox's position—with a wanted felon threatening him and fellow Officers with a knife from five feet away—would not understand that use of his weapon would violate a constitutional right. Officers are permitted "the ordinary human frailties of forgetfulness, distractibility, or misjudgment." *Dexter*, 2008 UT 29, ¶ 23. Here, however, Officer Fox's decision was not only reasonable but

necessary under the circumstances. Plaintiffs' claim that Officer Fox's use of force to protect himself from Mr. Harmon constituted a flagrant violation of Mr. Harmon's constitutional rights fails as a matter of law.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request the Court grant the Motion and enter summary judgment for Defendants and against Plaintiffs on all remaining causes of action.

DATED: August 26, 2022.

SALT LAKE CITY CORPORATION


/s/ *Katherine R. Nichols*
Katherine R. Nichols

*Attorney for Defendants Salt Lake City and Officer Clinton Fox*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 26, 2022, a true and correct copy of the foregoing was

electronically filed with the Clerk of the Court, which sent notice to:

Andrew G. Deiss
Corey D. Riley
DEISS LAW PC
10 West 100 South, Suite 425
Salt Lake City, UT 84101
adeiss@deisslaw.com
criley@deisslaw.com

Qusair Mohamedbhai
Nicholas A. Lutz
RATHOD MOHAMEDBHAI LLC
2701 Lawrence Street, Suite 100
Denver, CO 80205
qm@rmlawyers.com
nl@rmlawyers.com

*Attorneys for Plaintiffs*

/s/ Heidi Medrano

**259**

Katherine R. Nichols (#16711)
SALT LAKE CITY CORPORATION
P.O. Box 145478
451 South State Street, Suite 505A
Salt Lake City, Utah 84114-5478
Telephone:  (801) 535-7788
Facsimile:  (801) 535-7640
katherine.nichols@slcgov.com

*Attorneys for Defendants Salt Lake City and Officer Clinton Fox*

---

## IN THE UNITED STATES DISTRICT COURT
## STATE OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ESTATE OF PATRICK HARMON SR.; PATRICK HARMON II, as Personal Representative of the Estate of Patrick Harmon Sr., and heir of Patrick Harmon Sr., TASHA SMITH, as heir of Patrick Harmon, Sr., <br><br> Plaintiffs, <br><br> vs. <br><br> SALT LAKE CITY, a municipality; and OFFICER CLINTON FOX, in his individual capacity, <br><br> Defendants. | **APPENDIX IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Case No. 2:19-cv-00553-HCN-CMR <br><br> District Judge Howard C. Nielson, Jr. <br> Magistrate Judge Cecilia M. Romero |

Defendants Salt Lake City Corporation and Officer Clinton Fox, through counsel, hereby

submit this *Appendix of Evidence* in support of their *Motion for Summary Judgment*.

**260**

| No. | Description | Date | Document Source |
|-----|-------------|------|-----------------|
| 1 | Docket, Case No. 22901-02614-01 (Mo. 21st Cir. Ct.) | Various | Public Court Databases |
| 2 | Docket, Case No. 001901372 (Utah 2d Dist. Ct.); Docket, Case No. 001902478 (Utah 2d Dist. Ct.); Docket, Case No. 061906238 (Utah 3d Dist. Ct.); Docket, Case No. 1:07-CR-00113 (D. Utah) | Various | Public Court Databases |
| 3 | Criminal Information & Docket, Case No. 161402877 (3d Dist. Ct.) | Various | Public Court Databases |
| 4 | Patrick Harmon Active Warrants | August 14, 2017 | SLCC_001327–33 |
| 5 | Deposition of Officer Clinton Fox | June 17, 2022 | - |
| 6 | Declaration of Officer Clinton Fox | August 26, 2022 | - |
| 7 | Deposition of Officer Kris Smith | June 16, 2022 | - |
| 8 | Declaration of Officer Kris Smith | August 24, 2022 | - |
| 9 | Officer Kris Smith Body-worn Camera [filed conventionally] | August 13, 2017 | SLCC_001932 |
| 10 | Officer Scott Robinson Body-worn Camera [filed conventionally] | August 13, 2017 | SLCC_001931 |
| 11 | Deposition of Officer Scott Robinson | June 16, 2022 | - |
| 12 | Officer Clinton Fox Body-worn Camera [filed conventionally] | August 13, 2017 | SLCC_001941 |
| 13 | Combined Officer Body-worn Camera [filed conventionally] | August 13, 2017 | SLCC_002753 |
| 14 | Officer Clinton Fox Body-worn Camera still-frame photos [filed conventionally] | August 13, 2017 | SLCC_002603–65 |
| 15 | Officer Kris Smith Body-worn Camera still-frame photos [filed conventionally] | August 13, 2017 | SLCC_002702–52 |
| 16 | Officer Scott Robinson Body-worn Camera still-frame photos [filed conventionally] | August 13, 2017 | SLCC_002666–701 |

| No. | Description | Date | Document Source |
|-----|-------------|------|-----------------|
| 17 | Unified Police Department OICI Report (excerpted due to size) | August 13, 2017 | SLCC_001172, SLCC_001093–94, SLCC_001105–12, SLCC_001887–89 |
| 18 | Salt Lake County District Attorney Screening Letter | October 4, 2017 | SLCC_000653–70 |
| 19 | F.B.I. Screening Letter | December 8, 2017 | SLCC_000646 |
| 20 | NMS Labs Toxicology Report | August 29, 2017 | SLCC_000207–10 |

DATED: August 26, 2022.

SALT LAKE CITY CORPORATION


/s/ *Katherine R. Nichols*
Katherine R. Nichols

*Attorney for Defendants Salt Lake City and Officer Clinton Fox*

262

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 26, 2022, a true and correct copy of the foregoing was

electronically filed with the Clerk of the Court, which sent notice to:

Andrew G. Deiss
Corey D. Riley
DEISS LAW PC
10 West 100 South, Suite 425
Salt Lake City, UT 84101
adeiss@deisslaw.com
criley@deisslaw.com

Qusair Mohamedbhai
Nicholas A. Lutz
RATHOD MOHAMEDBHAI LLC
2701 Lawrence Street, Suite 100
Denver, CO 80205
qm@rmlawyers.com
nl@rmlawyers.com

*Attorneys for Plaintiffs*

                                                          */s/ Heidi Medrano*_____




Judicial Links    |    eFiling    |    Help    |    Contact Us    |    Print                        Logon

**22901-02164-01 - ST V PATRICK HARMON**

| Case Header | Parties & Attorneys | Docket Entries | Charges, Judgments & Sentences | Service Information | Filings Due | Scheduled Hearings & Trials | Civil Judgments | Garnishments/ Execution |

Sort Date Entries:  ○ Descending  ● Ascending          Display Options:  [ All Entries ▼ ]

| 08/17/1990 | **Information Filed** |
| | DEFENDANT BOUND OVER ON INFORMATION FILED, CASE ASSIGNED TO DIV 16 |
| | **Entry of Appearance Filed** |
| | RICHARD A. HARPER (PD) ENTERS APPEARANCE FOR DEFT |
| | **Entry of Appearance Filed** |
| | KATHLEEN M. TRUDEAU (CA) ENTERS APPEARANCE FOR STATE OF MISSOURI |
| | **Hearing Scheduled** |
| | CASE SET FOR INITIAL APPEARANCE 09/10/90 09:30AM DIV 16 JUDGE THADEUS F. NIEMIRA, DIV 25 |

| 08/21/1990 | **Motion to Suppress** |
| | MOTION TO SUPPRESS STATEMENTS FILED |
| | **Motion to Suppress** |
| | MOTION TO SUPPRESS IDENTIFICATION FILED |
| | **List of Witnesses** |
| | ENDORSEMENT OF WITNESSES BY DEFENDANT FILED |

| 08/24/1990 | **Subpoena Served** |
| | SUBPOENA RETURNS FILED |

| 09/06/1990 | **Hearing Scheduled** |
| | CONTINUED BY DEFENDANT 11/05/90 09:30AM DIV 16 JUDGE JAMES L. SANDERS, DIV 16 |

| 09/07/1990 | **Entry of Appearance Filed** |
| | HAROLD A. GOLDSMITH (CA) ENTERS APPEARANCE FOR STATE OF MISSOURI |
| | **Order Withdrawing Attorney:** |
| | KATHLEEN M. TRUDEAU (CA) WITHDRAWS AS ATTORNEY FOR STATE OF MISSOURI |

| 10/01/1990 | **Bond Set** |
| | BOND SET; $3,000.00 CASH ONLY 5% AUTHORIZED JUDGE EVELYN M. BAKER, DIV 20 |

| 10/31/1990 | **Order Withdrawing Attorney:** |
| | HAROLD A. GOLDSMITH (CA) WITHDRAWS AS ATTORNEY FOR STATE OF MISSOURI |
| | **Entry of Appearance Filed** |
| | ANGELA D. TURNER (CA) ENTERS APPEARANCE FOR STATE OF MISSOURI |

| 11/08/1990 | **Hearing Scheduled** |
| | CONTINUED FOR WANT OF TIME BY STATE 01/02/91 09:30AM DIV 16 JUDGE JAMES L. |

| | | |
|---|---|---|
| 12/31/1990 | **Order Assessing Fees** | |
| | SHERIFF'S FEE FILED. | |

**01/02/1991    Order**
CT-01, STEALING FELONY, (F). DEFT PLEADS GUILTY JUDGE ROBERT H. DIERKER JR, DIV 16

**Probation Order**
CT-01 SUSPENDED IMPOSITION OF SENTENCE DEFT PLACED ON PROBATION 1 YEAR WITH SPECIAL CONDITIONS: PROBATION TO BE SUPERVISED JUDGE ROBERT H. DIERKER JR, DIV 16

**Costs Ordered to Def**
COURT COSTS ORDERED JUDGE ROBERT H. DIERKER JR, DIV 16

**Guilty Plea**
DEFT PLEADS GUILTY

**09/06/1991    Probation Violation Filed**
NOTICE OF PROBATION VIOLATION FILED, CASE ASSIGNED TO DIV 16

**Entry of Appearance Filed**
RICHARD A. HARPER (PD) ENTERS APPEARANCE FOR DEFT

**Entry of Appearance Filed**
ANGELA D. TURNER (CA) ENTERS APPEARANCE FOR STATE OF MISSOURI

**Order for Prob Suspension**
PROBATION SUSPENDED. JUDGE ROBERT H. DIERKER JR

**Bond Set**
BOND SET; $2,500.00 SECURED OR 10% AUTH JUDGE ROBERT H. DIERKER JR

**Warrant Issued**
CAPIAS PROBATION WARRANT ORDERED JUDGE ROBERT H. DIERKER JR

**09/18/1991    Warrant Issued**
WARRANT ISSUED AND SENT TO CID

**10/29/1991    Notice**
NOTIFICATION OF CONFINEMENT FILED. CARBON COPY SENT TO PROBATION OFFICE 7 CENTRAL .

**11/04/1991    Probation Viol Hrng Scheduled**
PROBATION REVOCATION HEARING SET 11/15/91 09:00AM DIV 16 JUDGE ROBERT H. DIERKER JR

**Entry of Appearance Filed**
PUBLIC DEFENDERS OFFICE APPOINTED TO REPRESENT DEFT

**11/15/1991    Bond-Cash Bond Posted Full Amt**
CASH BOND IN THE AMOUNT OF $2,500.00 FILED 10% $250.00 RECEIVED SURETY: HENRY LEE ROSS

**Order**
DEFENDANT ADMITES VIOLATIONS AND WAIVES HIS FORAML PROBATION HEARING. SEE MEMO AS TO VIOLATIONS.

**Entry of Appearance Filed**
DAVID C. STOKELY (PD) ENTERS APPEARANCE FOR DEFT

Privacy - Terms

**Entry of Appearance Filed**
PAUL H. KAISER JR (CA) ENTERS APPEARANCE FOR STATE OF MISSOURI

**Order to Revoke Probation**
CT-01, STEALING FELONY, (F). PROBATION REVOKED JUDGE ROBERT H. DIERKER JR, DIV 16

**Defendant Sentenced**
DEFT SENTENCED ON CT-01 TO SERVE 5 YEARS IN THE CUSTODY OF MISSOURI DEPT. OF CORRECTIONS JUDGE ROBERT H. DIERKER JR, DIV 16

**Probation Order**
CT-01 SUSPENDED EXECUTION OF SENTENCE DEFT PLACED ON PROBATION 1 YEAR JUDGE ROBERT H. DIERKER JR, DIV 16

**Order**
JAIL TIME ALLOWED. JUDGE ROBERT H. DIERKER JR

**Order to Quash**
WARRANT ORDERED QUASHED JUDGE ROBERT H. DIERKER JR

11/18/1991 **Order to Quash**
WARRANT QUASHED.

11/19/1991 **Bond Refunded**
250.00 RETURNED TO SURETY BY CLERK'S OFFICE FROM CASH BOND DEPOSIT

01/10/1992 **Warrant Recalled/Withdrawn**
WARRANT RECALLED

10/02/1992 **Probation Violation Filed**
NOTICE OF PROBATION VIOLATION FILED, CASE ASSIGNED TO DIV 16

**Entry of Appearance Filed**
RICHARD A. HARPER (PD) ENTERS APPEARANCE FOR DEFT

**Entry of Appearance Filed**
ANGELA D. TURNER (CA) ENTERS APPEARANCE FOR STATE OF MISSOURI

**Entry of Appearance Filed**
PUBLIC DEFENDERS OFFICE APPOINTED TO REPRESENT DEFT

**Entry of Appearance Filed**
DAVID C. STOKELY (PD) ENTERS APPEARANCE FOR DEFT

**Entry of Appearance Filed**
PAUL H. KAISER JR (CA) ENTERS APPEARANCE FOR STATE OF MISSOURI

**Warrant Issued**
CAPIAS PROBATION WARRANT ORDERED JUDGE ROBERT H. DIERKER JR

**Bond Set**
BOND SET; $5,000.00 PROPERTY BOND JUDGE ROBERT H. DIERKER JR, DIV 16

**Order for Prob Suspension**
PROBATION SUSPENDED. JUDGE ROBERT H. DIERKER JR

10/05/1992 **Warrant Issued**
WARRANT ISSUED AND SENT TO CID

11/19/1992 **Notice**
NOTIFICATION OF CONFINEMENT FILED.

Privacy - Terms

| 11/23/1992 | **Probation Viol Hrng Scheduled** |
| | PROBATION REVOCATION HEARING SET 12/11/92 09:30AM DIV 06 JUDGE ROBERT H. DIERKER JR |
| | |
| 12/11/1992 | **Entry of Appearance Filed** |
| | SANFORD J. BOXERMAN (PD) ENTERS APPEARANCE FOR DEFT |
| | **Entry of Appearance Filed** |
| | GONZALO A. FERNANDEZ (CA) ENTERS APPEARANCE FOR STATE OF MISSOURI |
| | **Order to Revoke Probation** |
| | CT-01, STEALING FELONY, (F). PROBATION REVOKED JUDGE ROBERT H. DIERKER JR, DIV 16 |
| | **Defendant Sentenced** |
| | DEFT SENTENCED ON CT-01 TO SERVE 5 YEARS IN THE CUSTODY OF MISSOURI DEPT. OF CORRECTIONS JUDGE ROBERT H. DIERKER JR, DIV 16 |
| | **Order** |
| | JAIL TIME ALLOWED. JUDGE ROBERT H. DIERKER JR |
| | **Order to Quash** |
| | WARRANT ORDERED QUASHED JUDGE ROBERT H. DIERKER JR |
| | **No Probable Cause to Believe** |
| | THE DEFENDANT HAVING APPEARED AT THE CONCLUSION OF FINAL SENTENCING, HAVING BEEN ADVISED OF HIS RIGHT TO PROCEED UNDER RULE 24.035 THE COURT NOW FINDS THAT NO PROBABLE CAUSE OF INEFFECTIVE ASSISTANCE OF COUNSEL EXISTS JUDGE ROBERT H. DIERKER JR |
| | **Order Assessing Fees** |
| | SHERIFF'S FEE FILED. |
| | |
| 12/14/1992 | **Warrant Recalled/Withdrawn** |
| | WARRANT RECALLED |
| | |
| 06/05/2008 | **Judge/Clerk - Note** |
| | Request for certified copies processed and called Lori Meyer on 6-5-08 |
| | |
| 08/15/2008 | **Judge/Clerk - Note** |
| | Request for certified copies processed and mailed to Robin Howell on 8-15-08 |

Click here to receive MOVANS phone/e-
mail notices of future hearings on this case